# EXHIBIT "F"

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### Case No.:

_____X

DANIEL CAMERON M.D.

Plaintiff

-vs.-

Howard Zucker M.D. in his official capacity as Commissioner of
New York State Department of Health; Keith W. Servis in his official
capacity as Director of Office of Professional Medical Conduct)"OPMC");
Arthur S. Hengerer, M.D., in his official capacity as Chair of the BPMC
for Professional Medical Conduct ("BPMC"); Carmella Torrelli, Vice Chair of the
BPMC for Professional Medical Conduct; Katherine Hawkins, M.D., J.D.,
Executive Secretary of the BPMC; Patrick Sullivan, Investigator, NYS
OPMC; Burt Meyers MD, NYS OPMC medical director;
Kimberly A. O'Brien, administrative law judge; NYS
Department of Health, for antitrust injunction only; NYS Office
or professional Medical Conduct, for antitrust injunction only;
"John Doe" 1-108 and "Jane Doe" 1-108, the last two sets of Defendants
being fictitious names, the parties intended being the members of the
New York BPMC.

Defendants.

_____X

STATE OF NEW YORK      )
                                 )

COUNTY OF WESTCHESTER   )

     DANIEL CAMERON MD, being duly sworn deposes and says:

     1.     I am the Plaintiff in the instant action and as such I am fully familiar with

all the facts and circumstances of this litigation.

     2.     I am a physician dully licensed to practice medicine in the State of New York and

I maintain a medical practice at 657 Main Street, Mount Kisco, NY 10544.  I practice internal

-1-

Medicine. I diagnose treat patients affected by chronic Lyme disease in accordance with the standard of care prescribed by the guidelines of International Lyme and Associated Diseases Society ("ILADS").

2.    I submit this affidavit in support of the relief sought in the Verified Complaint and in support of my instant motion and application for emergency relief in the form of a Temporary Restraining Order and a Preliminary Injunction.

3.    I have read the Verified Complaint and know all the facts therein to be true except for those stated upon information and belief and as to those I believe them to be true. My belief is based upon the documents and information available to me at the time when the Petition was prepared.

4.    I hereby incorporate by reference in this affidavit all the facts stated in the accompanying Verified Complaint.

5.    The Verified Complaint explains that since 1988 I have been providing competitive medical services in the New York endemic area to Lyme disease patients. The services are and were at all the relevant times to this action provided to local, national and international patients who suffer from Lyme disease.

6.    The Verified Complaint also explains that the defendants are seeking to eliminate the competitive medical services offered by me since 1988 to chronic Lyme disease patients.

7.    The defendants are seeking to maintain a bad faith license disciplinary prosecution against me contrary to the prohibitions of the relatively new statute Public Health Law Sec. 230-9b. The bad faith prosecution is being instituted simply because I offer and offered medical services based upon the scientifically approved and sanctioned criteria of the ILADS guidelines

and for no other viable reason.

8.    The bad faith prosecution is also being used by the defendants to eliminate the competitive services which I offer to Lyme disease patients and for the financial benefit of the defendants and of hospital and office based physicians who offer Lyme related services exclusive under the criteria of the guidelines of the Infectious Disease Society of America ("IDSA").

9.    The defendants propose and are imminently about to use the New York license disciplinary process (Exhibit "A" to the Verified Complaint) to further their bad faith prosecution as stated in the complaint and the end goal of putting me out of business.

10.    They filed formal charges against me based upon investigations and reports of investigations which were generated and conducted in 2010 and based upon a post interview fabricated Report of Investigation ("ROI") as discussed below. Both the investigation and the ROI were aimed **EXCLUSIVELY** at my diagnosis and treatment of Lyme disease of patients "A" though "G" mentioned in the charges by methodology stated under the ILADS guidelines, as explained ion the Verified Complaint.

11.    Hearings aimed at eliminating my competitive services based on ILADS guidelines and are sought to be conducted by the defendants in derogation of the prohibitions of PHL Sec. 230-9b. The hearings are noticed by the defendants to commence on June 12, 2017. See Verified Complaint and Exhibit "A" thereto.

12.    Because this action involves a bad faith prosecution in progress as alleged in the Verified Complaint, I am seeking a preliminary injunction and a temporary restraining order staying the administrative proceedings pending a hearing on the merits of my claim for bad faith prosecution and for violation of the antitrust statutes by this Court.

13.     In this affidavit, I will be explaining the substantive basis for the contention that the defendants are seeking to maintain the license prosecution in bad faith and in furtherance of their conspiracy to violate the federal antitrust statutes as alleged in the complaint.

14.     I also explain the difference and competing interests between the two divergent competing physician groups who offer competitive Lyme disease related services to consumers and the public under ILADS and IDSA guidelines.

15.     I will also explain the concerted effort made by the defendants to create a monopoly for their own benefit and that of physicians who offer competitive medical services under the IDSA guidelines, using the bad faith prosecution brought contrary to the prohibitions of New York Public Health Law Sec, 230-9b.

**(a)      The competing interests and divergent views of
        the two distinct groups of physicians who offer
        <u>Lyme disease related services.</u>**

16.     In the Verified Complaint at paragraphs 24-66 I explained the competing interests of the IDSA and ILADS physicians in the patient market which is affected by Lyme disease.

17.     In the same paragraphs, I outlined the divergent approaches and views in the diagnosis and treatment of Lyme disease by the two groups of physicians.

18.     I also explained the overt and open assault launched by the group of physicians who offer IDSA guidelines services on physicians like myself who offer competing ILADS guidelines based services using license disciplinary proceedings aimed at eliminating and restricting the competition to the IDSA guidelines based services.

-4-

19.    All the allegations in the complaint are incorporated by reference herein and the Court is respectfully directed to the Verified Complaint for a full and true accounting of the statements made forth therein.

**(b)    The defendants are using the license disciplinary process in New York and the bad faith prosecution to facilitate their elimination from the New York markets of competitive medical services offered <u>under ILADS guidelines.</u>**

20.    As set forth in the Verified Complaint, that conduct involves defendants' use of the license disciplinary process to eliminate the competitive medical services which I am providing and have been providing to Lyme disease patients since 1988.

21.    The competitive medical services which have been offered by me to patients "A" though "G" through by ILADS guidelines have been recognized by the New York legislature as legitimate and protected against the administrative prosecution under the prohibitions of PHL Sec. 230-9b which became effective on May 12, 2017.

**(c)    The divergent competing Lyme disease diagnosis <u>and treatment guidelines of ILADS and the IDSA.</u>**

22.    As stated in the Verified Complaint ILADS is a private physician based organization dedicated to the education, diagnosis and treatment of Lyme disease and chronic and persistent Lyme Disease. I have been ILADS president twice in the past

23.    I am one of the authors of the ILADS guidelines. The guidelines have been updated to meet the scientific standard for acceptance and inclusions into the National Guidelines Clearinghouse ("NGC") of the US Government Department of Health and Human Services,

Agency for Healthcare Research and Quality ("AHRQ").

24.     The   ILADS   guidelines   titled   "Evidence   assessments   and   guideline recommendations  in  Lyme  Disease:  the  clinical  management  of  known  tick  bites,  erythema migrans rashes and persistent disease" are annexed as Exhibit "B" to the complaint and can be found     on     the     National     Guidelines     Clearinghouse     at     the     URL: https://www.guideline.gov/summaries/summary/49320/evidence-assessments-and-guideline-recommendations-in-lyme-disease-the-clinical-management-of-known-tick-bites-erythema-migrans-rashes-and-persistent-disease?q=lyme+disease.

25.     According  to  the  AHRQ's  own  posting  on  its  web  site,  "AHRQ's  National Guideline Clearinghouse is a public resource for summaries of evidence-based clinical practice guidelines".

26.     Effective June 1, 2014, the AHRQ published a revised criterion for the inclusion of scientific medical guidelines in the National Guidelines Clearinghouse ("NGC"). That criteria can be found on the AHRQW/NGC web site at the URL https://www.guideline.gov/help-and-about/summaries/inclusion-criteria.

27.     The inclusion guidelines contain the following highlights:

(i)     The clinical practice guideline must contain systematically developed statements including recommendations intended to optimize patient care and assist physicians and/or other health care practitioners and patients to make decisions about appropriate health care for specific clinical circumstances;

(ii)     The clinical practice guideline was produced under the auspices of a medical specialty association; relevant professional society; public or private organization; government agency at the Federal, State, or local level; or health care organization or plan. A clinical practice guideline developed and issued by an individual(s) not officially sponsored or supported by one of the above types of organizations does not meet the inclusion criteria for NGC;

-6-

(iii)    The clinical practice guideline is based on a systematic review of evidence as demonstrated by documentation of each of the following features in the clinical practice guideline or its supporting documents. This requirement includes some five specific scientific review mandates for acceptance of the guidelines

(iv).    The clinical practice guideline or its supporting documents contain an assessment of the benefits and harms of recommended care and alternative care options.

(v)    The full text guideline is available in English to the public upon request (for free or for a fee). Upon submission of the guideline to NGC, it also must be noted whether the systematic review or other supporting documents are available in English to the public upon request (for free or for a fee).

(vi).    The guideline is the most recent version published. The guideline must have been developed, reviewed, or revised within the past five years, as evidenced by appropriate documentation (e.g., the systematic review or detailed description of methodology)

28.    The ILADS guidelines have been submitted and accepted for inclusion and publication on the NGC database of the AHRQ. The ILADS scientific and medical guidelines are the only guidelines currently existing on the NGC publication.

29.    The IDSA guidelines in the treatment and diagnosis for Lyme disease have been deleted and excluded from the NGC by the AHRQ because the same expired and did not comport with the 2014 inclusion criteria for scientific update.

30.    As discussed in the Verified Complaint, a private divergent group of physicians called Infectious Disease Society of America ("IDSA") prepared its own guidelines regarding protocols for diagnosis and treatment of Lyme disease. The IDSA guidelines adopted as its model the CDC surveillance definition criteria for the diagnosis and treatment of Lyme disease.   The IDSA guidelines are annexed to the Verified Complaint as Exhibit "C""

31.    The IDSA guidelines promulgated in 2006 adopted the CDC surveillance criteria

and definition of Lyme disease while the ILADS guidelines do not.

32.    The CDC specifically states on its web site and in each one of its case definitions for Lyme adopted in 1995, 1996, 2008 and 2011 that its definitions of Lyme which include diagnosis and treatment statements are not intended to be used by clinicians in clinical settings and are NOT appropriate for clinical diagnosis and treatment of Lyme disease because they are to be used for CDC surveillance purposes only. See Exhibit "D" to the Verified Complaint.

33.    The CDC does not seek to restrict the practice of medicine in the field of Lyme disease according to its restrictive surveillance criteria. See Exhibit "D" annexed hereto - CDC Lyme disease surveillance criteria and definitions.

34.    IDSA physicians and physicians who offer medical services exclusively by IDSA guidelines, such as Burt Meyers and members of the New York Board of Professional Medical Conduct, have openly used and misused the license disciplinary process in this state as well as country wide to intimidate, investigate and prosecute physicians such as myself who offer Lyme services pursuant to ILADS guidelines. They are seeking to do the same now.

35.    IDSA physicians contend that the treatment of Lyme by IDSA guidelines is "conventional medicine".

36.    That is simply not the case. Because the ILADS guidelines and medical services offered by physicians who follow them are recognized by US Government scientific standards and published in the NGC and because IDSA guidelines are not included in the NGC database, the IDSA characterization of the practice of medicine by IDSA standards as "conventional" is outdated and nothing short of an unsubstantiated misrepresentation.

37.     As it can be seen from the Verified Complaint IDSA guidelines proponents and follower physicians openly criticize politicians who pass legislative enactments which protect the competitive medical services offered inter alia by ILADS guidelines and encourage the use of the license disciplinary process by professional medical boards to discipline and exclude ILADS guidelines based medical services from relevant markets. See exhibit "E" to the Verified Complaint.  The IDSA followers include members of the BPMC as well as the medical director Burt Meyers.

**(d).     The 2002 investigation.**

38.     The defendants started their effort to stage the instant bad faith prosecution and to eliminate the medical services based on medical criteria which 2004 became the official ILADS guidelines.

39.     On or about February 2002, the defendant Office of Professional Medical Conduct ("OPMC") commenced an investigation into my general practice of medicine in New York under case No. NR-02-11-5936A with focus on the services which I offered to Lyme disease patients.

40.     The 2002 inquiry involved a randomized review of medical records for the purposes of identifying practice of medicine in diagnosing and treating Lyme disease by the subsequently published ILADS guidelines and nothing else.

41.     As set forth in the Verified Complaint, on or about July 1, 2002, I was subjected to an interview pursuant to PHL Sec. 230(10)(a)(iii) regarding my care of the eleven patients then under scrutiny.  That interview involved exclusively issues of diagnosis and treatment of chronic Lyme disease by ILADS guidelines as set forth in the Verified Complaint.

42.     No action was taken by the OPMC with respect to case No. NR-02-11-5936A.

43.     The only activity on investigation NR-02-11-5936A of which I have any record is the request made in July 21, 2003 by my attorney at that time with respect to medical records and correspondence from the OPMC related to the same dated July 14, 2003. There was no activity in case No. NR-02-11-5936A since 2003 onward.

**(e)      The 2010 investigation and statutory interview.**

44.     In 2008 and 2010, after the initial 2004 publication of the ILADS guidelines, without having received any specific complaint and without the issuance of an Order of a comprehensive practice evaluation having been issued as alleged in the Verified Complaint, the defendants recommenced a general inquiry into my general practice of medicine of medicine regarding my diagnosis and treatment of Lyme diseases by requesting the production of some twelve patient records.

45.     There were newly opened cases bearing Nos. CR-08-04-22888-A; CR-08-08-5008-A; CR 10-03-2010-A and CR-10-08-5079. Annexed hereto as Exhibit "1" are sample letters sent to me sent by the defendants and requesting medical records for no stated reasons.

46.     By letter dated August 17, 2010 (Exhibit "2" hereto), the defendants advised me of the scheduling of a statutory interview pursuant to PHL Sec. 230(10)(a)(iii) on September 14, 2010. See Exhibit "2" hereto.

47.     That letter specifically identified the issues which were the subject matter of the investigation for the first time. As it can be seen from the same letter (Exhibit "2" hereto) without exception, the defendants identified the general subject matter of the inquiry with respect to each and every identified patient in general terms as "**diagnosis of Lyme disease, …differential diagnosis and treatment**". The relevant patients and issues under review were: (i) EW - for care

-10-

including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered in July 2008 (EW is Patient "E" in the current SOC);  (ii) MV for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between February 2008 and March 2008 (MV is patient "F" in the current SOC); (iii) EK for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between June 1999 through 2007 (EK is patient "C" in the current SOC); (iv)  DG for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between October 1998 through March 2008 (DG is patient "B" in the current SOC); (v) IH for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between October 1997 through 2004 (IH is patient "D" in the current SOC); (vi) AR for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between June 1999 through 2007 (AR is patient "A" in the current SOC).

48.     Patient RJ (Patient "G" of the SOC) was not named in the August 17, 2010 letter.

49.     I attended the interview of September 14, 2010. At the interview, I was questioned at length by defendant Meyers exclusively about the treatment and diagnosis of Lyme disease and nothing else.

50.     During the interview, it became clear that the medical director Meyers outright rejected the type of medical services offered by me to chronic Lyme disease patients pursuant to ILADS guidelines.

51.     Meyers made gratuitous statements indicating and infusing his bias towards medical services rendered by IDSA guidelines standards. Meyers' disdain for my treatment and diagnosis of Lyme and defendants' staging of the bad faith prosecution which is based on Meyer's

statements made in the ROI (Exhibit "4" hereto) is specifically discussed more in detail below in this affidavit.

52.     The initial statutory interview was not completed on September 14, 2010. By letter dated October 28, 2010 (Exhibit "3" hereto) the defendants notified me that that they will continue the statutory interview pursuant to PHL Sec. 230(10)(a)(iii) on December 13, 2010.

53.     The relevant issues and patients which were the subject matter of the investigation were identical as the ones recited above in connection with the letter of August 2010 (Exhibit "2" hereto). In addition, patient RG (RG is patient "G" in the SOC) was added. The issues identified with respect to patient RG in the October 28, 2010 letter are as follows: "…care including **diagnosis of Lyme disease…differential diagnosis and treatment"** rendered between August 2009 through September 2010.

54.     The letter of October 28, 2010 did not identify any other issues than my diagnosis and treatment of Lyme disease in all patients mentioned in the August letter a swell as patient RG ("G" in the SOC).  I diagnosed and treated patient RG exclusively by methodology recognized by ILADS guidelines and not by IDSA guidelines.

55.     I attended the interview of December 3, 2012.  At the interview, I was questioned at length by defendant Meyers regarding the treatment and diagnosis of Lyme disease exclusively and nothing else. Rather than affording me to answer his questions, Meyer was belligerent, he cut me off and he substituted his own opinions and answers to his own questions which militated in favor of IDSA based guidelines treatments and against and the exclusion of ILADS guidelines based diagnoses and treatments.

56.     Both statutory interviews were plagued by defendant Meyers' infusions of his own

-12-

IDSA standards and biases into the interviewing process and his aggressive questioning based on Meyers' own personal disapproval aimed at my treatment and diagnosis of Lyme pursuant to ILADS guidelines. During both interviews, Meyers did not afford me a chance to properly recollect the facts pertaining to each individual, himself suggested the answers to the questions and when he disagreed with me he simply inserted his own version and interpretation of the interview in the Report of Interview.

57.     As it can be seen form the memorandum of law in support of my motion for temporary relief, the opportunity to be interviewed by the OPMC is a mandatory statutory pre-requisite to advancing the bad faith prosecution into the actual charges and hearing stages.

58.     As it can be further seen from the accompanying memorandum of law, the disclosure of the subject matter of the investigation is also a mandatory statutory pre-requisite step to the advancement of any case towards administrative prosecutions and hearings.

59.     As it can further be seen from the accompanying memorandum of law, a statement of charges, such as Exhibit "A" to the Verified Complaint, which makes allegations which are beyond the subject matter identified in the pre-interview letter and discussed at the interview is evidence of bad faith prosecution for all the reasons set forth therein. This issue is further discussed below in this affidavit.

60.     Without exception, the statutory letters of August 17, 2010 and October 28, 2010 specifically identified the focus of defendants' interview and investigative process as targeting my diagnoses and treatment of Lyme in each and every one of the identified patients. See exhibits "2" and "3" hereto.

61.     Without exception, the diagnosis and treatment of Lyme in each one of the

-13-

identified patients ("A" through "G" in the SOC), who are now the subject matter of the instant prosecution were rendered by me in accordance with ILADS and not IDSA guidelines as explained in the Verified Complaint.

63. Couching the current SOC (Exhibit "A" to the complaint) in terms other than the treatment and diagnosis and Lyme disease by ILADS standards, as admitted and identified by the defendants in the initiating letters (Exhibits "2" and "3" hereto)  does not vitiate the fact that by defendants' own admissions the only issues identified by the defendants with respect to all of the patients in the SOC(pertain to the treatment and diagnosis of Lyme disease offered and rendered by me and no other identified issue.

64. Consequently, the instant prosecution is aimed at the elimination of ILADS based medical services rendered to Lyme disease patients and is maintained in bad faith in violation of the prohibitions of PHL Sec. 230-9b as alleged in the Verified Complaint and in the accompanying memorandum of law.

**(f).   The Report of Investigation.**

65. As it can be seen from the Verified Complaint and form the memorandum of law in support of the motion for interim relief, under the relevant provisions of New York law, after the completion of the interview the defendants must provide me with a Report of Investigation ("ROI") which identifies all issues fleshed out during the interview.

66. The defendants also must give me an opportunity to respond to such issues.

67. Under cover letter date January 12, 2011, the defendants issued the ROI and sent the same to me. See exhibit "4" hereto.

68. As it can be seen from the ROI, and as specifically discussed below, the

-14-

document is replete with defendant Meyer's infusions of his own bias and statements in such a fashion as to facilitate the bad faith prosecution for my rendering competitive medical service pursuant to ILADS guidelines

69.     By letter dated February 23, 2011 (Exhibit "5" hereto), through my attorney I provided corrective information to the allegations of the ROI. Upon information and belief, contrary to the mandatory provision of New York law and as stated in the Verified Complaint, my corrections to the ROI and the additional information provided were not presented to the Committee of the BPMC which voted to prosecute me based upon the ROI allegations.

70.     As set forth in the Verified Complaint, the concurrence of the BPMC committee was staged, tainted and obtained in furtherance of the staging of the bad faith prosecution and of the conspiracy to violate the Sherman Antitrust Act. It was obtained before the effective date of PHL 230-9b which specifically prohibits such prosecutions from taking place.

71.     Specific facts regarding the fabrication and tainting of the ROI are set forth below.

**(i).     Facts pertaining to the interview and the ROI statements
        related to patient MV (Patient "F" in the SOC).**

72.     The ROI (Exhibit "4" hereto) reports at pp 2-3 that the interview pertains to my care of patient MV for one month between February 2008 and March 2008.

73.     The substance of the ROI with respect to this patient contains the most telling note that the defendants are aiming to violate the Sherman Antitrust Act as alleged in the Verified Complaint and to exclude competitive Lyme disease medical services offered pursuant to the ILADS guidelines.

74.     The ROI specifically states at page "3" as follows: **"Meyers noted that the CDC**

-15-

**guidelines stated that more than one month of therapy has not proven to be effective"**. This statement signals a dual violation of my rights safeguarded by New York Law in furtherance of the staging of the bad faith prosecution as set forth in the Verified Complaint.

75.     For starters, as set forth in the memorandum of law and in the Verified Complaint and the memorandum of law, the statutory interview is not an opportunity for the defendants to offer and include in the ROI the medical director's own views and IDSA taint and biases regarding the treatment of Lyme disease.

76.     Moreover, the view that antibiotic treatment of Lyme disease beyond one month duration is ineffective the strict view urged by the IDSA physician group to the exclusion of the ILADS treatments emphasizing long term antibiotics. See exhibits "B" through "E" of the Verified Complaint.

77.     As set forth in the Verified Complaint, prosecutions based upon diagnoses and treatments of Lyme based inter alia upon ILADS guidelines are prohibited in this state by PHL Sec. 230-9b.

78.     Moreover, contrary to the Meyers statement infused in the ROI for the purposes of facilitating the bad faith prosecution, CDC "guidelines" do not exist at all. What does exist are the IDSA guidelines which are predicated upon the CDC surveillance criteria. It is the IDSA guidelines which disapprove of long term antibiotic treatment and not the CDC "guidelines".

79.     Meyers is a proponent and supporter of the IDSA treatment and of the exclusion of ILADS based treatments and diagnostic modalities.

80.     The bad faith prosecution predicated upon Meyers' infused bias is not supported by any CDC "guideline at all. The CDC specifically states that it surveillance criteria is not

appropriate for the clinical diagnosis and treatment of Lyme. See exhibit "D" annexed to the Verified Complaint. The CDC specifically states so in its own documents.

81.     As it can be seen from Exhibits "C" and "E" to the Verified Complaint, the view that **"more than one month of [of antibiotic] therapy has not proven to be effective"** is exclusively that of the IDSA physicians and guidelines and not that of the ILADS physicians and guidelines (see exhibit "B" to the Verified Complaint).

82.     To the contrary, the ILADS scientific guidelines (Exhibit "B" to the Verified Complaint) do recognize the efficacy of long term antibiotics and of the condition of chronic and persistent Lyme disease.

83.     The IDSA excludes that view in its totality and nothing short than license prosecution is recommended by IDSA supporters for those who do not agree with their views. See exhibits "C" and "D" to the Verified Complaint.

83.     New York does not have any regulations which adopted the CDC surveillance criteria regarding Lyme disease as the guidelines for the diagnosis and treatment of such disease in this state.

84.     To the contrary, as set forth in the Verified Complaint, defendants' stated position in the ROI has been rejected in New York by the legislature. My prosecution which is predicated upon defendants' stated premises in the ROI is specifically prohibited by PHL Sec. 230-9b.

85.     Moreover, Meyers's further comments contained in the ROI demonstrate that the defendants acted and are acting in furtherance of their conspiracy to violate the Sherman Antitrust Act as set forth in the Verified Complaint.

86.     In this case, the defendants purposefully appointed Meyers, an infectious disease

-17-

physician who practices medicine by IDSA guidelines only, for the purposes of generating the ROI infused with Meyers' own IDSA guidelines and treatments supporting comments, which in turn was used by the defendants to spin off and stage the bad faith prosecution as alleged in the Verified Complaint.

87.    The ROI clearly reflects at p. 3 (Exhibit "5" hereto) that my diagnosis of Lyme of patient MV (Patient "F" of the SOC) was based on clinical manifestation of joint and back pain, memory loss, fatigue, disturbed sleep muscle pain etc.

88.    Past medical records which were faxed over to me by the medical records department of Hudson River Community health clearly reflect this patient's persistent "severe joint pain", "back pain", "abdominal pain" and elevated ESR (Erythrocyte Sedimentation Rates).

89.    Elevated ESR is significant in people with Lyme disease as it is a test that physicians perform to measure inflammation of the body. The diagnosis of Lyme disease by the above reference criteria and symptomatology is in conformance with ILADS criteria.

90.    Defendants' staged license prosecution based upon the rejection of competitive medical services based ILADS criteria as evidenced by the ROI is prohibited in New York by PHL Sec. 230-9b.

91.    The ROI further indicates that Meyers reported that he accused me that the records of patient MV (Patient "F") do not indicate whether I have seen the prior medical records for the patient while treating MV.

92.    The ROI deliberately fails to report that I answered that question in the affirmative and that the medical record itself which the defendants and Meyer had in their possession at the time when the ROI was written, specifically indicates that the past medical records of this patient

-18-

were sent and reviewed by me on 2/19/2008. This deliberate omission indicates defendants' staging of the bad faith prosecution based upon defendants' deliberate spin and distortion of Plaintiff's interview responses.

(ii).    **Facts pertaining to the interview and the ROI**
**related to patient AR (Patient "A" in the SOC).**

93.    The relevant part of the ROI relating to the interview regarding patient AR is found at pp. 5-6. See Exhibit "5" annexed hereto.

94.    At page 5 and onto page 6 of the ROI (Exhibit "5" hereto) Meyers narratively and selectively describes treatment which patient AR received in 1997 and 1998 without documenting the questions addressed to me or answers regarding the same. As it can be seen from the memorandum of law, staging the ROI with Meyers' infusions and recitations for the purposes of staging the bad faith prosecution, violates New York law.

95.    My ex counsel's letter of February 23, 2011 (Exhibit "5" hereto) issued pursuant to the provisions of New York statutory law takes aim at inaccuracies in the ROI regarding this patient.

96.     No corrections were made to the ROI in accordance with mu counsel's letter. Upon information and belief, the corrective information propounded by my counsel was purposely omitted form the submissions given to the Committee of the BPMC.

(iii).    **Facts pertaining to the interview and ROI related to**
**patient D.G (Patient "B" in the SOC).**

97.    The two OPMC letters (Exhibits "2" and "3" hereto) identified the scope of the inquiry regarding this patient's medical care by me and specifically her diagnosis and treatment of Lyme disease from 1998 through 2008.

98.     The ROI (Exhibit "5" hereto) falsely reports that I stated that there is "no sign of the disease". If there was no sign of the disease then there would have been no reason to treat this patient for persistent and chronic Lyme disease. Form the face of the medical records which were examined by the defendants and specifically by Defendant Meyers, Meyers' statement infused in the ROI is patently and knowingly false and was made for the purposes of staging the bad faith prosecution.

99.     A diagnosis of the Lyme disease was made in the records and meticulous notes stating the same appear on the face of the medical record. There is no notation in the medical records that there is "no sign of the disease" and no such statement was ever made by me to Meyers.

100.    As is the case with the other patients, Meyers goes on with a biased and selective review and recitation of the medical records identifying specific medication and diarrhea as the main theme of this patient's treatment. Meyers does not afford me an opportunity to discuss the reason and selection of the medication, nor does Meyers afford me an opportunity to respond to the recurring interview theme of diarrhea. He just unilaterally narrated an issue which was not discussed with me during the statutory interview. See exhibit "5" hereto.

101.    With respect to Meyers' questions as to the "numbness of right arm and hand on occasion", Meyers flagrantly infused his own bias into the report by rejecting my diagnosis of Lyme disease and substituting Meyers' own impression of "multiple sclerosis". This comment and diagnosis was made by Meyers without having even seen the patient and was made in furtherance of the staging of the bad faith prosecution as articulated in the Verified Complaint.

-20-

**(iv)**   **Facts pertaining to the interview and ROI**
**related to patient IH (Patient "D" in the SOC).**

102.   Patient IH ("D" in the SOC) is discussed at pp. 7-8 of the ROI (exhibit "5" hereto).

103.   As it can be seen form the ROI and from the initiating letters (exhibits "2" and "3") like the prior patients the defendants proposed to discuss my diagnosis and treatment of Lyme disease regarding this patient between 1997 and 2004.

104.   The ROI reports Meyers' own narrative of the medical records without an opportunity being offered to me to explain such comments as mandated by New York law as set forth in the memorandum of law.

105.   Specifically, Meyers narrates that I documented neurological symptoms, joint pains and muscle aches but did not perform either a neurological examination of the joint muscles and extremities on 10/10/97. Meyers did not offer me any opportunity to respond to these comments during the interview.

101.   The ROI again narratively states that "Meyers asked if there were any signs of the disease and Cameron said no". This statement in patently false. In addition, the ROI is supposed to give me notice of the issues identified after the interview so as to enable me to respond further to such issues. The foregoing statement does not comport with the statutory notice mandates. Specifically, it fails to identify which signs of what disease Meyers is talking about and what it is that Meyers contends that I answered "No" to.

103.   The staging of the bad faith prosecution included the acceptance of the face value of Meyers' ROI comments without affording me notice of the specific issued identified in the post interview period and an opportunity to respond to the same.

-21-

104.    To the extent that Meyers contends that I said there are no signs of Lyme disease on 10/10/97, that is a knowingly false statement made in derogation of the content of the face of the medical records themselves.

105.    The existence and presence of Lyme disease in his patient is prevalent throughout the medical records which were purportedly reviewed by Meyers and by the defendants themselves.

106.    Meyers goes on at page 8 of the ROI to narrate that there were "no signs of the disease" on physical examination on 11/4/97 (carrying over from the previous page).

107.    This narration and comment infused by Meyers into the ROI demonstrates the tainted nature of the report and investigation in the staging of the bad faith prosecution.

108.    Specifically, this patient was never seen or examined by Meyers. Meyers made no physical observations regarding this patient's conditions and was unable to state that the patient presented with "no signs of the disease" on physical examination on 11/4/97.

109.    Nonetheless, in their quest to stage the bad faith prosecution and to barring me from offering competitive Lyme related medical services to patients in New York, the BPMC Committee took these comments for face value and facilitated my prosecution in derogation of PHL 230-9b.

110.    The SOC contains an allegation at page 6 paragraph "6" that the medical case rendered to this patient and the treatment rendered was not "accurately reflected" in the medical records. That is evidence of defendants' perpetuation of Meyers' staging of the bad faith prosecution through gratuitous statements infused in the ROI.

111.    In addition, Meyers' comment contained in the ROI  fails to identify which signs

of what disease Meyers is talking about and what it is that Meyers contends that the signs of the unidentified disease should be.

112.    Most importantly, Meyers does not report any question having been asked of me regarding my knowledge of the specific symptoms of the unidentified disease. Nor does Meyers identify any answer given by me with respect to such question.

113.    The remainder of the ROI regarding patient IH (Patient "D" in the SOC) is equally deficient in its statutory recitations as it expresses Meyers' apparent views on the medical records rather than reciting the opportunity given to me to address such recitations during the interview.

114.    The report states that Meyers stated and "Cameron concurred" that the treatment given by Cameron to the patient were for "symptoms without signs of disease". This statement does not state which symptoms were treated, which disease is referenced and what Meyers thinks that the "signs" of the unidentified disease should be and how Cameron got it wrong.

115.    In addition, the foregoing representation set forth in the ROI is patently false and made in furtherance of the staging of the bad faith prosecution.

116.    I have never concurred with Meyers on any issues regarding his rendition of the version of the ROI let alone his version of how patient IH was diagnosed or treated.

(v).    **Facts pertaining to the interview and ROI
related to patient EW (Patient "E" in the SOC).**

117.    The OPMC restricted the investigation of patient EW to the month of July 2008 after aimlessly having requested her medical record without any disclosed basis or purpose. The stated issues identified in the initiating letters (Exhibits "2" and "3") are limited to my diagnosis

and treatment of Lyme disease with respect to this patient.

118.    The ROI (Exhibit "5" hereto) does not recite any specific issues or facts stating any professional misconduct perpetrated by me in the diagnosis and treatment of Lyme disease in patient EW.

119.    Nonetheless, that did not stop the Committee of the BPMC from approving my prosecution and the defendants from fabricating at pp. 6-7 of the SOC charges which have no relevancy to the issues identified in the initiating letters or appearing in the ROI.

120.    As stated in the Verified Complaint and in the memorandum of law, in addition from being prohibited by the provisions of PHL Sec. 230-b from prosecuting me for diagnosis and treating any patient for Lyme disease by ILADS standards, the New York statutory provisions prohibit the defendants form maintaining any prosecution without offing me the statutory interview and without identifying post interview issues related to specific patient.

(vi)    **Facts pertaining to the interview and ROI related to patient RJ (Patient "G" in the SOC).**

122.    In the October initiating letter (Exhibits "3 hereto) the defendants identify the specific issues to be discussed at the statutory interview as my diagnosis and treatment Lyme disease regarding patient "G" during August 2009 through September 2010.

123.    Meyers devotes some three full pages in the ROI (Exhibit "5") to this patient starting at the bottom of page 8 and ending at page 11. The short period of eleven months of care given to this patient between August 2009 and September 2010 somehow commended Meyers' comments for some three pages (Exhibit "5" hereto).

124.    It is impossible to discern the post interview issues identified in the ROI from the

prolix description of the ROI pertaining to this patient.

125.    One thing that is quite possible however is to identify in the ROI Meyers' personal disdain for my use of long term antibiotics and combination antibiotics in the treatment of Lyme disease and co infections pursuant to ILADS standards as related to this patient.

126.    As discussed in the Verified Complaint and accompanying memorandum of law, no legal grounds exist for prosecution under New York law for the use of long term antibiotics in the treatment of Lyme disease or for the diagnosis of Lyme Disease symptomatically or in the presence of sero negative tests under ILADS standards. Such prosecution is specifically prohibited by PHL Sec. 230-9b.

### (vii)    Facts pertaining to  the interview and ROI related to patient EK (Patient "C" in the SOC).

127.    The initiating letters (Exhibits "2" and "3" hereto) identified the issues to be discussed at the statutory interview as my diagnosis and treatment of Lyme disease in this patient during a specified period between 1999 and 2007. Patient EK is discussed at pp. 11-12 of the ROI. (Exhibit "5" hereto).

128.    The last full paragraph on the ROI indicates that Meyers is purporting to report about questions and conversation had between him and the me during the interview with respect to treatment rendered to this patient on 4/15/08 and 07/18/08. Both initiating letters identified the period applicable to this patient to be June 1999 through 2007.

129.    Consequently, any questions regarding this patient asked at the interview beyond the period identified in the initiating letters (4/15/08 and 07/18/08) cannot form the basis for any prosecution for the reasons articulated in the accompanying memorandum of law.

130.    Moreover, the SOC (Exhibit "A" to the complaint) identifies periods of treatment between 1995 through 2009.

131.    No statutory interview to discuss my treatment of patient EK was offered to me for the period of 1995 through 1999. As set forth in the memorandum of law, the offering of a pre-charging interview to discuss the issues related to a particular patient is a condition precedent to bringing such charges against me. The fact that the SOC contains charges for a period of time which was never identified in the initiating letter nor discussed in the ROI is evidence of the staging of the bad faith prosecution.

132.    In addition, once again Meyers falsely mentions with respect to the treatment of 4/15/08 that Cameron "confirmed that.... [the patient] had no sign of the disease.". This comment was never made by me and the medical records pertaining to this patient which Meyers reviewed, do not reflect that I notated anywhere "no sign of the disease"

133.    In short, the statutory interview process was used by the defendants to fabricate the ROI which in turn was used to facilitate the bad faith prosecution as alleged in the Verified Complaint.

**(f)     The allegations contained in the Statement of Charges
evidence the bad faith prosecution sought to be conducted
by the defendants in this matter.**

134.    In an apparent effort to create the impression that they are not staging a bad faith prosecution in violation of the prohibitions of PHL Sec. 230-b the defendants went through

significant efforts to disguise the allegations of the Statement of Charges into something other than what the admitted issues of their investigation, the statutory interview and the ROI state.

135.    As discussed above, the initiating letters (Exhibits "2" and "3" hereto), the ROI and the statutory interviews were focused on and specifically identified my diagnoses and treatment of Lyme disease in patients "A" through "G" which was rendered and offered pursuant to ILADS guidelines and not pursuant to IDSA guidelines.

136.    Since the completion of the interviews of 9/14/10 and 12/13/10 (Exhibits "2" and "3"), since the completion and forwarding of the ROI on 1/12/11 (Exhibit "4") all of which focused on my competitive medical services rendered to patients "A" through "G" by ILADS standards, PHL 230-9b became effective on March 12, 2015.

137.    That statute prohibits the prosecution of physicians such as myself based upon issues which are related exclusively to the treatment and diagnosis of Lyme disease by "nonconventional" approaches, which according to the defendants include the ILADS standards.

138.    Upon information and belief, as stated in the Verified Complaint, the statutory consensus of the Committee of the BPMC was secured before December 11, 2011 which was the first time when the defendants announced that they will file charges against me. No additional Committee consensus to prosecution was obtained by the defendants after the March 12, 2015 effective date of the prohibitions of PHL 230-9b.

139.    Consequently, the defendants continued their bad faith prosecution through the masquerading and couching of the Statement of Charges in languages which attempt to bypass the prohibitions of PHL Sec. 230-9b against the current prosecution.

140.    To the extent that the defendants contend that their statement of charges (Exhibit

"A" to the verified Complaint) seeks to prosecute me for issues other than my diagnosis and treatment of Lyme disease, those contentions are simply incorrect by defendants' own statements and admissions contained in exhibits "2", "3" and "4" attached hereto.

141.    As it can be seen from the memorandum of law, masquerading and disguising the SOC with language designed to bypass the prohibitions of PHL 230-9b does not make the present prosecution any less illegal and does not take the "bad faith" character out of this prosecution.

142.    The entire pre-hearing administrative process including the investigation, the ROI and the consensus reached by the Committee of the BPMC to prosecute me is based exclusively upon issues related to my diagnosis and treatment of Lyme disease in patients "A" through "G" pursuant to ILADS guidelines. See exhibits "2", "3" and "4" annexed hereto.

143.    As set forth in the accompanying memorandum of law, the defendants' pursuit of the instant prosecution based on the charges levied in the SOC is in bad faith because is brought in contravention of pre-charging mandates of New York statutory provisions.

144.    In addition, the charges regarding all the patients have the recurring and common theme of the use of long term combination antibiotics for the treatment of Lyme disease, an ILADS approach and treatment which is rejected by the defendants and IDSA physicians alike and sought to be eliminated from the menu of competitive medical services offered in New York.

145.    The additional issues set forth in the Statement of Charges were not identified in either one of the initiating letter (Exhibits "2" and "3") and were not discussed during the statutory interview as a pre-requisite to the filing of the charges. As it can be seen from the memorandum of law this is further evidence of defendants' bad faith prosecution.

## **CONCLUSION**

146.    For all the foregoing reasons, for all the reasons articulated in the Verified Complaint, in the motion seeking a temporary restraining order and a preliminary injunction and in the memorandum of law in support thereof, the relief sough in the Verified Complaint and in the motion, should be granted in its entirety.

_____
DANIEL CAMERON MD

Sworn to before me
this ____ day of May 2017

_____
Notary Public, State of New York

-29-

## **CONCLUSION**

146.    For all the foregoing reasons, for all the reasons articulated in the Verified
Complaint, in the motion seeking a temporary restraining order and a preliminary injunction and
in the memorandum of law in support thereof, the relief sough in the Verified Complaint and in
the motion, should be granted in its entirety.

_____

DANIEL CAMERON MD

Sworn to before me
this ___ day of May 2017

_____
Notary Public, State of New York

AMY GREEN
Notary Public - State of New York
NO. 01GR6323610
Qualified in Westchester County
My Commission Expires Apr 20, 2019

-29-

# EXHIBIT "1"

 **STATE OF NEW YORK**
**DEPARTMENT OF HEALTH**

433 River Street, Suite 303          Troy, New York 12180-2299

Richard F. Daines, MD                                    Wendy E. Saunders
Commissioner of Health                                   Chief of Staff

September 3, 2008

CERTIFIED MAIL – RETURN RECEIPT REQUESTED
Daniel Cameron, MD
175 Main Street
Mount Kisco, NY 10549

RE: OPMC #CR-08-08-5008-A

Dear Dr. Cameron:

Pursuant to authority granted to the office of Professional Medical Conduct under Section 230-10(l) of the New York State Public Health Law (see attached), I hereby request a copy of the complete medical record of P█████ █████████████████

HIPAA regulations, 45 C.F.R. Part 164.512 (see attached) authorizes disclosure, without patient consent, to a public health authority that is authorized by law to conduct public health investigations.

**The requested record should include copies of any and all x-ray films and reports, laboratory tests, medication sheets and all other documents in the patient file. Any written explanation of the record may accompany the file but cannot be accepted in lieu of it.**

**NEW YORK STATE EDUCATION LAW, SECTION 6530-28, REQUIRES A RESPONSE WITHIN 30 DAYS OF RECEIPT OF THIS REQUEST. FAILURE TO COMPLY WITH THIS REQUEST MAY BE CONSIDERED MISCONDUCT.**

I have enclosed a **Certification Form** to be completed and returned with the requested records. Please address your response to my attention at: The Office of Professional Medical Conduct, Suite 303 433 River Street Troy, New York 12180. If you have any questions pertaining to this request, I can be reached at (518) 402-0820.

Sincerely,

*Patrick Sullivan*
Patrick Sullivan
Medical Conduct Investigator
Office of Professional Medical Conduct

Enclosures
cc: William Wood, Esq.



# STATE OF NEW YORK
## DEPARTMENT OF HEALTH

433 River Street, Suite 303                    Troy, New York 12180-2299

Richard F. Daines, MD
Commissioner of Health
Staff

Wendy E. Saunders
Chief of

September 14, 2010

Daniel Cameron, MD
175 Main Street
Mount Kisco, NY  10549

Dear Dr. Cameron:                    RE: OPMC #CR-10-08-5079-A

     Pursuant to authority granted to the office of Professional Medical Conduct under Section 230-10(l) of the New York State Public Health Law (see attached), I hereby request a copy of the complete medical record of R█████████████████

     HIPAA regulations, 45 C.F.R. Part 164.512 (see attached) authorizes disclosure, without patient consent, to a public health authority that is authorized by law to conduct public health investigations.

     **The requested record should include copies of any and all x-ray films and reports, laboratory tests, medication sheets and all other documents in the patient file.  Any written explanation of the record may accompany the file but cannot be accepted in lieu of it.**

     **NEW YORK STATE EDUCATION LAW, SECTION 6530-28, REQUIRES A RESPONSE WITHIN 30 DAYS OF RECEIPT OF THIS REQUEST.  FAILURE TO COMPLY WITH THIS REQUEST MAY BE CONSIDERED MISCONDUCT.**

     I have enclosed a **Certification Form** to be completed and returned with the requested records.  Please address your response to my attention at: The Office of Professional Medical Conduct, Suite 303 433 River Street Troy, New York 12180. If you have any questions pertaining to this request, I can be reached at (518) 402-0820.

RECEIVED
JUL 0  2010
BY:--------------------

Sincerely,

*Patrick Sullivan*

Patrick Sullivan
Medical Conduct Investigator
Office of Professional Medical Conduct

Enclosures

# EXHIBIT "2"

 STATE OF NEW YORK
DEPARTMENT OF HEALTH

433 River Street, Suite 303          Troy, New York 12180-2299

Richard F. Daines, M.D.
Commissioner                                      James W. Clyne, Jr.
                                                  Executive Deputy Commissioner

                                                  August 17, 2010    

CERTIFIED MAIL- RETURN RECEIPT REQUESTED
PERSONAL AND CONFIDENTIAL
Daniel Cameron, MD                                 BY: -------------------
657 Main Street
Mount Kisco, NY 10549

                              RE:  OPMC # CR-08-04-2288-A
                                            CR-08-08-5008-A
                                            CR-10-03-2010-A
Dear Dr. Cameron:

   This will confirm that an interview has been scheduled with you on Tuesday, September 14, 2010, at 9:30AM. As discussed with your attorney, and it was agreed, this interview will be conducted in person at the Office of Professional Medical Conduct, 90 Church Street, 4th Floor, New York, NY, 10007.

   Public Health Law Section 230(10)(a)(iii) provides that in all matters referred to an investigation committee of the Board for Professional Medical Conduct, the licensee shall have an opportunity to be interviewed by the Office in order to provide an explanation of the issues under investigation and to submit written comments or expert opinions to the Office. You may have legal counsel present during this interview

The issues under investigation involve:
1) The care you rendered to Eileen Warmbrand. Specifically, the appropriateness of the care and treatment you rendered to Ms. Warmbrand in July 2008 for Lyme disease and complaints of neck pain.
2) The care you rendered to Maria Vele. Specifically, the appropriateness of the care you rendered to Ms. Vele for the period February 2008 through March 2008 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.
3) The care you rendered to Phyllis Finkelstein. Specifically, the appropriateness of the care you rendered to Ms. Finkelstein for the period August 2006 through October 2006 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.
4) The care you rendered to Claude D'Esterno. Specifically, the appropriateness of the care you rendered to Mr. D'Esterno for the period July 1999 through 2001 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

Dr. Cameron, cont'd...
Page 2
08/17/10

5)  The care you rendered to Elliot Krowe. Specifically, the appropriateness of the care you rendered to Mr. Krowe for the period June 1999 through 2007 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

6)  The care you rendered to Donna Grace. Specifically, the appropriateness of the care you rendered to Ms. Grace for the period October 1998 through March 2008 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

7)  The care you rendered to Sarah Bangs. Specifically, the appropriateness of the care you rendered to Ms. Bangs for the period June 1998 through 2006 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

8)  The care you rendered to Ivona Hammer. Specifically, the appropriateness of the care you rendered to Ms. Hammer for the period October 1997 through 2004 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

9)  The care you rendered to Annie Raso.  Specifically, the appropriateness of the care you rendered to Ms. Raso for the period January 1997 through February 2004 including but not limited to diagnosis of Lyme disease, your differential diagnosis and treatment of Lyme disease and complaints of pain and prescribing practices.


Your failure to appear for this scheduled interview will be considered a declination of this opportunity and this Office will proceed with the investigation without your input.


                                        Sincerely,

                                        Patrick Sullivan

                                        Patrick Sullivan
                                        Medical Conduct Investigator
                                        Office of Professional Medical Conduct

cc: William Wood, Esq.

# EXHIBIT "3"

 **STATE OF NEW YORK**
**DEPARTMENT OF HEALTH**

433 River Street,  Suite 303          Troy, New York 12180-2299

Richard F. Daines, M.D.                          James W. Clyne, Jr.
*Commissioner*                                   *Executive Deputy Commissioner*

October 28, 2010

**CERTIFIED MAIL- RETURN RECEIPT REQUESTED**
**PERSONAL AND CONFIDENTIAL**
Daniel Cameron, MD
657 Main Street
Mount Kisco, NY  10549

RE:  OPMC # CR-08-04-2288-A
CR-08-08-5008-A
CR-10-03-2010-A
CR-10-08-5079-A

Dear Dr. Cameron:

This will confirm that an interview has been scheduled with you on Monday, December 13, 2010, at 11:00AM.  As discussed with your attorney, and it was agreed, this interview will be conducted in person at the Office of Professional Medical Conduct, 90 Church Street, 4th Floor, New York, NY, 10007.

Public Health Law Section 230(10)(a)(iii) provides that in all matters referred to an investigation committee of the Board for Professional Medical Conduct, the licensee shall have an opportunity to be interviewed by the Office in order to provide an explanation of the issues under investigation and to submit written comments or expert opinions to the Office.  You may have legal counsel present during this interview

The issues under investigation involve:
1)  The care you rendered to Eileen Warmbrand. Specifically, the appropriateness of the care and treatment you rendered to Ms. Warmbrand in July 2008 for Lyme disease and complaints of neck pain.
2)  The care you rendered to Maria Vele.  Specifically, the appropriateness of the care you rendered to Ms. Vele for the period February 2008 through March 2008 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.
3)  The care you rendered to Phyllis Finkelstein. Specifically, the appropriateness of the care you rendered to Ms. Finkelstein for the period August 2006 through October 2006 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.
4)  The care you rendered to Claude D'Esterno. Specifically, the appropriateness of the care you rendered to Mr. D'Esterno for the period July 1999 through 2001 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

Dr. Cameron, cont'd...
Page 2
10/27/10

5) The care you rendered to Elliot Krowe. Specifically, the appropriateness of the care you rendered to Mr. Krowe for the period June 1999 through 2007 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

6) The care you rendered to Donna Grace. Specifically, the appropriateness of the care you rendered to Ms. Grace for the period October 1998 through March 2008 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

7) The care you rendered to Sarah Bangs. Specifically, the appropriateness of the care you rendered to Ms. Bangs for the period June 1998 through 2006 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

8) The care you rendered to Ivona Hammer. Specifically, the appropriateness of the care you rendered to Ms. Hammer for the period October 1997 through 2004 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

9) The care you rendered to Annie Raso. Specifically, the appropriateness of the care you rendered to Ms. Raso for the period January 1997 through February 2004 including but not limited to diagnosis of Lyme disease, your differential diagnosis and treatment of Lyme disease and complaints of pain and prescribing practices.

10) The care you rendered to Reid Jagger. Specifically, the appropriateness of the care you rendered to Mr. Jagger for the period August 2009 through September 2010 including but not limited to the diagnosis of Lyme disease, your differential diagnosis and treatment.

Your failure to appear for this scheduled interview will be considered a declination of this opportunity and this Office will proceed with the investigation without your input.

Sincerely,

Patrick Sullivan
Medical Conduct Investigator
Office of Professional Medical Conduct

cc: William L. Wood, Esq.

RECEIVED NOV 0 1 2010

# EXHIBIT "4"

 **STATE OF NEW YORK**
**DEPARTMENT OF HEALTH**

433 River Street, Suite 303

Troy, New York 12180-2299

Richard F. Daines, MD
*Commissioner*
*Commissioner*

Wendy E. Saunders
*Executive Deputy*

January 12, 2011

**CERTIFIED MAIL- RETURN RECEIPT REQUESTED**
**PERSONAL AND CONFIDENTIAL**
Daniel Cameron. MD
657 Main Street
Mount Kisco, NY  10549

Re: OPMC#  CR-08-04-2288-A
CR-08-08-5008-A
CR-10-03-2010-A
CR-10-08-5079-A

Dear Dr. Cameron:

As outlined in the Office of Professional Medical Conduct Information for Licensees which was previously provided to you, attached is a report of the interview that was completed with you by December 13, 2010 in person at the Office of Professional Medical Conduct, 90 Church Street, New York, NY.

Please review the report for accuracy. If any discrepancies are noted, you must inform this office in writing as soon as possible. If you have any questions. please contact me at (518) 408-0216.

Sincerely,

*Patrick Sulla*

Patrick Sullivan
Medical Conduct Investigator
Office of Professional Medical Conduct

Enclosure
cc: William L. Wood, Jr. Esq.

## NEW YORK STATE DEPARTMENT OF HEALTH
## OFFICE OF PROFESSIONAL MEDICAL CONDUCT

### REPORT OF INTERVIEW

**SUBJECT:** DANIEL CAMERON, MD
**FILE#:** CR-08-04-2288-A
CR-08-08-5008-A
CR-10-03-2010-A
CR-10-08-5079-A
**INTERVIEW OF:** DANIEL CAMERON, MD
**DATE OF INTERVIEW:** SEPTEMBER 14, 2010 AND DECEMBER 13, 2010
**BY:** MEDICAL COORDINATOR BURT MEYERS, MD
NURSE INVESTIGATOR (NI) PATRICK SULLIVAN

DANIEL CAMERON, MD was interviewed in person at the Office of Professional Medical Conduct (OPMC) at 90 Church Street, New York, NY, on Tuesday, September 14, 2010 beginning at 09:40 AM and ending at 06:15PM, and on Monday, December 13, 2010 beginning at 11:10AM and ending at 3:40PM. On both dates Health Department staff members in attendance were BURT MEYERS, MD and PATRICK SULLIVAN, RN. CAMERON was accompanied by his attorney, WILLIAM WOOD, Jr., Esq.

The OPMC process was reviewed with CAMERON and he was informed that he could provide a written response to the allegations if he wished. CAMERON confirmed that he had received the informational brochure entitled "Information for Licensees" and said that he had no questions. CAMERON's education, training, experience, and professional data were reviewed.

CAMERON confirmed his date of birth-03/12/54, social security number-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, and that he graduated in 1981 with his medical degree from the University of Minnesota Medical School. After graduating from medical school CAMERON completed an internship/residency in Internal Medicine at Beth Israel Medical Center, NY ending in 1985. CAMERON said he also completed one year residency in Preventative Medicine at Mount Sinai Medical Center. CAMERON is currently board certified in Internal Medicine, and is affiliated with Northern Westchester Hospital in Mount Kisco, NY and has an affiliation with non-admitting privileges at Burke Rehabilitation Center, White Plains, NY. CAMERON said his practice is located at 657 Main Street, Mount Kisco, NY. 10549, telephone number (914) 666-4665. CAMERON said employed at the practice are staff members that include a nurse practitioner, two physician assistants, a medical assistant, an office manager and two receptionists. CAMERON provided his home address as 11 Green Lane, Chappaqua, NY, 10514 and home telephone as (914) 238-0661. CAMERON stated that he is solo practice, seeing adolescent and adult patients. While he is a general internist, CAMERON reported that 50-60 percent of the patients are treated for Lyme disease.

CAMERON had with him for the interviews his office records for P


Initially discussed was CAMERON's care and treatment rendered to ▉▉▉▉▉▉▉ for the period August 2006 through October 2006 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. MEYERS noted that on the first visit 8/11/06 a very long note was written by a PA (to be named). MEYERS asked what was the chief complaint and CAMERON said it was "not written because of multiple complaints." Though the Lyme test was negative the impression written was Lyme Disease. MEYERS noted that in the physical examination (PE) there was no pulse or temperature noted, and no examination of the abdomen by the PA. MEYERS asked if CAMERON examined the patient and he did not recall and agreed there was no documentation of a PE. MEYERS asked if he recalled if he discussed care with PA and he did not remember; also he admitted when asked that he did not discuss case with primary care physician (PCP). MEYERS asked "where is your diagnosis?" and CAMERON said it was not written. MEYERS asked if there was any differential diagnosis (DDX) and he stated the PA wrote "headache, migraines and Lyme." CAMERON stated he did not order any tests since the other MD had sent the records. MEYERS asked when he got the records including lab tests and he said he "did not know." MEYERS asked why continue therapy with a negative Lyme test and he responded "a prior physician thought it was Lyme and given clinical results it seemed reasonable to continue." MEYERS asked if ▉▉▉▉▉▉▉ had any signs of diseases and CAMERON said no. On the 9/12/06 visit MEYERS asked if he examined the patient? CAMERON stated "I typically do." MEYERS stated there was no note written. Was there any DDX? CAMERON said no. He claimed it was a "Focus visit." MEYERS asked again why did you continue Ampicillin; he said F▉▉▉▉▉ had a response and had not resolved her illness." Again MEYERS asked were there any signs of disease and CAMERON said "no." MEYERS asked what would be the resolution of the illness? CAMERON wrote headaches infrequent, memory and concentration gain." MEYERS asked what was the word gains based on; MEYERS noted there were no tests of memory or concentration. CAMERON asked the patient "how is your memory, and concentration?" On the October 10th note by the PA he wrote "flare up x 2 weeks of Lyme Disease and continued Amoxicillin x 1 month". There was no physical examination by the PA or CAMERON at this time nor were any lab tests ordered. MEYERS noted the patient complained of "tingling" and CAMERON said this could emerge as an important symptom "not yet ready for neuro consult." MEYERS asked about the diarrhea and he stated F▉▉▉▉▉ was taking probiotics e.g. Acidophilus but this was not documented. MEYERS asked at this time were there any signs of disease or any differential diagnoses and CAMERON's answer was no to both. MEYERS asked why did "you continue therapy in the presence of multiple negative Lyme tests?" CAMERON stated that in his "actual practice" his patients were people who did not meet the CDC criteria, and were not included in clinical trials. MEYERS then asked "in a patient with negative Lyme tests and no signs of disease how did you know these patients had Lyme disease? He said "he made a clinical judgement". CAMERON admitted he "never saw a positive Lyme test, and never spoke to PCP who treated without a positive test." MEYERS remarked "did you feel she had Lyme disease at this time though you never did a test? MEYERS asked CAMERON to look at the lab tests and asked was anything edimentation rate and noted it was a - (normal). CAMERON stated "while it can occur in normal people it is common in Lyme disease."

Next discussed was CAMERON's care and treatment rendered to V▉▉ for the period February 2008 through March 2008 including but not limited to the diagnosis of Lyme disease, differential

2

diagnosis and treatment. V███ was first seen on 2/19/08. There is a note written by the PA. The vital signs did not record a temperature, nor did the physical examination have an abdominal exam and nothing was written about an examination of the joints. The PA did note the patient complained of pain in the back, waist, muscles, abdomen etc. The PA wrote positive diagnosis Lyme Disease three weeks ago. There is no note by CAMERON on that visit and therefore no physical examination documented. MEYERS asked CAMERON if he spoke to VELE's physician DILLARD ELMORE, MD who made a diagnosis of LYME Disease, and he said no. MEYERS asked was there a positive LYME test and CAMERON was not sure. MEYERS asked if CAMERON had a DDX - "none was written." MEYERS and CAMERON noted the ESR was high 50 and CAMERON stated "not typical Lyme." MEYERS asked "how did you arrive at a diagnosis of Lyme Disease? CAMERON stated there was a history of positive test stated by V███ and "could have been a clinical diagnosis." He noted that three weeks prior ELMORE "began therapy for LYME and also gave steroids." MEYERS asked why CAMERON continued Doxcycline for another month? "Lyme was considered as part of the clinical picture; MEYERS pointed out that this therapy would now equal a total of 7 weeks. MEYERS asked what this was based on? CAMERON stated that in his patients that don't meet the requirements for clinical trials, in clinical practice longer therapy has been effective." He admitted "these are not the CDC recommendations." The next visit was on 3/18/08 and the impression was "Lyme Disease" and Doxcycline was ordered for another 3-4 weeks (total 10-11 weeks of therapy). MEYERS asked if there were any other DDX and CAMERON stated the following, "Fibromyalgia. Chronic Fatigue, ALS, MS, Migraine, Sleep Apnea, vasculitis etc, MEYERS pointed out that none of this was written, and that CAMERON admitted he did not do a physical examination. When asked about the lab tests from ELMORE, he stated he did not know when he received them. MEYERS and CAMERON reviewed the tests for Lyme and CAMERON stated these "were not positive Lyme tests," and that is why he did not do the CDC recommendation of a Western Blot (WB) Test when the results were deemed equivocal. MEYERS noted that the record does not indicate if you saw "these tests while caring for the patient." MEYERS noted the ESR was 131, but CAMERON stated the last one was 60 - and there might be other reasons for this elevation. MEYERS noted that CAMERON ordered IV Rocephin. MEYERS asked what is the evidence that this will be effective after 11 weeks of therapy with the antibiotics?" CAMERON said "to give it if clinical presentation persists. CAMERON stated that "chronic neurologic Lyme" discussed in a paper in the New England Journal of Medicine in 1990, had patients with the same clinical picture and that two weeks of IV antibiotic therapy was effective in 2/3 of patients treated," and the majority of these patients had been previously treated. These and other papers subsequently were requested by MEYERS. MEYERS noted that the CDC guidelines stated that more than one month of therapy has not proven to be effective. CAMERON stated "science was a dialogue and "what to do with complicated patients that don't meet the rigid guidelines". MEYERS asked if V███ had any signs of Lyme Disease; CAMERON said none defined by the CDC criteria. MEYERS said what about any criteria for any disease; he suggested "chronic neurologic Lyme Disease." MEYERS asked what criteria from chronic neurologic Lyme Disease did V███ have? CAMERON responded 'fatigue, disturbed sleep, memory loss, sadness, crying, ears ringing, back pain, parenthesis, joint and muscle pain."

Next discussed was CAMERON's care and treatment rendered to B███████ or the period June

1998 through 2006 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. B▇▇▇ first visit was on 6/8/98 for a Lyme evaluation. There is an extensive note by a PA who stated B▇▇▇ was Lyme "sero positive in 1997, with Bull's Eye Rash and reviewed therapy - including oral and IV Rocephin prior to this visit. BANGS was seen at Westchester County Medical Center where a diagnosis of fibromyalgia was made and there are notes of 12 weeks of IV Rocephin (in 2 courses, "after a severe relapse" which is not explained. There are no vital signs and the physical examination by the PA is only of the heart and lungs, and is very sparse. The impression by the PA is Lyme, sero + and headache etc. There is no physical examination by CAMERON, only a note discussing "consider Zithromax, - Bicillin and continue Ceftin (total 4 weeks)." CAMERON was asked if there was any DDX and he said none written, but offered again all the choices stated in the interview of VELE (See above). The next visit was on 6/29/98 and no PE by CAMERON; again diagnosis is sero + Lyme test and Ceftin was ordered for two more weeks. On 9/25/98 there was no physical by either the PA or CAMERON. It was noted there was no sero positive Lyme test found. CAMERON said that the sero positive may have been from prior PCP. MEYERS asked if he spoke to B▇ PCP since there was no record, CAMERON did not respond. On 10/7/98, again no physical exam by PA or CAMERON. Lab tests were ordered including Lyme. Zithromax was ordered for Lyme Disease - MEYERS asked was this chronic Lyme Disease? CAMERON stated he did not use the word chronic, just Lyme disease. CAMERON agreed there was nothing for acute Lyme disease. MEYERS asked were there any signs of disease and CAMERON said none. Of note all the Lyme tests were negative. CAMERON said these Lyme tests may be sero negative due to prior therapy. MEYERS noted, and CAMERON agreed there were no calls to PCP regarding positive Lyme tests and that there were no positive Lyme tests in the record from the prior doctor. On 10/28 the impression again was Lyme, "frequent flare ups." Again there were no physical examinations by either the PA or CAMERON. Bicillin 1.2 million q weekly was ordered and MEYERS asked why? CAMERON stated BANGS failed first line therapy, e.g. oral and then IV and clinical judgment was for Bicillin. CAMERON stated there was data in the literature for I M Bicillin vs. placebo. MEYERS asked if in this study there were prior failures, stated the therapy with Bicillin for 6 months q weekly was in the literature for two cases. MEYERS asked again about any signs of disease in B▇▇ and he said none. From 11/04 to 6/2/09 there were weekly visits for the Bicillin IM shots. On all of these visits there were no physical examinations, and no signs of disease noted. B▇▇▇ was given Zoloft, and the dose was increased. On Sept 9/10/99 Bicillin was restarted at 1.2 million units and increased to 2.4 million q weekly. MEYERS asked why and CAMERON responded clinical judgement. MEYERS asked if there was an DDX and he said none written, but it was the same answer (see above VELE). MEYERS asked if CAMERON considered a psychiatric consult since B▇▇ was not responding to treatment. CAMERON said neuro psychiatric issues were common in "Lyme Disease." On October 7, 1999 CAMERON did not see patient. (No note was written). There was a physical exam by the PA who wrote for lab tests and ordered 2.4 million of Bicillin again q weekly. MEYERS asked why the double dose and CAMERON said he wanted higher tissue levels. MEYERS asked what did he want to get in the tissue and he said "some infection that had not resolved." MEYERS asked what data was there for this statement e.g., were there biopsies, cultures, histological evidence, and were there any signs of disease to warrant therapy and now the higher dose? CAMERON stated there is literature in patients with no signs that have histological and culture evidence: there are strains of the organism that persisted.

4

CAMERON said there was complexity in this delayed treatment, discussed in the literature. From 11/09 till 6/13/00 BANGS is given weekly shots of 2.4 million unit weekly for 1 year. On one of these visits there is a physical exam. On 6/13/00 B[redacted] was switched to oral Ceftin. MEYERS asked why, and CAMERON said this was a complex patient. MEYERS asked if CAMERON considered stopping antibiotics, and he said yes, but continued it anyway. MEYERS asked if there were signs of disease, and CAMERON said "no signs of disease." BANGS was on Ceftin to 6/9/00. On the 11/4/99 visit the patient said "feels like my brain is floating in poison." MEYERS asked about this comment and CAMERON said as a PCP he hears patients make odd statements. MEYERS suggested this sounded like a "psychotic type statement." On 9/8/00 a third sequence of Bicillin was begun; when asked why, CAMERON said "based on personal experience." On 9/24/01 B[redacted] had received three years of Bicillin weekly shots. CAMERON discussed the Klempner study which he "said was not favorable." Years later BANGS was still on Bicillin and was given Ceftin because she went on vacation see note of 7/13/05. Again on 3/1/06 was started on Doxycycline for Lyme infection. MEYERS then stated the patient had five years of therapy with no confirmed Lyme tests.

Next discussed was CAMERON's care and treatment rendered to R[redacted] for the period January 1997 through February 2004 including but not limited to diagnosis of Lyme disease, differential diagnosis and treatment of Lyme disease and complaints of pain and prescribing practices. RASO's first visit was on 1/28/97 with a chief complaint of leg pain. When seen by CAMERON there is a 4 page note which mentions multiple symptoms, including joint pain, and numbness in the feet. MEYERS noted that the examination did not have either a neurological or muscular skeletal exam, noting that the joints were not examined. MEYERS asked why the narcotics and CAMERON said R[redacted] was on these drugs for pain. CAMERON's diagnosis was sero negative Lyme disease (secondary to prior Bactrim therapy); a variety of lab test were ordered. On 2/24/97 R[redacted] was on MS Contin and Ampicillin was ordered, and R[redacted] was given Paxil. Doxycycline was ordered. On April 10th, Rocephin IV was ordered. On 5/15/97 a Lyme PCR was ordered, but the results were not found. On 5/23/97, it was noted RASO was on Xanax, Paxil, and the narcotics. At this time MEYERS noted R[redacted] was on double therapy with Doxycycline and Rocephin, CAMERON said "he was uncomfortable with both". MEYERS asked why did you do it, and he responded "I don't know? In June 1997, R[redacted] was still on the combination of antibiotics. On July 7, Bicillin was begun. On 7/23 /97, R[redacted] was on Morphine, Percocet, Compazine, and Paxil. CAMERON noted RASO's symptoms the last two weeks were much worse "with joint pain in ankles, knees, hips, and muscle pains severe." There was no physical examination. Doxycycline was discontinued and IV Rocephin 2 grams was continued. On 8/8/97 CAMERON noted improvement, and decided to start IM Bicillin. MEYERS asked why and CAMERON stated that R[redacted] had reached therapeutic goals like "better' nervous system, joint pain improved, "but fatigue and joint pain persisted." In October 97 it was noted that R[redacted] was going to pain management clinic. In November 1997 Zithromax was added to the Bicillin. MEYERS asked if there was data for two drug therapy and if two drugs were better than one and CAMERON said the "work of Dr. SAM DONTA." On 3/20/98 double therapy with weekly Bicillin and Zithromax for Lyme was ongoing. CAMERON wrote the Percocet dose though R[redacted] was under the care of the pain management team. On 8/14/98 the note reads "Lyme remains severe, quite sick" and double therapy was continued. MEYERS asked if this severe illness was only by symptoms and CAMERON said yes, and admitted there were no signs of

5

disease. Rocephin continued till 6/24/99 then Bicillin given; again no physical examination at the time. In April, 1999 R████was admitted for detoxification still on Bicillin. In the 8/5/99 note it states Zithromax and Bicillin ordered through March." On 3/25/00 the double therapy will end and Zithromax continued. On 6/23/00 Zithromax continued since R███on vacation 8/15/00 Bicillin ordered again; no physical examination performed. In the 05/24/01 note, it states "off antibiotics for one month." On 11/15/01 IM Bicillin begun again no physical examination performed. Bicillin is continued through Feb/March 03. In April 03 - the note states impression "Lyme Disease." On multiple dates beginning on 12/26/03. On 02/06/04 CAMERON mailed narcotics prescriptions to R███n Florida; he stated RASO had difficulty finding doctors, and he knew the patient and he was skilled in narcotic usage. MEYERS noted these prescriptions were based on phone calls and that CAMERON did not examine RASO. CAMERON admitted he had last seen RASO 11/03. R███was seen on 4/22/04 in the clinic. MEYERS then noted that on 5/26/04 the patient was "white water rafting in Colorado"; Dr. CAMERON mailed /04, and 6/24/04 respectfully. MEYERS asked why and noted there was no discussion of RASO's symptoms. R████was seen on 9/27/04. CAMERON mailed by Fed Ex on 10/12/04 MS Contin for 25 days; the dose was 200 BID. MEYERS pointed out that on 10/25/04 CAMERON mailed again MS Contin 200 BID for 3 weeks dosage. CAMERON said "Ms RASO, now in Palm Beach could not find a physician to take care of her." CAMERON stated there was an "agreement to taper in three weeks." On 10/28/04 MS Contin was mailed again. CAMERON agreed that he was managing her pain care with rare visits by her.  CAMERON stated he was dropping the MS Contin dosage by mail and on 2/18/05 the note was "off MS Contin."

Next discussed was CAMERON's care and treatment rendered to G████for the period October 1998 through March 2008 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. G████was seen on 10/15/98 for Lyme evaluation. There was no neuro or muscular skeletal examination by the PA and no physical examination by CAMERON. There is a note of borderline Lyme test that was from Stony Brook . Multiple tests were ordered. G████was on Ceftin and this was continued. CAMERON saw the patient on 11/13/98; he did not examine the patient but he wrote an impression "Lyme, Neurological hematologic. CAMERON agreed there were no signs of disease and he based his diagnosis on "clinical evidence. CAMERON continued the Ceftin. On 12/14/98 CAMERON arranged for GRACE to see a neurologist and hematologist. A spinal tap was discussed on two occasions but CAMERON had no recollection GRACE's answer. On 1/2/99  CAMERON stated that because of demyelinization "he discussed spinal tap but left decision to the neurologist to decide." On 3/1/99 CAMERON began weekly Bicillin injections and discontinued Ceftin. On 4/2/99 G████ complained of diarrhea and he did a C. difficile workup, since he considered antibiotics as a possible cause. On 6/14/99 still with diarrhea on IM Bicillin- but after G███ had a SPEC scan he ordered 2.4 Bicillin Q weekly. On July 6th - diarrhea still persisted. On 7/15/89 the note reads abnormal SPEC scan.  MEYERS asked what was done about it;  CAMERON said he continued therapy. On July 19, and 20, 1999 GRACE still with cramping and diarrhea but Bicillin was continued. On 7/30/99 "diarrhea increased;" G████ is given an IV and Rocephin is started. On 8/9/99 still no physical examination, but nausea and diarrhea persists. Still on IV Rocephin (note on 10/5/99 states for 9 weeks) but having neurologic and rheumatologic symptoms. On October 19, 1999 "diarrhea 4-5 x day" Rocephin is continued to 10/27/99 and IM Bicillin is begun.

increasing to 2.4 Million on October 29, 1999. On 7/25/01, still on Bicillin, there is a note "slurred speech." The impression was Lyme. On 1/14/ 02 the not reads "last Bicillin was 12/01." The diagnosis is still Lyme Disease. on 3/17/03. MEYERS asked CAMERON to discuss the disability form which states "numbness of ® arm and hand on occasions" and including slurred speech." MEYERS asked what he attributed this to, and CAMERON stated "Lyme Disease is the only diagnosis." MEYERS stated these could be signs of multiple sclerosis. CAMERON admitted there were no physical examinations up to and including this date. MEYERS noted there were no notes written after 3/17/03 referring patient to a neurologist. MEYERS then stated ▇▇▇▇ was on antibiotics for 3½ years, e.g. 38 consecutive months and asked why? CAMERON stated it was "clinically presumed she had Lyme. He "stopped them for "treatment failure." MEYERS asked if he considered any other diagnosis and CAMERON stated "no other diagnosis apparent. " MEYERS stated, and CAMERON agreed, there was no physical exam ever documented on this patient". MEYERS noted that in 2008 the diagnosis of multiple sclerosis was made based on spinal tap with **oligoclonal bands** and abnormal MRI.

Next discussed was CAMERON's care and treatment rendered to D▇▇▇▇▇ for the period July 1999 through 2001 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. D▇▇▇▇▇ first visit on 7/16/99 was discussed. MEYERS pointed out that there was no physical examination by CAMERON, or the PA. There was no differential diagnosis written by CAMERON. MEYERS noted Bicillin was begun, and the diagnosis was "Lyme." MEYERS asked if there were any positive Lyme tests and CAMERON said no. MEYERS then asked if CAMERON had any discussion with other physicians, or received notes from them and CAMERON said no. MEYERS pointed out that the physical examination on 10/7/99 was negative and that there were no signs of disease. CAMERON agreed and continued Bicillin weekly. MEYERS asked about a disability form that CAMERON filled out (last date 2/19/00) without a physical examination. MEYERS asked if he performed any tests based on function? CAMERON said no; use of the form was "based on what the patient tells you." MEYERS then pointed out that the patient was treated for two years with weekly Bicillin until July 2001. CAMERON then changed to Zithromax, and when MEYERS asked why, CAMERON stated the symptoms reversed and therefore he started Zithromax. On 3/13/03 D▇▇▇▇▇ was off antibiotics. MEYERS asked was there ever a positive Lyme test, and CAMERON said no. MEYERS pointed out a statement in October 1999 from a non physician (a neuro psychologist) who stated aggressive antibiotics should be continued as long as necessary. CAMERON suggested this was immaterial and not relevant and that non physicians should not recommend therapy.

Next discussed was CAMERON's care and treatment rendered to H▇▇▇▇▇ for the period October 1997 through 2004 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. H▇▇▇▇▇ was first seen on 10/10/97 for Lyme evaluation. MEYERS said that documented in the long note there are comments about neurological symptoms, joint pains, muscle aches. On physical neither a neurological or examination of the joints, muscles or extremities was done by the PA and that CAMERON did not do a physical examination. Among other things CAMERON recommended tests, including Lyme and Doxcycline. MEYERS asked if there were any signs of disease and CAMERON said no. On 11/4/97 a Lyme test was "sero negative" and prior test was negative. CAMERON stated that

7

H.___ received some antibiotics not for Lyme that could have diminished the immune response. On physical exam there were no signs of disease and the joints were not examined. The diagnosis was sero- negative Lyme Disease. The patient was treated with Doxcycline till October 1998. On October 1 the note reads "flare up" Lyme. CAMERON recommended a neurology consult for the neck pain. On 10/9/98 CAMERON began weekly Bicillin injections and Zithromax. On 12/04/98 a spinal tap was recommended; at that time no physical exam was done. No differential diagnosis was written. The treatment for Lyme diagnosis continued to 6/9/01. MEYERS stated there were 5 years of negative Lyme tests, no physical examinations of the joints or muscles skeletal system and you still treated; it was stated CAMERON treated for 3 years and 8 months. CAMERON stated she had flare ups, and clinical responses. MEYERS stated and CAMERON concurred that his treatment was for symptoms without signs of disease. MEYERS asked why he decided to stop therapy and he said "clinical judgement." MEYERS stated the neurological consult recommends spinal tap for MS or Lyme. CAMERON did not know if H.___ had spinal tap.

Next discussed was CAMERON's care and treatment rendered to W.___ in July 2008 for Lyme disease and complaints of neck pain. W.___ was seen on 07/08/08 with a clinical diagnosis of Lyme Disease, because there was a history of tick bite, rash, fever, and a positive Lyme test. MEYERS pointed out there was no physical examination by CAMERON. . CAMERON noted that W.___ was on Doxcycline, Flagyl, and Bicillin; he wrote consider IV therapy, and added Zithromax. CAMERON stated, "the physical exam was normal." MEYERS noted that the chart only documented W.___ symptoms (on page 3 of this office visit). On 7/17/08 W.___ had an office visit and also had PICC line placed at the hospital. Again the note by CAMERON reveals W.___'s symptoms but no physical examination was performed. W.___ was seen again on 7/28/08. She complained of very painful shoulder and neck, slight sore throat etc. CAMERON stated that he 'changed the dressing at the catheter site and there was no problem. MEYERS noted information was added on the side of page 7 and asked CAMERON if that was written at the same time he wrote the original note, and he said "yes, that he often wrote this way". On 07/31/08 W.___ returned with complaints of "left shoulder and neck pain, hurts to swallow. Another statement "extreme left should pain since PICC line put in," hard to swallow, neck left side swollen. On physical examination of "neck left side swollen and painful to touch." The plan was to remove the PICC line, and do a Doppler of left arm. This was done and WARMBRAND was admitted in the hospital with clots in the venous system on the left side and she was treated with anticoagulants. MEYERS asked if W.___ was told "this was a Herksheimer reaction" and CAMERON said "not by him". CAMERON said it may have been a visiting nurse told this to W.___

At this point the interview was stopped with plans to reschedule to complete at a later date. The interview was resumed on 12/13/10 with CAMERON, WOOD, MEYERS and SULLIVAN in attendance at the OPMC office located at 90 Church Street, New York, NY.

The first case reviewed was that of CAMERON's care and treatment rendered to J.___ for the period August 2009 through September 2010 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment.. MEYERS began with the visit of 8/11/09,

8

and MEYERS asked what were the diagnoses? CAMERON stated "Headache, fatigue, poor concentration" and Lyme was part of the differential. MEYERS asked why he prescribed Amoxicillin and CAMERON stated he gave Amoxicillin because J████████ was allergic to Minocycline." CAMERON confirmed he was treating Lyme Disease. MEYERS asked who did the history and physical and CAMERON stated that he and the PA (DIANE W). MEYERS asked if "thrush" was an allergic reaction to Minocycline and CAMERON stated that he put adverse events in the allergy section. MEYERS and CAMERON reviewed some initial laboratory tests and of note CAMERON stated the "ESR was 1, the Lyme was non reactive (Elisa) and the Igm had 1 band positive (indeterminate) and is not a positive test. On 8/16/09 there is a note of phone call to PA stating J████████ had hematuria for one day. The PA reduced the "Amoxicillin to TID." MEYERS asked "what was the reason for Amoxicillin, e.g. what were you treating? CAMERON said "Lyme Disease was being treated, with a dose of 1 gm TID. MEYERS asked about J████████ visit of 9/26/09, in which he pointed out there were complaints relating to musculo-skeletal (e.g. back pain) system, and neurological symptoms e.g. tingling and numbness. MEYERS asked if these symptoms were examined and CAMERON said none were written. CAMERON said he had modest gains with Amoxicillin and so he ordered four more weeks of therapy (180 pills). CAMERON stated "Lyme Disease was in the differential and that's what we were treating." "Headache, fatigue, poor concentration" were in the differential, and the "neurologist was treating headache." MEYERS asked if on 11/06/09 there was a neurological or musculo-skeletal exam and CAMERON said no; he added the neurologist was treating the headaches. On 11/6/09 he ordered another four weeks of Amoxicillin and added Zithromax to be taken for one month. MEYERS asked why if he was treating for Lyme Disease? CAMERON stated "there are other infections like Erlichia, Anaplasma, Babesia, and Bartonella." CAMERON added "Lyme Disease often responds better to different antibiotics. MEYERS asked if CAMERON did any tests for these other infections? CAMERON replied that these tests were done once on an initial visit, and "there were problems with false negatives." CAMERON stated "regarding Babesia and Erlichia these are described on smear and positive only for a week." MEYERS asked if on 12/03/09 there was a neurological or musculo-skeletal exam and CAMERON stated, "no record of it." CAMERON said Amoxicillin was decreased and Doxcycline 300 mgm a day (90 pills) were given for one month. The plan was to start IV Rocephin. MEYERS noted the diagnoses were Fatigue, poor concentration and headaches which were the same for the last four months. MEYERS asked CAMERON to discuss a letter requesting IV Rocephin dated 01/19/10 stating there were "gains with Doxcycline, Amoxicillin, and Zithromax". MEYERS asked what gains? CAMERON responded "regarding fatigue, headache and resolved tingling." CAMERON in the letter stated that IV Rocephin "a medical necessity to resolve remaining symptoms and prevent severe manifestation of Lyme disease described in the NIH trials?" MEYERS asked what signs of disease JAGGER had, and CAMERON said "he had "several symptoms". "He had encephalopathy." SULLIVAN asked if J████████ had encephalopathy and CAMERON said "he has it." MEYERS asked if the neurologist said he had encephalopathy and CAMERON said "no." MEYERS asked if there was any data that IV Rocephin can prevent severe manifestations Lyme disease described in the NIH trials? CAMERON stated with a response "there are numerous recommendations to treat Lyme disease". MEYERS asked "haven't you been treating for four weeks; isn't that promptly?" CAMERON stated there were studies by Dr. B. FALLON in the journal Neurology (2008/9) in patients who were sick for up to nine years, and had been

9

previously treated. MEYERS asked if the patients had signs of disease, and CAMERON stated "no signs but symptoms." CAMERON quoted a study by Dr. KLEMPNER in patients sick for 4-7 years. MEYERS asked what was the evidence for Lyme Disease in the two studies; he answered "sero positive, and sero negative." CAMERON stated in the FALLON study in patients with symptoms and no signs; patient required 5 IgG bands out of 10."
IV Rocephin was started on 3/1/10. Again on 3/27/10, MEYERS noted there was no neurological or musculo-skeletal exam in the presence of symptoms. MEYERS asked if JAGGER was seeing a neurologist and the answer was "I don't know." Zithromax was added and MEYERS asked why? CAMERON stated Lyme can occur with different strains with different antibiotic sensitivities. Another reason, CAMERON stated for the Zithromax was the presence of co infection. MEYERS asked if he did any tests? CAMERON said "only on the first visit" at which time they were negative the record showed. MEYERS noted the Rocephin was continued for up to six weeks. MEYERS asked what is the data that six weeks is better than four weeks? CAMERON stated "no comparative trials and I took evidence that is available from the prior trials mentioned." CAMERON extended the therapy to a total of eight weeks. MEYERS asked why again. CAMERON stated it was based on 4/13/10 office visit; he then read from the section "latest symptoms". There was no exam of the muscles, joints, or neuro exam in the face of symptoms in these areas. CAMERON wrote "consider Mepron." MEYERS asked why, and CAMERON said "nights sweats a few times a week; "Mepron" was added for possible Babesia to explain the severity of his disease." MEYERS asked if he tested for Babesia, and if he was familiar with signs and symptoms of Babesia? CAMERON stated there was an "overlap" and "would not have fever like the first week of disease" "could have night sweats without fever" later in the disease without therapy. MEYERS asked if there were signs of disease and CAMERON said "no signs after first week." MEYERS asked CAMERON if he did any lab tests? CAMERON stated the parasite is not visible after the first week. MEYERS said if there was, it persists, did you measure the antibodies? CAMERON said "no, it may be sero negative if no immune response." MEYERS said if no therapy why would you not get an immune response? CAMERON said "we don't know enough about the immune response." MEYERS said could they have splenomegaly? CAMERON said "with viruses." MEYERS said "where does the Babesia live?" CAMERON said "I am not sure where it resides." MEYERS noted on 4/30/10 CAMERON ordered two more weeks of Rocephin. MEYERS asked why, CAMERON said there were "continuing improvements, and symptoms that had not resolved." MEYERS asked if there were any signs of disease and Dr. CAMERON "said no." MEYERS noted that J████████ at this time was now on three drugs e.g. Rocephin, Zithromax and Mepron and MEYERS asked why? CAMERON stated "same differential as noted before, and more virulent strains, with different antibiotic sensitivities, and co infection". CAMERON said that Zithromax was good for Babesia. It was noted that the Rocephin was continued for another 15 days (5/20/10) and "there was an increase in symptoms on Mepron." MEYERS said "but you continued the Mepron for another month; why not discontinue?" CAMERON said that this was based on "improvement in symptoms and remaining symptom and referred to J████████ 5/17/10 visit" CAMERON stated "could be a temporary flare-up of symptoms when starting a new therapy." MEYERS asked "what is the flare -up from" could it be Mepron? MEYERS continued "did you consider stopping Mepron and CAMERON "said no." MEYERS noted that on the 6/2/10 visit that the same three drugs were still being given. MEYERS asked again why? CAMERON stated for the three reasons stated above; MEYERS asked since one reason was co infection did you do any

tests? CAMERON said no.  MEYERS asked if there was a neurological or musculo-skeletal exam noted. CAMERON stated "regularly do them but I am not good at documentation." MEYERS and SULLIVAN noted that he documented Lungs and Heart examination. He was asked if there were any Heart and Lung symptoms and CAMERON said no; but he was noted to not have documented the muscle, skeletal or neuro exam. The above sequence of questions and answerers were given for the 6/15/10 - 7/15/10 visits though again there were symptoms of shoulder and hip pain. The three drugs were continued and CAMERON gave the same three reasons cited above. On the 7/15/10 visit CAMERON noted J███████ was more active and MEYERS asked "why not stop therapy. CAMERON stated he had not resolved his symptoms," though his mood was better from the Lexapro. The Rocephin, Zithromax and Mepron remained as therapy through 8/10/10.  CAMERON stated he would consider Rifampin for Bartonella for remaining symptoms possibly related to Bartonella or other co infections." Again no examination as cited above. On 9/14/10 J█████ was put on Ceftin because it was a cephalosporin and he was done with the Rocephin. (cephalosporin).  MEYERS asked what he was treating now. CAMERON said J█████ had mood issues but that his headaches were under control and he could take Advil for that.  CAMERON stated "he would complete therapy for Lyme and co infection."  MEYERS asked when he planned to stop and CAMERON said he would take away one antibiotic each month.

Next discussed was CAMERON's care and treatment rendered to K█████ for the period June 1999 through 2007 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. K█████ record was reviewed beginning with the visit of 07/26/99. The note read IV Rocephin for cellulitis started 06/25/99; there is a note Lyme WB and Elisa for Lyme ordered from Stoney Brook lab. (No record was found and CAMERON and WOOD were asked to try and retrieve results.)  On 08/06/99 there is a note, Ceftin for Lyme disease, and it appears that Rocephin was started on 8/17/99 for phlebitis. The next day Zithromax was "added for Lyme as part of presentation." Meyers said why not Rocephin alone?  CAMERON stated it "often works" but he was concerned with Lyme Disease so he added Zithromax. CAMERON stated "Ceftin and Rocephin are pretty close and most of the time Ceftin will do the trick;" Ceftin was good in the EM trials. Of note KROWE came daily for IV Rocephin given by "Butterfly." On 09/27/99 IV Rocephin was stopped.

On 01/14/02 phlebitis occurred again and IV Rocephin was started. On 01/16/02 a note written by CAMERON states Lyme, and he "discussed as a problem in the past." Further review of the record with CAMERON showed a note on 1/18/02, and CAMERON said that now Lyme as a contributing factor since surgeon had stated possibility. On 1/19/02 there is a note by CAMERON stating "Lyme mimicking cellulites." CAMERON said there was literature on "mimicry cellulitis." On 1/23/02, KROWE was given Augmention.

On 06/03/05 K█████ was treated with Amoxicillin. There was a reference in the notes to "Lyme tests positive" in a phone call 6/16/05. Amoxicillin was continued. There is a note on 11/5/05 "Igm, by WB", also positive in June.  CAMERON said "it was positive for five months and that it stays positive longer". MEYERS asked if this correlates with Lyme disease and CAMERON said it correlates with flare-ups. MEYERS asked if there was any evidence of a new tic bite , CAMERON said no, this was a flare-up of Lyme disease.  MEYERS said why

11

would it flare-up?  CAMERON stated Igm is a marker of severity of disease. MEYERS said IGM and he has no complaints, thus what is the flare -up?  CAMERON said he was not treated and you have to pay attention to it." On 8/9/06 there is a note Augmentation for "Cellulitis/Lyme" with fever. On 12/28/00 "Ceftin started for cellulitis and Lyme tests done. In November 2006 at Stoney Brook Igm indeterminate and IgG indeterminate.On 12/28/07 with recurrence of fatigue, joint pain, stiff neck and memory issues. Lyme therapy with Amoxicillin 1000 mgm TID x 4 weeks was prescribed. CAMERON confirmed no physical exam was documented and there were no signs of disease.

On 4/15/08 the note reads "Lyme flare up". When asked what were K████████symptoms CAMERON stated "tired, stiffness, and see progress note". K██████ was treated with Doxcycline. Again, CAMERON confirmed no physical exam was documented andKROWE had no signs of disease. On 05/18/08 KROWE was still on Doxcycline. MEYERS noted there are no documented visits May and July and asked if there are any notes, WOOD said he would send them to OPMC if they exist. CAMERON said that on 07/18/08 K████████"went off medicines too early" and he was placed on Doxcycline, at a dose of 300 mgm a day. On 9/13/08 there is a PA note "hold Doxcycline for photo sensitivity issues as patient was traveling, CAMERON and MEYERS note KROWE symptoms were much better. CAMERON stated, "he must have had symptoms left since he was going to Africa."

There were no further questions and the interview was terminated. WOOD said that he would send to OPMC additional information requested during the interview, including a submission on behalf of CAMERON.


**Transcriber:**          ps
**Date:**                 1/5/2010

12



# STATE OF NEW YORK
# DEPARTMENT OF HEALTH

433 River Street, Suite 303
www.health.ny.gov

Troy, New York 12180-2299

Nirav R. Shah, M.D., M.P.H.
*Commissioner*

Sue Kelly
*Executive Deputy Commissioner*

April 1, 2011

**CERTIFIED MAIL- RETURN RECEIPT REQUESTED**
**PERSONAL AND CONFIDENTIAL**
Daniel Cameron, MD
657 Main Street
Mount Kisco, NY  10549

Re: OPMC# CR-08-04-2288-A
CR-08-08-5008-A
CR-10-03-2010-A
CR-10-08-5079-A

Dear Dr. Cameron:

Your attorney telephoned yesterday to discuss the revised report of interview mailed to you on March 28, 2011.  During our discussion it was noted that another revision was needed.  Enclosed is a copy of a revised report of interview.

Sincerely,

*Patrick Sullivan*

Patrick Sullivan
Medical Conduct Investigator
Office of Professional Medical Conduct

Enclosure
Cc: William L. Wood, Jr., Esq.

RECEIVED APR 0 4 2010

#6257B

# NEW YORK STATE DEPARTMENT OF HEALTH
# OFFICE OF PROFESSIONAL MEDICAL CONDUCT

## REPORT OF INTERVIEW

| | |
|---|---|
| **SUBJECT:** | DANIEL CAMERON, MD |
| **FILE#:** | CR-08-04-2288-A |
| | CR-08-08-5008-A |
| | CR-10-03-2010-A |
| | CR-10-08-5079-A |
| **INTERVIEW OF:** | DANIEL CAMERON,  MD |
| **DATE OF INTERVIEW:** | SEPTEMBER 14, 2010 AND DECEMBER 13, 2010 |
| **BY:** | MEDICAL COORDINATOR  BURT MEYERS, MD |
| | NURSE INVESTIGATOR (NI) PATRICK SULLIVAN |

DANIEL CAMERON, MD was interviewed in person at the Office of Professional Medical
Conduct (OPMC) at 90 Church Street, New York, NY, on Tuesday, September 14, 2010
beginning at 09:40 AM and ending at 06:15PM, and on Monday, December 13, 2010 beginning
at 11:10AM and ending at 3:40PM.  On both dates Health Department staff members in
attendance were BURT MEYERS, MD and PATRICK SULLIVAN, RN. CAMERON was
accompanied by his attorney, WILLIAM WOOD, Jr., Esq.

The OPMC process was reviewed with CAMERON and he was informed that he could provide a
written response to the allegations if he wished. CAMERON confirmed that he had received the
informational brochure entitled "Information for Licensees" and said that he had no questions.
CAMERON's education, training, experience, and professional data were reviewed.

CAMERON confirmed his date of birth-03/12/54, social security number-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, and that
he graduated in 1981 with his medical degree from the University of Minnesota Medical School.
After graduating from medical school CAMERON completed an internship/residency in Internal
Medicine at Beth Israel Medical Center, NY ending in 1985. CAMERON said he also completed
one year residency in Preventative Medicine at Mount Sinai Medical Center. CAMERON is
currently board certified in Internal Medicine, and is affiliated with Northern Westchester
Hospital in Mount Kisco, NY and has an affiliation with non-admitting privileges at Burke
Rehabilitation Center, White Plains, NY. CAMERON said his practice is located at 657 Main
Street, Mount Kisco, NY, 10549, telephone number (914) 666-4665. CAMERON said employed
at the practice are staff members that include a nurse practitioner, two physician assistants, a
medical assistant, an office manager and two receptionists. CAMERON provided his home
address as 11 Green Lane, Chappaqua, NY, 10514 and home telephone as (914) 238-0661.
CAMERON stated that he is solo practice, seeing adolescent and adult patients. While he is a
general internist, CAMERON reported that 50-60 percent of the patients are treated for Lyme
disease.

CAMERON had with him for the interviews his office records for ▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮ ▮▮▮ S▮▮▮ B▮▮▮ A▮▮▮ R▮▮ D▮▮ G▮▮▮ , C▮▮▮ D▮▮ I▮▮ H. ▮▮▮ E▮▮ W▮▮▮ R▮▮ J▮ and E▮▮▮ K▮▮

Initially discussed was CAMERON's care and treatment rendered to F▮▮▮▮▮▮▮▮▮ for the period August 2006 through October 2006 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. MEYERS noted that on the first visit 8/11/06 a very long note was written by a PA (to be named). MEYERS asked what was the chief complaint and CAMERON said it was "not written because of multiple complaints." Though the Lyme test was negative the impression written was Lyme Disease. MEYERS noted that in the physical examination (PE) there was no pulse or temperature noted, and no examination of the abdomen by the PA. MEYERS asked if CAMERON examined the patient and he did not recall and agreed there was no documentation of a PE. MEYERS asked if he recalled if he discussed care with PA and he did not remember; also he admitted when asked that he did not discuss case with primary care physician (PCP). MEYERS asked "where is your diagnosis?" and CAMERON said it was not written. MEYERS asked if there was any differential diagnosis (DDX) and he stated the PA wrote "headache, migraines and Lyme." CAMERON stated he did not order any tests since the other MD had sent the records. MEYERS asked when he got the records including lab tests and he said he "did not know." MEYERS asked why continue therapy with a negative Lyme test and he responded "a prior physician thought it was Lyme and given clinical results it seemed reasonable to continue." MEYERS asked if F▮▮▮▮▮▮▮ had any signs of diseases and CAMERON said no. On the 9/12/06 visit MEYERS asked if he examined the patient? CAMERON stated "I typically do." MEYERS stated there was no note written. Was there any DDX? CAMERON said no. He claimed it was a "Focus visit." MEYERS asked again why did you continue Amoxicillin; he said F▮▮▮▮▮▮▮ had a response and had not resolved her illness." Again MEYERS asked were there any signs of disease and CAMERON said "no." MEYERS asked what would be the resolution of the illness? CAMERON wrote headaches infrequent, memory and concentration gain." MEYERS asked what was the word gains based on; MEYERS noted there were no tests of memory or concentration. CAMERON asked the patient "how is your memory, and concentration?" On the October 10th note by the PA he wrote "flare up x 2 weeks of Lyme Disease and continued Amoxicillin x 1 month". There was no physical examination documented by the PA or CAMERON at this time nor were any lab tests ordered. MEYERS noted the patient complained of "tingling" and CAMERON said this could emerge as an important symptom "not yet ready for neuro consult." MEYERS asked about the diarrhea and he stated F▮▮▮▮▮▮▮ was taking probiotics e.g. Acidophilus but this was not documented. MEYERS asked at this time were there any signs of disease or any differential diagnoses and CAMERON's answer was no to both. MEYERS asked why did "you continue therapy in the presence of multiple negative Lyme tests?" CAMERON stated that in his "actual practice" his patients were people who did not meet the CDC criteria, and were not included in clinical trials. MEYERS then asked "in a patient with negative Lyme tests and no signs of disease how did you know these patients had Lyme disease? He said "he made a clinical judgement". CAMERON admitted he "never saw a positive Lyme test, and never spoke to PCP who treated without a positive test." MEYERS remarked "did you feel she had Lyme disease at this time though you never did a test? MEYERS asked CAMERON to look at the lab tests and asked was anything abnormal? MEYERS asked about the ESR (sedimentation rate and noted it

2

was a - (normal). CAMERON stated "while it can occur in normal people it is common in Lyme disease."

Next discussed was CAMERON's care and treatment rendered to V███ for the period February 2008 through March 2008 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. V███ was first seen on 2/19/08. There is a note written by the PA. The vital signs did not record a temperature, nor did the physical examination have an abdominal exam and nothing was written about an examination of the joints. The PA did note the patient complained of pain in the back, waist, muscles, abdomen etc. The PA wrote positive diagnosis Lyme Disease three weeks ago. There is no note by CAMERON on that visit and therefore no physical examination documented. MEYERS asked CAMERON if he spoke to V███ physician DILLARD ELMORE, MD who made a diagnosis of LYME Disease, and he said no. MEYERS asked was there a positive LYME test and CAMERON was not sure. MEYERS asked if CAMERON had a DDX - "none was written." MEYERS and CAMERON noted the ESR was high 50 and CAMERON stated "not typical Lyme." MEYERS asked "how did you arrive at a diagnosis of Lyme Disease? CAMERON stated there was a history of positive test stated by VELE and "could have been a clinical diagnosis." He noted that three weeks prior ELMORE "began therapy for LYME and also gave steroids." MEYERS asked why CAMERON continued Doxcycline for another month? "Lyme was considered as part of the clinical picture; MEYERS pointed out that this therapy would now equal a total of 7 weeks. MEYERS asked what this was based on? CAMERON stated that in his patients that don't meet the requirements for clinical trials, in clinical practice longer therapy has been effective." He admitted "these are not the CDC recommendations." The next visit was on 3/18/08 and the impression was "Lyme Disease" and Doxcycline was ordered for another 3-4 weeks (total 10-11 weeks of therapy). MEYERS asked if there were any other DDX and CAMERON stated the following, "Fibromyalgia. Chronic Fatigue, ALS, MS, Migraine, Sleep Apnea, vasculitis etc, MEYERS pointed out that none of this was written, and that CAMERON admitted he did not do a physical examination. When asked about the lab tests from ELMORE, he stated he did not know when he received them. MEYERS and CAMERON reviewed the tests for Lyme and CAMERON stated these "were not positive Lyme tests," and that is why he did not do the CDC recommendation of a Western Blot (WB) Test when the results were deemed equivocal. MEYERS noted that the record does not indicate if you saw "these test while caring for the patient." MEYERS noted the ESR was 131, but CAMERON stated the last one was 60 - and there might be other reasons for this elevation. MEYERS noted that CAMERON ordered IV Rocephin. MEYERS asked what is the evidence that this will be effective after 11 weeks of therapy with the antibiotics?" CAMERON said "to give it if clinical presentation persists. CAMERON stated that "chronic neurologic Lyme" discussed in a paper in the New England Journal of Medicine in 1990, had patients with the same clinical picture and that two weeks of IV antibiotic therapy was effective in 2/3 of patients treated," and the majority of these patients had been previously treated. These and other papers subsequently were requested by MEYERS. MEYERS noted that the CDC guidelines stated that more than one month of therapy has not proven to be effective. CAMERON stated "science was a dialogue and "what to do with complicated patients that don't meet the rigid guidelines". MEYERS asked if V███ had any signs of Lyme Disease; CAMERON said none defined by the CDC criteria. MEYERS said what about any criteria for any disease; he suggested "chronic neurologic Lyme Disease." MEYERS asked what criteria from chronic neurologic Lyme

Disease did V████have?  CAMERON responded 'fatigue, disturbed sleep, memory loss, sadness, crying, ears ringing, back pain, parenthesis, joint and muscle pain."

Next discussed was CAMERON's care and treatment rendered to B████for the period June 1998 through 2006 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. B████first visit was on 6/8/98 for a Lyme evaluation. There is an extensive note by a PA who stated BANGS was Lyme "sero positive in 1997, with Bull's Eye Rash and reviewed therapy - including oral and IV Rocephin prior to this visit. B████was seen at Westchester County Medical Center where a diagnosis of fibromyalgia was made and there are notes of 12 weeks of IV Rocephin (in 2 courses, "after a severe relapse" which is not explained. There are no vital signs and the physical examination by the PA is only of the heart and lungs, and is very sparse. The impression by the PA is Lyme, sero + and headache etc. There is no physical examination by CAMERON, only a note discussing "consider Zithromax, - Bicillin and continue Ceftin (total 4 weeks)."  CAMERON was asked if there was any DDX and he said none written, but offered again all the choices stated in the interview of VELE (See above). The next visit was on 6/29/98 and no PE by CAMERON; again diagnosis is sero + Lyme test and Ceftin was ordered for two more weeks.  On 9/25/98 there was no physical by either the PA or CAMERON. It was noted there was no sero positive Lyme test found.  CAMERON said that the sero positive may have been from prior PCP.  MEYERS asked if he spoke to BANGS' PCP since there was no record, CAMERON did not respond.  On 10/7/98, again no physical exam by PA or CAMERON.  Lab tests were ordered including Lyme.  Zithromax was ordered for Lyme Disease - MEYERS asked was this chronic Lyme Disease?  CAMERON stated he did not use the word chronic, just Lyme disease. CAMERON agreed there was nothing for acute Lyme disease.  MEYERS asked were there any signs of disease and CAMERON said none. Of note all the Lyme tests were negative.  CAMERON said these Lyme tests may be sero negative due to prior therapy.  MEYERS noted, and CAMERON agreed there were no calls to PCP regarding positive Lyme tests and that there were no positive Lyme tests in the record from the prior doctor. On 10/28 the impression again was Lyme, "frequent flare ups." Again there were no physical examinations by either the PA or CAMERON.  Bicillin 1.2 million q weekly was ordered and MEYERS asked why?  CAMERON stated BANGS failed first line therapy, e.g. oral and then IV and clinical judgment was for Bicillin. CAMERON stated there was data in the literature for IM Bicillin vs. placebo.  MEYERS asked if in this study there were prior failures, of people not on IV?  CAMERON stated the therapy with Bicillin for 6 months q weekly was in the literature for two cases.  MEYERS asked again about any signs of disease in BANGS and he said none. From 11/04 to 6/2/09 there were weekly visits for the Bicillin IM shots. On all of these visits there were no physical examinations, and no signs of disease noted. BANGS was given Zoloft, and the dose was increased. On Sept 9/10/99 Bicillin was restarted at 1.2 million units and increased to 2.4 million q weekly.  MEYERS asked why and CAMERON responded clinical judgement. MEYERS asked if there was an DDX and he said none written, but it was the same answer (see above VELE).  MEYERS asked if CAMERON considered a psychiatric consult since BANGS was not responding to treatment. CAMERON said neuro psychiatric issues were common in "Lyme Disease." On October 7, 1999 CAMERON did not see patient. (No note was written). There was a physical exam by the PA who wrote for lab tests and ordered 2.4 million of Bicillin again q weekly.  MEYERS asked why the double dose and CAMERON said he wanted higher tissue levels. MEYERS asked what did he want to get in the tissue and he said "some infection that had not resolved."  MEYERS asked what data was there for this

statement e.g., were there biopsies, cultures, histological evidence, and were there any signs of disease to warrant therapy and now the higher dose? CAMERON stated there is literature in patients with no signs that have histological and culture evidence; there are strains of the organism that persisted. CAMERON said there was complexity in this delayed treatment, discussed in the literature. From 11/09 till 6/13/00 B███████ is given weekly shots of 2.4 million unit weekly for 1 year. On one of these visits there is a physical exam. On 6/13/00 BANGS was switched to oral Ceftin. MEYERS asked why, and CAMERON said this was a complex patient. MEYERS asked if CAMERON considered stopping antibiotics, and he said yes, but continued it anyway. MEYERS asked if there were signs of disease, and CAMERON said "no signs of disease." B███████ was on Ceftin to 6/9/00. On the 11/4/99 visit the patient said "feels like my brain is floating in poison." MEYERS asked about this comment and CAMERON said as a PCP he hears patients make odd statements. MEYERS suggested this sounded like a "psychotic type statement." On 9/8/00 a third sequence of Bicillin was begun; when asked why, CAMERON said "based on personal experience." On 9/24/01 BANGS had received three years of Bicillin weekly shots. CAMERON discussed the Klempner study which he "said was not favorable." Years later BANGS was still on Bicillin and was given Ceftin because she went on vacation see note of 7/13/05. Again on 3/1/06 was started on Doxycycline for Lyme infection. MEYERS then stated the patient had five years of therapy with no confirmed Lyme tests.

Next discussed was CAMERON's care and treatment rendered to R██████ for the period January 1997 through February 2004 including but not limited to diagnosis of Lyme disease, differential diagnosis and treatment of Lyme disease and complaints of pain and prescribing practices. RASO's first visit was on 1/28/97 with a chief complaint of leg pain. When seen by CAMERON there is a 4 page note which mentions multiple symptoms, including joint pain, and numbness in the feet. MEYERS noted that the examination did not have either a neurological or muscular skeletal exam, noting that the joints were not examined. MEYERS asked why the narcotics and CAMERON said RASO was on these drugs for pain. CAMERON's diagnosis was sero negative Lyme disease (secondary to prior Bactrim therapy); a variety of lab test were ordered. On 2/24/97 RASO was on MS Contin and Ampicillin was ordered, and R██████ was given Paxil. Doxcycline was ordered. On April 10th, Rocephin IV was ordered. On 5/15/97 a Lyme PCR was ordered, but the results were not found. On 5/23/97, it was noted RASO was on Xanax, Paxil, and the narcotics. At this time MEYERS noted R████ was on double therapy with Doxcycline and Rocephin, CAMERON said "he was uncomfortable with both". MEYERS asked why did you do it, and he responded "I don't know? In June 1997, R█████ was still on the combination of antibiotics. On July 7, Bicillin was begun. On 7/23/97, RASO was on Morphine, Percocet, Compazine, and Paxil. CAMERON noted R█████s symptoms the last two weeks were much worse "with joint pain in ankles, knees, hips, and muscle pains severe." There was no physical examination. Doxcycline was discontinued and IV Rocephin 2 grams was continued. On 8/8/97 CAMERON noted improvement, and decided to start IM Bicillin. MEYERS asked why and CAMERON stated that R█████had reached therapeutic goals like "better' nervous system, joint pain improved, "but fatigue and joint pain persisted." In October 97 it was noted that R█████ was going to pain management clinic. In November 1997 Zithromax was added to the Bicillin. MEYERS asked if there was data for two drug therapy and if two drugs were better than one and CAMERON said the "work of Dr. SAM DONTA." On 3/20/98 double therapy with weekly Bicillin and Zithromax for Lyme was ongoing. CAMERON wrote the Percocet dose though RASO was under the care of the pain management team. On 8/14/98 the note reads "Lyme

remains severe, quite sick" and double therapy was continued.  MEYERS asked if this severe illness was only by symptoms and CAMERON said yes, and admitted there were no signs of disease. Rocephin continued till 6/24/99 then Bicillin given; again no physical examination at the time. In April, 1999 R████ was admitted for detoxification still on Bicillin. In the 8/5/99 note it states Zithromax and Bicillin ordered through March." On 3/25/00 the double therapy will end and Zithromax continued. On 6/23/00 Zithromax continued since R████ on vacation 8/15/00 Bicillin ordered again; no physical examination performed. In the 05/24/01 note, it states "off antibiotics for one month." On 11/15/01 IM Bicillin begun again no physical examination performed. Bicillin is continued through Feb/March 03. In April 03 - the note states impression "Lyme Disease." On multiple dates beginning on 12/26/03. On 02/06/04 CAMERON mailed narcotics prescriptions to R████ in Florida; he stated RASO had difficulty finding doctors, and he knew the patient and he was skilled in narcotic usage.  MEYERS noted these prescriptions were based on phone calls and that CAMERON did not examine RASO.  CAMERON admitted he had last seen R████ 11/03. RASO was seen on 4/22/04 in the clinic.  MEYERS then noted that on 5/26/04 the patient was "white water rafting in Colorado"; Dr. CAMERON mailed prescriptions for Neurontin, Klonopin, and MS Contin on 5/26/04, 6/7/04, and 6/24/04 respectfully.  MEYERS asked why and noted there was no discussion of RASO's symptoms. RASO was seen on 9/27/04.  CAMERON mailed by Fed Ex on 10/12/04 MS Contin for 25 days; the dose was 200 BID.  MEYERS pointed out that on 10/25/04 CAMERON mailed again MS Contin 200 BID for 3 weeks dosage.  CAMERON said "Ms R████ now in Palm Beach could not find a physician to take care of her."  CAMERON stated there was an "agreement to taper in three weeks."  On 10/28/04 MS Contin was mailed again.  CAMERON agreed that he was managing her pain care with rare visits by her.  CAMERON stated he was dropping the MS Contin dosage by mail and on 2/18/05 the note was "off MS Contin."

Next discussed was CAMERON's care and treatment rendered to G████ for the period October 1998 through March 2008 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. G████ was seen on 10/15/98 for Lyme evaluation. There was no neuro or muscular skeletal examination by the PA and no physical examination by CAMERON. There is a note of borderline Lyme test that was from Stony Brook . Multiple tests were ordered. G████ was on Ceftin and this was continued.  CAMERON saw the patient on 11/13/98; he did not examine the patient but he wrote an impression "Lyme, Neurological hematologic. CAMERON agreed there were no signs of disease and he based his diagnosis on "clinical evidence. CAMERON continued the Ceftin. On 12/14/98 CAMERON arranged for GRACE to see a neurologist and hematologist. A spinal tap was discussed on two occasions but CAMERON had no recollection G████ answer. On 1/2/99  CAMERON stated that because of demyelinization "he discussed spinal tap but left decision to the neurologist to decide." On 3/1/99 CAMERON began weekly Bicillin injections and discontinued Ceftin. On 4/2/99 GRACE complained of diarrhea and he did a C. difficile workup, since he considered antibiotics as a possible cause. On 6/14/99 still with diarrhea on IM Bicillin- but after G████ had a SPEC scan he ordered 2.4 Bicillin Q weekly. On July 6th - diarrhea still persisted. On 7/15/89 the note reads abnormal SPEC scan.  MEYERS asked what was done about it;  CAMERON said he continued therapy. On July 19, and 20, 1999 G████ still with cramping and diarrhea but Bicillin was continued. On 7/30/99 "diarrhea increased;" G████ s given an IV and Rocephin is started. On 8/9/99 still no physical examination, but nausea and diarrhea persists. Still on IV Rocephin (note on 10/5/99 states for 9 weeks) but having neurologic and rheumatologic symptoms. On October

19, 1999 "diarrhea 4-5 x day" Rocephin is continued to 10/27/99 and IM Bicillin is begun, increasing to 2.4 Million on October 29, 1999. On 7/25/01, still on Bicillin, there is a note "slurred speech." The impression was Lyme. On 1/14/ 02 the not reads "last Bicillin was 12/01." The diagnosis is still Lyme Disease. on 3/17/03. MEYERS asked CAMERON to discuss the disability form which states "numbness of ® arm and hand on occasions" and including slurred speech." MEYERS asked what he attributed this to, and CAMERON stated "Lyme Disease is the only diagnosis." MEYERS stated these could be signs of multiple sclerosis. CAMERON admitted there were no physical examinations up to and including this date. MEYERS noted there were no notes written after 3/17/03 referring patient to a neurologist. MEYERS then stated G███████ was on antibiotics for 3½ years, e.g. 38 consecutive months and asked why? CAMERON stated it was "clinically presumed she had Lyme. He "stopped them for "treatment failure." MEYERS asked if he considered any other diagnosis and CAMERON stated "no other diagnosis apparent. " MEYERS stated, and CAMERON agreed, there was no physical exam ever documented on this patient". MEYERS noted that in 2008 the diagnosis of multiple sclerosis was made based on spinal tap with oligoclonal bands and abnormal MRI.

Next discussed was CAMERON's care and treatment rendered to D██████████or the period July 1999 through 2001 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. D██████████s first visit on 7/16/99 was discussed. MEYERS pointed out that there was no physical examination by CAMERON, or the PA. There was no differential diagnosis written by CAMERON. MEYERS noted Bicillin was begun, and the diagnosis was "Lyme." MEYERS asked if there were any positive Lyme tests and CAMERON said no. MEYERS then asked if CAMERON had any discussion with other physicians, or received notes from them and CAMERON said no. MEYERS pointed out that the physical examination on 10/7/99 was negative and that there were no signs of disease. CAMERON agreed and continued Bicillin weekly. MEYERS asked about a disability form that CAMERON filled out (last date 2/19/00) without a physical examination. MEYERS asked if he performed any tests based on function? CAMERON said no; use of the form was "based on what the patient tells you." MEYERS then pointed out that the patient was treated for two years with weekly Bicillin until July 2001. CAMERON then changed to Zithromax, and when MEYERS asked why, CAMERON stated the symptoms reversed and therefore he started Zithromax. On 3/13/03 D██████████ was off antibiotics. MEYERS asked was there ever a positive Lyme test, and CAMERON said no. MEYERS pointed out a statement in October 1999 from a non physician (a neuro psychologist) who stated aggressive antibiotics should be continued as long as necessary. CAMERON suggested this was immaterial and not relevant and that non physicians should not recommend therapy.

Next discussed was CAMERON's care and treatment rendered to HAMMER for the period October 1997 through 2004 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. H██████████was first seen on 10/10/97 for Lyme evaluation. MEYERS said that documented in the long note there are comments about neurological symptoms, joint pains, muscle aches. On physical neither a neurological or examination of the joints, muscles or extremities was done by the PA and that CAMERON did not do a physical examination. Among other things CAMERON recommended tests, including Lyme and Doxcycline. MEYERS asked if there were any signs of disease and CAMERON said no. On 11/4/97 a Lyme test was "sero negative" and prior test was negative. CAMERON stated that

H█████ received some antibiotics not for Lyme that could have diminished the immune response. On physical exam there were no signs of disease and the joints were not examined. The diagnosis was sero- negative Lyme Disease. The patient was treated with Doxcycline till October 1998. On October 1 the note reads "flare up" Lyme.  CAMERON recommended a neurology consult for the neck pain. On 10/9/98 CAMERON began weekly Bicillin injections and Zithromax. On 12/04/98 a spinal tap was recommended; at that time no physical exam was done. No differential diagnosis was written. The treatment for Lyme diagnosis continued to 6/9/01. MEYERS stated there were 5 years of negative Lyme tests, no physical examinations of the joints or muscles skeletal system and you still treated; it was stated CAMERON treated for 3 years and 8 months.  CAMERON stated she had flare ups, and clinical responses.  MEYERS stated and CAMERON concurred that his treatment was for symptoms without signs of disease. MEYERS asked why he decided to stop therapy and he said "clinical judgement."  MEYERS stated the neurological consult recommends spinal tap for MS or Lyme.  CAMERON did not know if HAMMER had spinal tap.

Next discussed was CAMERON's care and treatment rendered to W█████████ in July 2008 for Lyme disease and complaints of neck pain. W█████████ was seen on 07/08/08 with a clinical diagnosis of Lyme Disease, because there was a history of tick bite, rash, fever, and a positive Lyme test.  MEYERS pointed out there was no physical examination by CAMERON. . CAMERON noted that W█████████ was on Doxcycline, Flagyl, and Bicillin; he wrote consider IV therapy, and added Zithromax. CAMERON stated, "the physical exam was normal." MEYERS noted that the chart only documented█████████symptoms (on page 3 of this office visit). On 7/17/08 W█████████had an office visit and also had PICC line placed at the hospital. Again the note by CAMERON reveals W█████████symptoms but no physical examination was performed. W█████████was seen again on 7/28/08. She complained of very painful shoulder and neck, slight sore throat etc. CAMERON stated that he 'changed the dressing at the catheter site and there was no problem. MEYERS noted information was added on the side of page 7 and asked CAMERON if that was written at the same time he wrote the original note, and he said "yes, that he often wrote this way". On 07/31/08 W█████████ returned with complaints of "left shoulder and neck pain, hurts to swallow. Another statement "extreme left should pain since PICC line put in," hard to swallow, neck left side swollen. On physical examination of "neck left side swollen and painful to touch." The plan was to remove the PICC line, and do a Doppler of left arm. This was done and W█████████was admitted in the hospital with clots in the venous system on the left side and she was treated with anticoagulants.  MEYERS asked if W█████████was told "this was a Herksheimer reaction" and CAMERON said "not by him". CAMERON said it may have been a visiting nurse told this to W█████████

At this point the interview was stopped with plans to reschedule to complete at a later date. The interview was resumed on 12/13/10 with CAMERON, WOOD, MEYERS and SULLIVAN in attendance at the OPMC office located at 90 Church Street, New York, NY.

The first case reviewed was that of CAMERON's care and treatment rendered to J█████████for the period August 2009 through September 2010 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment.. EYERS began with the visit of 8/11/09, and MEYERS asked what were the diagnoses? CAMERON stated "Headache, fatigue, poor

concentration" and Lyme was part of the differential. MEYERS asked why he prescribed Amoxicillin and CAMERON stated he gave Amoxicillin because J██████ "was allergic to Minocycline." CAMERON confirmed he was treating Lyme Disease. MEYERS asked who did the history and physical and CAMERON stated that he and the PA (DIANE W). MEYERS asked if "thrush" was an allergic reaction to Minocycline and CAMERON stated that he put adverse events in the allergy section. MEYERS and CAMERON reviewed some initial laboratory tests and of note CAMERON stated the "ESR was 1, the Lyme was non reactive (Elisa) and the Igm had 1 band positive (indeterminate) and is not a positive test. On 8/16/09 there is a note of phone call to PA stating J██████ had hematuria for one day. The PA reduced the "Amoxicillin to TID." MEYERS asked "what was the reason for Amoxicillin, e.g. what were you treating? CAMERON said "Lyme Disease was being treated, with a dose of 1 gm TID. MEYERS asked about JAGGER's visit of 9/26/09, in which he pointed out there were complaints relating to musculo-skeletal (e.g. back pain) system, and neurological symptoms e.g. tingling and numbness. MEYERS asked if these symptoms were examined and CAMERON said none were written. CAMERON said he had modest gains with Amoxicillin and so he ordered four more weeks of therapy (180 pills). CAMERON stated "Lyme Disease was in the differential and that's what we were treating." "Headache, fatigue, poor concentration" were in the differential, and the "neurologist was treating headache." MEYERS asked if on 11/06/09 there was a neurological or musculo-skeletal exam and CAMERON said no; he added the neurologist was treating the headaches. On 11/6/09 he ordered another four weeks of Amoxicillin and added Zithromax to be taken for one month. MEYERS asked why if he was treating for Lyme Disease? CAMERON stated "there are other infections like Erlichia, Anaplasma, Babesia, and Bartonella." CAMERON added "Lyme Disease often responds better to different antibiotics. MEYERS asked if CAMERON did any tests for these other infections? CAMERON replied that these tests were done once, and "there were problems with false negatives." CAMERON stated "regarding Babesia and Erlichia these are described on smear and positive only for a week." MEYERS asked if on 12/03/09 there was a neurological or musculo-skeletal exam and CAMERON stated, "no record of it." CAMERON said Amoxicillin was decreased and Doxycline 300 mgm a day (90 pills) were given for one month. The plan was to start IV Rocephin. MEYERS noted the diagnoses were Fatigue, poor concentration and headaches which were the same for the last four months. MEYERS asked CAMERON to discuss a letter requesting IV Rocephin dated 01/19/10 stating there were "gains with Doxcycline, Amoxicillin, and Zithromax". MEYERS asked what gains? CAMERON responded "regarding fatigue, headache and resolved tingling." CAMERON in the letter stated that IV Rocephin "a medical necessity to resolve remaining symptoms and prevent severe manifestation of Lyme disease described in the NIH trials?" MEYERS asked what signs of disease JAGGER had, and CAMERON said "he had "several symptoms". "He had encephalopathy." SULLIVAN asked if JAGGER had encephalopathy and CAMERON said "he has it." MEYERS asked if the neurologist said he had encephalopathy and CAMERON said "no." MEYERS asked if there was any data that IV Rocephin can prevent severe manifestations of Lyme disease described in the NIH trials? CAMERON stated with a response "there are numerous recommendations to treat Lyme disease". MEYERS asked "haven't you been treating for four weeks; isn't that promptly?" CAMERON stated there were studies by Dr. B. FALLON in the journal Neurology (2008/9) in patients who were sick for up to nine years, and had been previously treated. MEYERS asked if the patients had signs of disease, and CAMERON stated "no signs but symptoms." CAMERON quoted a study by Dr. KLEMPNER in patients sick for

4-7 years. MEYERS asked what was the evidence for Lyme Disease in the two studies; he answered "sero positive, and sero negative." CAMERON stated in the FALLON study in patients with symptoms and no signs; patient required 5 IgG bands out of 10."
IV Rocephin was started on 3/1/10. Again on 3/27/10, MEYERS noted there was no neurological or musculo-skeletal exam in the presence of symptoms. MEYERS asked if JAGGER was seeing a neurologist and the answer was "I don't know." Zithromax was added and MEYERS asked why? CAMERON stated Lyme can occur with different strains with different antibiotic sensitivities. Another reason, CAMERON stated for the Zithromax was the presence of co infection. MEYERS asked if he did any tests? CAMERON said "only on the first visit" at which time they were negative the record showed.  MEYERS noted the Rocephin was continued for up to six weeks. MEYERS asked what is the data that six weeks is better than four weeks? CAMERON stated "no comparative trials and I took evidence that is available from the prior trials mentioned." CAMERON extended the therapy to a total of eight weeks. MEYERS asked why again. CAMERON stated it was based on 4/13/10 office visit; he then read from the section "latest symptoms". There was no exam of the muscles, joints, or neuro exam in the face of symptoms in these areas. CAMERON wrote "consider Mepron." MEYERS asked why, and CAMERON said "nights sweats a few times a week; "Mepron" was added for possible Babesia to explain the severity of his disease." MEYERS asked if he tested for Babesia, and if he was familiar with signs and symptoms of Babesia? CAMERON stated there was an "overlap" and "would not have fever like the first week of disease' 'could have night sweats without fever" later in the disease without therapy. MEYERS asked if there were signs of disease and CAMERON said "no signs after first week." MEYERS asked CAMERON if he did any lab tests? CAMERON stated the parasite is not visible after the first week. MEYERS said if there was, it persists, did you measure the antibodies? CAMERON said "no, it may be sero negative if no immune response. MEYERS said if no therapy why would you not get an immune response? CAMERON said "we don't know enough about the immune response." MEYERS said could they have splenomegly? CAMERON said "with viruses." MEYERS said "where does the Babesia live?" CAMERON said "I am not sure where it resides." MEYERS noted on 4/30/10 CAMERON ordered two more weeks of Rocephin. MEYERS asked why, CAMERON said there were "continuing improvements, and symptoms that had not resolved." MEYERS asked if there were any signs of disease and Dr. CAMERON "said no." MEYERS noted that JAGGER at this time was now on three drugs e.g. Rocephin, Zithromax and Mepron and MEYERS asked why? CAMERON stated "same differential as noted before, and more virulent strains, with different antibiotic sensitivities, and co infection". CAMERON said that Zithromax was good for Babesia. It was noted that the Rocephin was continued for another 15 days (5/20/10) and "there was an increase in symptoms on Mepron." MEYERS said "but you continued the Mepron for another month; why not discontinue?" CAMERON said that this was based on "improvement in symptoms and remaining symptom and referred to J██████ 5/17/10 visit" CAMERON stated "could be a temporary flare-up of symptoms when starting a new therapy." MEYERS asked "what is the flare -up from" could it be Mepron? MEYERS continued "did you consider stopping Mepron and CAMERON "said no." MEYERS noted that on the 6/2/10 visit that the same three drugs were still being given. MEYERS asked again why? CAMERON stated for the three reasons stated above; MEYERS asked since one reason was co infection did you do any tests? CAMERON said no. MEYERS asked if there was a neurological or musculo-skeletal exam noted. CAMERON stated "regularly do them but I am not good at documentation." MEYERS and SULLIVAN noted that he documented Lungs and Heart examination. He was

asked if there were any Heart and Lung symptoms and CAMERON said no; but he was noted to not have documented the muscle, skeletal or neuro exam. The above sequence of questions and answerers were given for the 6/15/10 - 7/15/10 visits though again there were symptoms of shoulder and hip pain. The three drugs were continued and CAMERON gave the same three reasons cited above. On the 7/15/10 visit CAMERON noted J█████was more active and MEYERS asked "why not stop therapy. CAMERON stated he had not resolved his symptoms," though his mood was better from the Lexapro. The Rocephin, Zithromax and Mepron remained as therapy through 8/10/10. CAMERON stated he would consider Rifampin for Bartonella for remaining symptoms possibly related to Bartonella or other co infections." Again no examination as cited above. On 9/14/10 JAGGER was put on Ceftin because it was a cephalosporin and he was done with the Rocephin, (cephalosporin). MEYERS asked what he was treating now. CAMERON said J█████had mood issues but that his headaches were under control and he could take Advil for that." CAMERON stated "he would complete therapy for Lyme and co infection." MEYERS asked when he planned to stop and CAMERON said he would take away one antibiotic each month.

Next discussed was CAMERON's care and treatment rendered to K█████ for the period June 1999 through 2007 including but not limited to the diagnosis of Lyme disease, differential diagnosis and treatment. K█████record was reviewed beginning with the visit of 07/26/99. The note read IV Rocephin for cellulitis started 06/25/99; there is a note Lyme WB and Elisa for Lyme ordered from Stoney Brook lab. (No record was found and CAMERON and WOOD were asked to try and retrieve results.) On 08/06/99 there is a note, Ceftin for Lyme disease, and it appears that Rocephin was started on 8/17/99 for phlebitis. The next day Zithromax was "added for Lyme as part of presentation." Meyers said why not Rocephin alone? CAMERON stated it "often works" but he was concerned with Lyme Disease so he added Zithromax. CAMERON stated "Ceftin and Rocephin are pretty close and most of the time Ceftin will do the trick;" Ceftin was good in the EM trials. Of note K█████came daily for IV Rocephin given by "Butterfly." On 09/27/99 IV Rocephin was stopped.

On 01/14/02 phlebitis occurred again and IV Rocephin was started. On 01/16/02 a note written by CAMERON states Lyme, and he "discussed as a problem in the past." Further review of the record with CAMERON showed a note on 1/18/02, and CAMERON said that now Lyme as a contributing factor since surgeon had stated possibility. On 1/19/02 there is a note by CAMERON stating "Lyme mimicking cellulites." CAMERON said there was literature on "mimicry cellulitis." On 1/23/02, KROWE was given Augmention.

On 06/03/05 K█████ was treated with Amoxicillin. There was a reference in the notes to "Lyme tests positive" in a phone call 6/16/05. Amoxicillin was continued. There is a note on 11/5/05 "Igm, by WB", also positive in June. CAMERON said "it was positive for five months and that it stays positive longer". MEYERS asked if this correlates with Lyme disease and CAMERON said it correlates with flare-ups. MEYERS asked if there was any evidence of a new tic bite , CAMERON said no, this was a flare-up of Lyme disease. MEYERS said why would it flare-up? CAMERON stated Igm is a marker of severity of disease. MEYERS said IGM and he has no complaints, thus what is the flare -up? CAMERON said he was not treated and you have to pay attention to it." On 8/9/06 there is a note Augmention for "Cellulitis/Lyme" with fever. On 12/28/00 "Ceftin started for cellulitis and Lyme tests done. In November 2006 at

Stoney Brook Igm indeterminate and IgG indeterminate.On 12/28/07 with recurrence of fatigue, joint pain, stiff neck and memory issues. Lyme therapy with Amoxicillin 1000 mgm TID x 4 weeks was prescribed. CAMERON confirmed no physical exam was documented and there were no signs of disease.

On 4/15/08 the note reads "Lyme flare up". When asked what were K██████ymptoms CAMERON stated "tired, stiffness, and see progress note". K█████ was treated with Doxcycline. Again, CAMERON confirmed no physical exam was documented and K██████had no signs of disease. On 05/18/08 K████ was still on Doxcycline. MEYERS noted there are no documented visits May and July and asked if there are any notes, WOOD said he would send them to OPMC if they exist. CAMERON said that on 07/18/08 K█████"went off medicines too early" and he was placed on Doxcycline, at a dose of 300 mgm a day. On 9/13/08 there is a PA note "hold Doxcycline for photo sensitivity issues as patient was traveling, CAMERON and MEYERS note K█████symptoms were much better. CAMERON stated, "he must have had symptoms left since he was going to Africa."

There were no further questions and the interview was terminated. WOOD said that he would send to OPMC additional information requested during the interview, including a submission on behalf of CAMERON.

**Transcriber:**          ps
**Date:**               3/31/2011

12

# EXHIBIT "5"

# WOOD & SCHER

### ATTORNEYS AT LAW
222 BLOOMINGDALE ROAD, SUITE 311

## WHITE PLAINS, NEW YORK 10605

TELEPHONE (914) 328-5600
FACSIMILE (914) 328-5627
E-MAIL: WoodScher@aol.com

ANTHONY Z. SCHER
WILLIAM L. WOOD, JR.
(ALSO ADMITTED IN TEXAS)

ANDREA DIAL SCHER
OF COUNSEL

February 23, 2011

*By Mail & Fax 518-402-0751*
NYS Department of Health
Office of Professional Medical Conduct
433 River Street, Suite 303
Troy, NY 12180
*Attn: Patrick Sullivan*
  *Medical Conduct Investigator*

       *RE: Daniel Cameron, M.D.*
       *Your File # CR-10-03-2010 A*

Dear Mr. Sullivan:

    This constitutes Dr. Cameron's response to the ROI for his September 14 and December 13 interviews with Dr. Meyers.

    For our mutual convenience, I have marked your ROI with red reference numbers. Our response to the ROI is cited to each of those numbers.

*Patient F█████████*

1.  Dr. Cameron said he did not recall if he discussed this case with his PA, but his usual and customary practice in a complex case such as this is to discuss it with the PA. Moreover, he notes that he and his PA work the same hours, so he is always in the office when his PA's see patients, so he is able to see any patient immediately after his PA has seen the patient, if the circumstances warrant it.

2.  In this case Dr. Cameron did not recall talking with the PCP because the patient had not been referred by the PCP. In such cases he takes a detailed history himself (or his PA does) and he calls the PCP if he thinks it would be helpful, but does not if he thinks he has adequate information to go forward with the case.

Patrick Sullivan
February 23, 2011

Page 2

3.    It is not accurate to say there was no written diagnosis, since in the next few
      words of the ROI it is confirmed that the diagnosis was "*headache, migraines
      & Lyme.*"

4.    Though he did answer he did not know when the labs were received, often
      patients bring the labs with them, especially so when they have not been
      referred by their PCP, and he assumes that was so for this case.

5.    True, there are often no signs in actual practice.  The 4 NIH sponsored Lyme
      disease trials documented Lyme disease cases without signs (citation of the
      NIH trials will be contained in the post-interview submission we will make
      in the near future.)

6.    He said there was no DDX, but in fact one was contained in the chart.
      However, it was not a comprehensive or exhaustive DDX when compared to
      the consult note a specialist might have written.

7.    There is a reference to a "focus visit." We are puzzled by that term.  This was
      comprehensive, new evaluation with assessment and plan.

8.    Ampicillin was not continued it was Amoxicillin.

9.    As we have already stated, there are often no signs of disease in actual
      practice.

10.   A clearer explanation of what would constitute resolution of the illness would
      have been less frequent, less intense headaches and improved memory and
      concentration.  That is actually what the patient record said, but the actual
      language of the ROI did not make this clear.

11.   It is true there were no memory or concentration tests, but Dr. Cameron has
      used a Review of Systems Scale (ROSS) (ac copy enclosed) to assess the
      severity of symptoms and has found this measure to be effective. The ROSS
      is a series of 100 mm visual analog scales (VAS) rating symptoms from none
      to severe.  VAS have been increasingly used as an outcome measure in a
      number of diseases and pain programs in addition to Lyme. VAS were used
      in the NIH Lyme disease trials.

Patrick Sullivan
February 23, 2011

Page 3

12.   Dr. Cameron did not concede that no PE was done; he stated no PE was documented.   No PE was documented because typically there were only negative findings or signs.   In a primary care setting, where the disease under care often presents no signs, Dr. Cameron sees little value in documenting negative findings.

13.   Dr. Cameron regularly refers to neurologists if indicated; it was not indicated at this time.

14.   The reference to patients not meeting CDC criteria implies that none of Dr. Cameron's patients meet the criteria.   That is not true.   A lot of his patients meet the CDC criteria for Lyme disease, some do not.   Those who do not often are not diagnosed in a timely fashion.   The disease process of those patients who do not meet the CDC criteria is often complex and more difficult to treat.

The best example of this is the Columbia based NIH trial where Lyme disease patients were not diagnosed for two years on average.   These patients remained ill for nine years after infection (reference to the Columbia trial will be contained in our post-interview submission.)

15.   The reference to the PCP who treated without a positive tests reflects that that PCP, came to the same conclusion as Dr. Cameron without labs or signs.

16.   "Edimentation" rate should read sedimentation.

*Patient V* ▉

1.   This was an office note in a primary care setting and the full DDX that was considered was not documented.

2.   A sed note of 50 is consistent with resolving diverticulitis from 11/07. He could repeat the test on follow up if the illness persists.   The rate had already dropped by half.

3.   These are not the CDC recommendations, but many doctors have other treatment regimens.   Those other regimens will be documented in detail in our post-interview submission.

Patrick Sullivan
February 23, 2011

Page 4

4.      As previously discussed negative findings from the PE are not always
        documented.  Lyme disease often does not have physical findings.

*Patient* ▉▉▉▉▉

1.      The ROI implies that the "severe relapse" should have been explained. In
        practice however, the patients often can't provide sufficient detail of such
        relapses. These patients have been described in the NIH trials and case series.
        Treatment therefore depends primarily on the patient's unique clinical
        circumstances.  Again, clinical judgment is very important in complex cases
        such as these.

2.      A diagnosis of fibromyalgia does not rule out a diagnosis of Lyme disease.

3.      Dr. Cameron does not typically use the word "chronic" in practice when
        referring to Lyme disease because "chronic Lyme disease" has been viewed
        by some physicians as a condition not responsive to antibiotics.  His view is
        that some cases improve with additional antibiotics in combination with
        supportive care.

4.      1M should be IM.

5.      Though Dr. Cameron did not contest the assertion there were no documented
        vital signs, the chart contains documentation of vital signs taken on numerous
        occasions, including the IM flow sheet and the health history and physical
        forms.  Also physical exams are documented in the chart.

6.      The ROI suggests there were no physical exams, but documentation of the
        exams contained in the chart has been annexed hereto.  Moreover, the chart
        contains numerous ROSS forms.

7.      Dr. Cameron, did not elaborate on the neuro psychiatric issues, but they will
        be addressed in his post-interview submission.

8.      Dr. Cameron continued antibiotic treatment because he concluded that
        benefits outweighed risks.

Patrick Sullivan
February 23, 2011

Page 5

9.   Dr. Meyers implied "floating in poison" was a psychotic statement, but Dr. Cameron saw no evidence of psychotic manifestations after a year and a half of treatment, often including weekly visits.

10.  By "personal experience" Dr. Cameron meant clinical judgment..

11.  Dr. Cameron did say that the Klempner study was not favorable, but that the Klempner trial cannot be generalized to this patient. Moreover, the result of the Klempner trial were not published until 3 years after he started treatment of this patient.

**Patient R**

1.   As stated in the case of Finkelstein, Dr. Cameron sees little value in documenting negative findings.

2.   The ROI does not reflect that the 4/22/04 visit documented that the patient had seen Dr. Fitcheman who had done two pain blocks and that the referral to pain management had been denied by her insurer. This denial, obviously, made her care more difficult and complex.

3.   ROI says the 5/26/04 note contained no discussion of the patient's symptoms, but in fact the note documented pain and excessive sleeping.

**Patient G**

**Patient D**

1.   Dr. Cameron should have noted the numerous ROSS reports contained in the record.

2.   Dr. Cameron did not mean that the neuro psychologist's report was immaterial and not relevant. He simply meant it was only one finding that should have been considered in assessing the patient.

**Patient Hammer**

**Patient Warmbrand**

Patrick Sullivan
February 23, 2011

Page 6

*Patient J* ▆▆▆

*Patient K* ▆▆▆

1.   That IgM persists for five months or longer after a well documented infection is supported in the literature referred to in Dr. Cameron's post-interview submission.

2.   The literature supporting using IgM as a marker of severity will be contained in Dr. Cameron's post-interview submission.

Very truly yours,

William L. Wood, Jr.

WLW:ag
#6257-b

encl.