## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW
## YORK Case No.: 1:17- cv - 3420JGK

_____X

DANIEL CAMERON M.D.

Plaintiff

-vs.-

Howard Zucker M.D. in his official capacity as Commissioner of
New York State Department of Health; Keith W. Servis in his official
capacity as Director of Office of Professional Medical Conduct)"OPMC");
Arthur S. Hengerer, M.D., in his official capacity as Chair of the BPMC
for Professional Medical Conduct ("BPMC"); Carmella Torrelli, Vice Chair of the
BPMC for Professional Medical Conduct; Katherine Hawkins, M.D., J.D.,
Executive Secretary of the BPMC; Patrick Sullivan, Investigator, NYS
OPMC; Burt Meyers MD, NYS OPMC medical director;
Kimberly A. O'Brien, administrative law judge; NYS
Department of Health, for antitrust injunction only; NYS Office
or professional Medical Conduct, for antitrust injunction only;
"John Doe" 1-108 and "Jane Doe" 1-108, the last two sets of Defendants
being fictitious names, the parties intended being the members of the
New York BPMC.

Defendants.

_____X

STATE OF NEW YORK       )
                                     )

COUNTY OF WESTCHESTER   )

       DANIEL CAMERON MD, being duly sworn deposes and says:

       1.     I am the Plaintiff in the instant action and as such I am fully familiar with

all the facts and circumstances of this litigation.

       2.     I am a physician dully licensed to practice medicine in the State of New York and

I maintain a medical practice at 657 Main Street, Mount Kisco, NY 10544.  I practice internal

-1-

Medicine. I diagnose treat patients affected by chronic Lyme disease in accordance with the standard of care prescribed by the guidelines of International Lyme and Associated Diseases Society ("ILADS").

2.      I submit this affidavit in support of the relief sought in the Verified Complaint and in support of my instant motion and application for emergency relief in the form of a Temporary Restraining Order and a Preliminary Injunction.

3.      I have read the Verified Complaint and know all the facts therein to be true except for those stated upon information and belief and as to those I believe them to be true. My belief is based upon the documents and information available to me at the time when the Petition was prepared.

4.      I hereby incorporate by reference in this affidavit all the facts stated in the accompanying Verified Complaint.

5.      The Verified Complaint explains that since 1988 I have been providing competitive medical services in the New York endemic area to Lyme disease patients. The services are and were at all the relevant times to this action provided to local, national and international patients who suffer from Lyme disease.

6.      The Verified Complaint also explains that the defendants are seeking to eliminate the competitive medical services offered by me since 1988 to chronic Lyme disease patients.

7.      The defendants are seeking to maintain a bad faith license disciplinary prosecution against me contrary to the prohibitions of the relatively new statute Public Health Law Sec. 230-9b. The bad faith prosecution is being instituted simply because I offer and offered medical services based upon the scientifically approved and sanctioned criteria of the ILADS guidelines

and for no other viable reason.

8.     The bad faith prosecution is also being used by the defendants to eliminate the competitive services which I offer to Lyme disease patients and for the financial benefit of the defendants and of hospital and office based physicians who offer Lyme related services exclusive under the criteria of the guidelines of the Infectious Disease Society of America ("IDSA").

9.     The defendants propose and are imminently about to use the New York license disciplinary process (Exhibit "A" to the Verified Complaint) to further their bad faith prosecution as stated in the complaint and the end goal of putting me out of business.

10.     They filed formal charges against me based upon investigations and reports of investigations which were generated and conducted in 2010 and based upon a post interview fabricated Report of Investigation ("ROI") as discussed below. Both the investigation and the ROI were aimed **EXCLUSIVELY** at my diagnosis and treatment of Lyme disease of patients "A" though "G" mentioned in the charges by methodology stated under the ILADS guidelines, as explained ion the Verified Complaint.

11.     Hearings aimed at eliminating my competitive services based on ILADS guidelines and are sought to be conducted by the defendants in derogation of the prohibitions of PHL Sec. 230-9b. The hearings are noticed by the defendants to commence on June 12, 2017. See Verified Complaint and Exhibit "A" thereto.

12.     Because this action involves a bad faith prosecution in progress as alleged in the Verified Complaint, I am seeking a preliminary injunction and a temporary restraining order staying the administrative proceedings pending a hearing on the merits of my claim for bad faith prosecution and for violation of the antitrust statutes by this Court.

13.    In this affidavit, I will be explaining the substantive basis for the contention that the defendants are seeking to maintain the license prosecution in bad faith and in furtherance of their conspiracy to violate the federal antitrust statutes as alleged in the complaint.

14.    I also explain the difference and competing interests between the two divergent competing physician groups who offer competitive Lyme disease related services to consumers and the public under ILADS and IDSA guidelines.

15.    I will also explain the concerted effort made by the defendants to create a monopoly for their own benefit and that of physicians who offer competitive medical services under the IDSA guidelines, using the bad faith prosecution brought contrary to the prohibitions of New York Public Health Law Sec, 230-9b.

**(a)    The competing interests and divergent views of
the two distinct groups of physicians who offer
Lyme disease related services.**

16.    In the Verified Complaint at paragraphs 24-66 I explained the competing interests of the IDSA and ILADS physicians in the patient market which is affected by Lyme disease.

17.    In the same paragraphs, I outlined the divergent approaches and views in the diagnosis and treatment of Lyme disease by the two groups of physicians.

18.    I also explained the overt and open assault launched by the group of physicians who offer IDSA guidelines services on physicians like myself who offer competing ILADS guidelines based services using license disciplinary proceedings aimed at eliminating and restricting the competition to the IDSA guidelines based services.

19.     All the allegations in the complaint are incorporated by reference herein and the Court is respectfully directed to the Verified Complaint for a full and true accounting of the statements made forth therein.

**(b)     The defendants are using the license disciplinary process in New York and the bad faith prosecution to facilitate their elimination from the New York markets of competitive medical services offered under ILADS guidelines.**

20.     As set forth in the Verified Complaint, that conduct involves defendants' use of the license disciplinary process to eliminate the competitive medical services which I am providing and have been providing to Lyme disease patients since 1988.

21.     The competitive medical services which have been offered by me to patients "A" though "G" through by ILADS guidelines have been recognized by the New York legislature as legitimate and protected against the administrative prosecution under the prohibitions of PHL Sec. 230-9b which became effective on May 12, 2017.

**(c)     The divergent competing Lyme disease diagnosis and treatment guidelines of ILADS and the IDSA.**

22.     As stated in the Verified Complaint ILADS is a private physician based organization dedicated to the education, diagnosis and treatment of Lyme disease and chronic and persistent Lyme Disease. I have been ILADS president twice in the past

23.     I am one of the authors of the ILADS guidelines. The guidelines have been updated to meet the scientific standard for acceptance and inclusions into the National Guidelines Clearinghouse ("NGC") of the US Government Department of Health and Human Services,

Agency for Healthcare Research and Quality ("AHRQ").

24.    The ILADS guidelines titled "Evidence assessments and guideline recommendations in Lyme Disease: the clinical management of known tick bites, erythema migrans rashes and persistent disease" are annexed as Exhibit "B" to the complaint and can be found on the National Guidelines Clearinghouse at the URL: https://www.guideline.gov/summaries/summary/49320/evidence-assessments-and-guideline-recommendations-in-lyme-disease-the-clinical-management-of-known-tick-bites-erythema-migrans-rashes-and-persistent-disease?q=lyme+disease.

25.    According to the AHRQ's own posting on its web site, "AHRQ's National Guideline Clearinghouse is a public resource for summaries of evidence-based clinical practice guidelines".

26.    Effective June 1, 2014, the AHRQ published a revised criterion for the inclusion of scientific medical guidelines in the National Guidelines Clearinghouse ("NGC"). That criteria can be found on the AHRQW/NGC web site at the URL https://www.guideline.gov/help-and-about/summaries/inclusion-criteria.

27.    The inclusion guidelines contain the following highlights:

(i)    The clinical practice guideline must contain systematically developed statements including recommendations intended to optimize patient care and assist physicians and/or other health care practitioners and patients to make decisions about appropriate health care for specific clinical circumstances;

(ii)    The clinical practice guideline was produced under the auspices of a medical specialty association; relevant professional society; public or private organization; government agency at the Federal, State, or local level; or health care organization or plan. A clinical practice guideline developed and issued by an individual(s) not officially sponsored or supported by one of the above types of organizations does not meet the inclusion criteria for NGC;

(iii)    The clinical practice guideline is based on a systematic review of evidence as demonstrated by documentation of each of the following features in the clinical practice guideline or its supporting documents. This requirement includes some five specific scientific review mandates for acceptance of the guidelines

(iv).   The clinical practice guideline or its supporting documents contain an assessment of the benefits and harms of recommended care and alternative care options.

(v)    The full text guideline is available in English to the public upon request (for free or for a fee). Upon submission of the guideline to NGC, it also must be noted whether the systematic review or other supporting documents are available in English to the public upon request (for free or for a fee).

(vi).   The guideline is the most recent version published. The guideline must have been developed, reviewed, or revised within the past five years, as evidenced by appropriate documentation (e.g., the systematic review or detailed description of methodology)

28.    The ILADS guidelines have been submitted and accepted for inclusion and publication on the NGC database of the AHRQ. The ILADS scientific and medical guidelines are the only guidelines currently existing on the NGC publication.

29.    The IDSA guidelines in the treatment and diagnosis for Lyme disease have been deleted and excluded from the NGC by the AHRQ because the same expired and did not comport with the 2014 inclusion criteria for scientific update.

30.    As discussed in the Verified Complaint, a private divergent group of physicians called Infectious Disease Society of America ("IDSA") prepared its own guidelines regarding protocols for diagnosis and treatment of Lyme disease. The IDSA guidelines adopted as its model the CDC surveillance definition criteria for the diagnosis and treatment of Lyme disease.   The IDSA guidelines are annexed to the Verified Complaint as Exhibit "C""

31.    The IDSA guidelines promulgated in 2006 adopted the CDC surveillance criteria

and definition of Lyme disease while the ILADS guidelines do not.

32.    The CDC specifically states on its web site and in each one of its case definitions for Lyme adopted in 1995, 1996, 2008 and 2011 that its definitions of Lyme which include diagnosis and treatment statements are not intended to be used by clinicians in clinical settings and are NOT appropriate for clinical diagnosis and treatment of Lyme disease because they are to be used for CDC surveillance purposes only. See Exhibit "D" to the Verified Complaint.

33.    The CDC does not seek to restrict the practice of medicine in the field of Lyme disease according to its restrictive surveillance criteria. See Exhibit "D" annexed hereto - CDC Lyme disease surveillance criteria and definitions.

34.    IDSA physicians and physicians who offer medical services exclusively by IDSA guidelines, such as Burt Meyers and members of the New York Board of Professional Medical Conduct, have openly used and misused the license disciplinary process in this state as well as country wide to intimidate, investigate and prosecute physicians such as myself who offer Lyme services pursuant to ILADS guidelines. They are seeking to do the same now.

35.    IDSA physicians contend that the treatment of Lyme by IDSA guidelines is "conventional medicine".

36.    That is simply not the case. Because the ILADS guidelines and medical services offered by physicians who follow them are recognized by US Government scientific standards and published in the NGC and because IDSA guidelines are not included in the NGC database, the IDSA characterization of the practice of medicine by IDSA standards as "conventional" is outdated and nothing short of an unsubstantiated misrepresentation.

37.     As it can be seen from the Verified Complaint IDSA guidelines proponents and follower physicians openly criticize politicians who pass legislative enactments which protect the competitive medical services offered inter alia by ILADS guidelines and encourage the use of the license disciplinary process by professional medical boards to discipline and exclude ILADS guidelines based medical services from relevant markets. See exhibit "E" to the Verified Complaint.   The IDSA followers include members of the BPMC as well as the medical director Burt Meyers.

**(d).     The 2002 investigation.**

38.     The defendants started their effort to stage the instant bad faith prosecution and to eliminate the medical services based on medical criteria which 2004 became the official ILADS guidelines.

39.     On or about February 2002, the defendant Office of Professional Medical Conduct ("OPMC") commenced an investigation into my general practice of medicine in New York under case No. NR-02-11-5936A with focus on the services which I offered to Lyme disease patients.

40.     The 2002 inquiry involved a randomized review of medical records for the purposes of identifying practice of medicine in diagnosing and treating Lyme disease by the subsequently published ILADS guidelines and nothing else.

41.     As set forth in the Verified Complaint, on or about July 1, 2002, I was subjected to an interview pursuant to PHL Sec. 230(10)(a)(iii) regarding my care of the eleven patients then under scrutiny.   That interview involved exclusively issues of diagnosis and treatment of chronic Lyme disease by ILADS guidelines as set forth in the Verified Complaint.

42.     No action was taken by the OPMC with respect to case No. NR-02-11-5936A.

43.     The only activity on investigation NR-02-11-5936A of which I have any record is the request made in July 21, 2003 by my attorney at that time with respect to medical records and correspondence from the OPMC related to the same dated July 14, 2003. There was no activity in case No. NR-02-11-5936A since 2003 onward.

**(e)      The 2010 investigation and statutory interview.**

44.     In 2008 and 2010, after the initial 2004 publication of the ILADS guidelines, without having received any specific complaint and without the issuance of an Order of a comprehensive practice evaluation having been issued as alleged in the Verified Complaint, the defendants recommenced a general inquiry into my general practice of medicine of medicine regarding my diagnosis and treatment of Lyme diseases by requesting the production of some twelve patient records.

45.     There were newly opened cases bearing Nos. CR-08-04-22888-A; CR-08-08-5008-A; CR 10-03-2010-A and CR-10-08-5079. Annexed hereto as Exhibit "1" are sample letters sent to me sent by the defendants and requesting medical records for no stated reasons.

46.     By letter dated August 17, 2010 (Exhibit "2" hereto), the defendants advised me of the scheduling of a statutory interview pursuant to PHL Sec. 230(10)(a)(iii) on September 14, 2010. See Exhibit "2" hereto.

47.     That letter specifically identified the issues which were the subject matter of the investigation for the first time. As it can be seen from the same letter (Exhibit "2" hereto) without exception, the defendants identified the general subject matter of the inquiry with respect to each and every identified patient in general terms as "**diagnosis of Lyme disease, …differential diagnosis and treatment**". The relevant patients and issues under review were: (i) EW - for care

-10-

including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered in July 2008 (EW is Patient "E" in the current SOC); (ii) MV for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between February 2008 and March 2008 (MV is patient "F" in the current SOC); (iii) EK for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between June 1999 through 2007 (EK is patient "C" in the current SOC); (iv) DG for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between October 1998 through March 2008 (DG is patient "B" in the current SOC); (v) IH for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between October 1997 through 2004 (IH is patient "D" in the current SOC); (vi) AR for care including **diagnosis of Lyme disease, ...differential diagnosis and treatment"** rendered between June 1999 through 2007 (AR is patient "A" in the current SOC).

48.     Patient RJ (Patient "G" of the SOC) was not named in the August 17, 2010 letter.

49.     I attended the interview of September 14, 2010. At the interview, I was questioned at length by defendant Meyers exclusively about the treatment and diagnosis of Lyme disease and nothing else.

50.     During the interview, it became clear that the medical director Meyers outright rejected the type of medical services offered by me to chronic Lyme disease patients pursuant to ILADS guidelines.

51.     Meyers made gratuitous statements indicating and infusing his bias towards medical services rendered by IDSA guidelines standards. Meyers' disdain for my treatment and diagnosis of Lyme and defendants' staging of the bad faith prosecution which is based on Meyer's

statements made in the ROI (Exhibit "4" hereto) is specifically discussed more in detail below in this affidavit.

52.     The initial statutory interview was not completed on September 14, 2010. By letter dated October 28, 2010 (Exhibit "3" hereto) the defendants notified me that that they will continue the statutory interview pursuant to PHL Sec. 230(10)(a)(iii) on December 13, 2010.

53.     The relevant issues and patients which were the subject matter of the investigation were identical as the ones recited above in connection with the letter of August 2010 (Exhibit "2" hereto). In addition, patient RG (RG is patient "G" in the SOC) was added. The issues identified with respect to patient RG in the October 28, 2010 letter are as follows: "...care including **diagnosis of Lyme disease...differential diagnosis and treatment"** rendered between August 2009 through September 2010.

54.     The letter of October 28, 2010 did not identify any other issues than my diagnosis and treatment of Lyme disease in all patients mentioned in the August letter a swell as patient RG ("G" in the SOC).  I diagnosed and treated patient RG exclusively by methodology recognized by ILADS guidelines and not by IDSA guidelines.

55.     I attended the interview of December 3, 2012.  At the interview, I was questioned at length by defendant Meyers regarding the treatment and diagnosis of Lyme disease exclusively and nothing else. Rather than affording me to answer his questions, Meyer was belligerent, he cut me off and he substituted his own opinions and answers to his own questions which militated in favor of IDSA based guidelines treatments and against and the exclusion of ILADS guidelines based diagnoses and treatments.

56.     Both statutory interviews were plagued by defendant Meyers' infusions of his own

IDSA standards and biases into the interviewing process and his aggressive questioning based on Meyers' own personal disapproval aimed at my treatment and diagnosis of Lyme pursuant to ILADS guidelines. During both interviews, Meyers did not afford me a chance to properly recollect the facts pertaining to each individual, himself suggested the answers to the questions and when he disagreed with me he simply inserted his own version and interpretation of the interview in the Report of Interview.

57.     As it can be seen form the memorandum of law in support of my motion for temporary relief, the opportunity to be interviewed by the OPMC is a mandatory statutory pre-requisite to advancing the bad faith prosecution into the actual charges and hearing stages.

58.     As it can be further seen from the accompanying memorandum of law, the disclosure of the subject matter of the investigation is also a mandatory statutory pre-requisite step to the advancement of any case towards administrative prosecutions and hearings.

59.     As it can further be seen from the accompanying memorandum of law, a statement of charges, such as Exhibit "A" to the Verified Complaint, which makes allegations which are beyond the subject matter identified in the pre-interview letter and discussed at the interview is evidence of bad faith prosecution for all the reasons set forth therein. This issue is further discussed below in this affidavit.

60.     Without exception, the statutory letters of August 17, 2010 and October 28, 2010 specifically identified the focus of defendants' interview and investigative process as targeting my diagnoses and treatment of Lyme in each and every one of the identified patients. See exhibits "2" and "3" hereto.

61.     Without exception, the diagnosis and treatment of Lyme in each one of the

identified patients ("A" through "G" in the SOC), who are now the subject matter of the instant prosecution were rendered by me in accordance with ILADS and not IDSA guidelines as explained in the Verified Complaint.

63.     Couching the current SOC (Exhibit "A" to the complaint) in terms other than the treatment and diagnosis and Lyme disease by ILADS standards, as admitted and identified by the defendants in the initiating letters (Exhibits "2" and "3" hereto)  does not vitiate the fact that by defendants' own admissions the only issues identified by the defendants with respect to all of the patients in the SOC(pertain to the treatment and diagnosis of Lyme disease offered and rendered by me and no other identified issue.

64.     Consequently, the instant prosecution is aimed at the elimination of ILADS based medical services rendered to Lyme disease patients and is maintained in bad faith in violation of the prohibitions of PHL Sec. 230-9b as alleged in the Verified Complaint and in the accompanying memorandum of law.

**(f).      The Report of Investigation.**

65.     As it can be seen from the Verified Complaint and form the memorandum of law in support of the motion for interim relief, under the relevant provisions of New York law, after the completion of the interview the defendants must provide me with a Report of Investigation ("ROI") which identifies all issues fleshed out during the interview.

66.      The defendants also must give me an opportunity to respond to such issues.

67.     Under cover letter date January 12, 2011, the defendants issued the ROI and sent the same to me. See exhibit "4" hereto.

68.     As it can be seen from the ROI, and as specifically discussed below, the

document is replete with defendant Meyer's infusions of his own bias and statements in such a fashion as to facilitate the bad faith prosecution for my rendering competitive medical service pursuant to ILADS guidelines

69.     By letter dated February 23, 2011 (Exhibit "5" hereto), through my attorney I provided corrective information to the allegations of the ROI. Upon information and belief, contrary to the mandatory provision of New York law and as stated in the Verified Complaint, my corrections to the ROI and the additional information provided were not presented to the Committee of the BPMC which voted to prosecute me based upon the ROI allegations.

70.     As set forth in the Verified Complaint, the concurrence of the BPMC committee was staged, tainted and obtained in furtherance of the staging of the bad faith prosecution and of the conspiracy to violate the Sherman Antitrust Act. It was obtained before the effective date of PHL 230-9b which specifically prohibits such prosecutions from taking place.

71.     Specific facts regarding the fabrication and tainting of the ROI are set forth below.

**(i).     Facts pertaining to the interview and the ROI statements
related to patient MV (Patient "F" in the SOC).**

72.     The ROI (Exhibit "4" hereto) reports at pp 2-3 that the interview pertains to my care of patient MV for one month between February 2008 and March 2008.

73.     The substance of the ROI with respect to this patient contains the most telling note that the defendants are aiming to violate the Sherman Antitrust Act as alleged in the Verified Complaint and to exclude competitive Lyme disease medical services offered pursuant to the ILADS guidelines.

74.     The ROI specifically states at page "3" as follows: **"Meyers noted that the CDC**

**guidelines stated that more than one month of therapy has not proven to be effective"**. This statement signals a dual violation of my rights safeguarded by New York Law in furtherance of the staging of the bad faith prosecution as set forth in the Verified Complaint.

75.     For starters, as set forth in the memorandum of law and in the Verified Complaint and the memorandum of law, the statutory interview is not an opportunity for the defendants to offer and include in the ROI the medical director's own views and IDSA taint and biases regarding the treatment of Lyme disease.

76.     Moreover, the view that antibiotic treatment of Lyme disease beyond one month duration is ineffective the strict view urged by the IDSA physician group to the exclusion of the ILADS treatments emphasizing long term antibiotics. See exhibits "B" through "E" of the Verified Complaint.

77.     As set forth in the Verified Complaint, prosecutions based upon diagnoses and treatments of Lyme based inter alia upon ILADS guidelines are prohibited in this state by PHL Sec. 230-9b.

78.     Moreover, contrary to the Meyers statement infused in the ROI for the purposes of facilitating the bad faith prosecution, CDC "guidelines" do not exist at all. What does exist are the IDSA guidelines which are predicated upon the CDC surveillance criteria. It is the IDSA guidelines which disapprove of long term antibiotic treatment and not the CDC "guidelines".

79.     Meyers is a proponent and supporter of the IDSA treatment and of the exclusion of ILADS based treatments and diagnostic modalities.

80.     The bad faith prosecution predicated upon Meyers' infused bias is not supported by any CDC "guideline at all. The CDC specifically states that it surveillance criteria is not

appropriate for the clinical diagnosis and treatment of Lyme. See exhibit "D" annexed to the Verified Complaint. The CDC specifically states so in its own documents.

81.     As it can be seen from Exhibits "C" and "E" to the Verified Complaint, the view that "**more than one month of [of antibiotic] therapy has not proven to be effective"** is exclusively that of the IDSA physicians and guidelines and not that of the ILADS physicians and guidelines (see exhibit "B" to the Verified Complaint).

82.     To the contrary, the ILADS scientific guidelines (Exhibit "B" to the Verified Complaint) do recognize the efficacy of long term antibiotics and of the condition of chronic and persistent Lyme disease.

83.     The IDSA excludes that view in its totality and nothing short than license prosecution is recommended by IDSA supporters for those who do not agree with their views. See exhibits "C" and "D" to the Verified Complaint.

83.     New York does not have any regulations which adopted the CDC surveillance criteria regarding Lyme disease as the guidelines for the diagnosis and treatment of such disease in this state.

84.     To the contrary, as set forth in the Verified Complaint, defendants' stated position in the ROI has been rejected in New York by the legislature. My prosecution which is predicated upon defendants' stated premises in the ROI is specifically prohibited by PHL Sec. 230-9b.

85.     Moreover, Meyers's further comments contained in the ROI demonstrate that the defendants acted and are acting in furtherance of their conspiracy to violate the Sherman Antitrust Act as set forth in the Verified Complaint.

86.     In this case, the defendants purposefully appointed Meyers, an infectious disease

physician who practices medicine by IDSA guidelines only, for the purposes of generating the ROI infused with Meyers' own IDSA guidelines and treatments supporting comments, which in turn was used by the defendants to spin off and stage the bad faith prosecution as alleged in the Verified Complaint.

87.    The ROI clearly reflects at p. 3 (Exhibit "5" hereto) that my diagnosis of Lyme of patient MV (Patient "F" of the SOC) was based on clinical manifestation of joint and back pain, memory loss, fatigue, disturbed sleep muscle pain etc.

88.    Past medical records which were faxed over to me by the medical records department of Hudson River Community health clearly reflect this patient's persistent "severe joint pain", "back pain", "abdominal pain" and elevated ESR (Erythrocyte Sedimentation Rates).

89.    Elevated ESR is significant in people with Lyme disease as it is a test that physicians perform to measure inflammation of the body. The diagnosis of Lyme disease by the above reference criteria and symptomatology is in conformance with ILADS criteria.

90.    Defendants' staged license prosecution based upon the rejection of competitive medical services based ILADS criteria as evidenced by the ROI is prohibited in New York by PHL Sec. 230-9b.

91.    The ROI further indicates that Meyers reported that he accused me that the records of patient MV (Patient "F") do not indicate whether I have seen the prior medical records for the patient while treating MV.

92.    The ROI deliberately fails to report that I answered that question in the affirmative and that the medical record itself which the defendants and Meyer had in their possession at the time when the ROI was written, specifically indicates that the past medical records of this patient

were sent and reviewed by me on 2/19/2008. This deliberate omission indicates defendants' staging of the bad faith prosecution based upon defendants' deliberate spin and distortion of Plaintiff's interview responses.

**(ii).    Facts pertaining to the interview and the ROI
related to patient  AR (Patient "A" in the SOC).**

93.    The relevant part of the ROI relating to the interview regarding patient AR is found at pp. 5-6. See Exhibit "5" annexed hereto.

94.    At page 5 and onto page 6 of the ROI (Exhibit "5" hereto) Meyers narratively and selectively describes treatment which patient AR received in 1997 and 1998 without documenting the questions addressed to me or answers regarding the same. As it can be seen from the memorandum of law, staging the ROI with Meyers' infusions and recitations for the purposes of staging the bad faith prosecution, violates New York law.

95.    My ex counsel's letter of February 23, 2011 (Exhibit "5" hereto) issued pursuant to the provisions of New York statutory law takes aim at inaccuracies in the ROI regarding this patient.

96.    No corrections were made to the ROI in accordance with mu counsel's letter. Upon information and belief, the corrective information propounded by my counsel was purposely omitted form the submissions given to the Committee of the BPMC.

**(iii).    Facts pertaining to the interview and ROI related to
patient D.G (Patient "B" in the SOC).**

97.    The two OPMC letters (Exhibits "2" and "3" hereto) identified the scope of the inquiry regarding this patient's medical care by me and specifically her diagnosis and treatment of Lyme disease from 1998 through 2008.

98.     The ROI (Exhibit "5" hereto) falsely reports that I stated that there is "no sign of the disease". If there was no sign of the disease then there would have been no reason to treat this patient for persistent and chronic Lyme disease. Form the face of the medical records which were examined by the defendants and specifically by Defendant Meyers, Meyers' statement infused in the ROI is patently and knowingly false and was made for the purposes of staging the bad faith prosecution.

99.     A diagnosis of the Lyme disease was made in the records and meticulous notes stating the same appear on the face of the medical record. There is no notation in the medical records that there is "no sign of the disease" and no such statement was ever made by me to Meyers.

100.    As is the case with the other patients, Meyers goes on with a biased and selective review and recitation of the medical records identifying specific medication and diarrhea as the main theme of this patient's treatment. Meyers does not afford me an opportunity to discuss the reason and selection of the medication, nor does Meyers afford me an opportunity to respond to the recurring interview theme of diarrhea. He just unilaterally narrated an issue which was not discussed with me during the statutory interview. See exhibit "5" hereto.

101.    With respect to Meyers' questions as to the "numbness of right arm and hand on occasion", Meyers flagrantly infused his own bias into the report by rejecting my diagnosis of Lyme disease and substituting Meyers' own impression of "multiple sclerosis". This comment and diagnosis was made by Meyers without having even seen the patient and was made in furtherance of the staging of the bad faith prosecution as articulated in the Verified Complaint.

**(iv)     Facts pertaining to the interview and ROI
related to patient IH (Patient "D" in the SOC).**

102.     Patient IH ("D" in the SOC) is discussed at pp. 7-8 of the ROI (exhibit "5" hereto).

103.     As it can be seen form the ROI and from the initiating letters (exhibits "2" and "3") like the prior patients the defendants proposed to discuss my diagnosis and treatment of Lyme disease regarding this patient between 1997 and 2004.

104.     The ROI reports Meyers' own narrative of the medical records without an opportunity being offered to me to explain such comments as mandated by New York law as set forth in the memorandum of law.

105.     Specifically, Meyers narrates that I documented neurological symptoms, joint pains and muscle aches but did not perform either a neurological examination of the joint muscles and extremities on 10/10/97. Meyers did not offer me any opportunity to respond to these comments during the interview.

101.     The ROI again narratively states that "Meyers asked if there were any signs of the disease and Cameron said no". This statement in patently false. In addition, the ROI is supposed to give me notice of the issues identified after the interview so as to enable me to respond further to such issues. The foregoing statement does not comport with the statutory notice mandates. Specifically, it fails to identify which signs of what disease Meyers is talking about and what it is that Meyers contends that I answered "No" to.

103.     The staging of the bad faith prosecution included the acceptance of the face value of Meyers' ROI comments without affording me notice of the specific issued identified in the post interview period and an opportunity to respond to the same.

-21-

104.    To the extent that Meyers contends that I said there are no signs of Lyme disease on 10/10/97, that is a knowingly false statement made in derogation of the content of the face of the medical records themselves.

105.    The existence and presence of Lyme disease in his patient is prevalent throughout the medical records which were purportedly reviewed by Meyers and by the defendants themselves.

106.    Meyers goes on at page 8 of the ROI to narrate that there were "no signs of the disease" on physical examination on 11/4/97 (carrying over from the previous page).

107.    This narration and comment infused by Meyers into the ROI demonstrates the tainted nature of the report and investigation in the staging of the bad faith prosecution.

108.    Specifically, this patient was never seen or examined by Meyers. Meyers made no physical observations regarding this patient's conditions and was unable to state that the patient presented with "no signs of the disease" on physical examination on 11/4/97.

109.    Nonetheless, in their quest to stage the bad faith prosecution and to barring me from offering competitive Lyme related medical services to patients in New York, the BPMC Committee took these comments for face value and facilitated my prosecution in derogation of PHL 230-9b.

110.    The SOC contains an allegation at page 6 paragraph "6" that the medical case rendered to this patient and the treatment rendered was not "accurately reflected" in the medical records. That is evidence of defendants' perpetuation of Meyers' staging of the bad faith prosecution through gratuitous statements infused in the ROI.

111.    In addition, Meyers' comment contained in the ROI   fails to identify which signs

of what disease Meyers is talking about and what it is that Meyers contends that the signs of the unidentified disease should be.

112.    Most importantly, Meyers does not report any question having been asked of me regarding my knowledge of the specific symptoms of the unidentified disease. Nor does Meyers identify any answer given by me with respect to such question.

113.    The remainder of the ROI regarding patient IH (Patient "D" in the SOC) is equally deficient in its statutory recitations as it expresses Meyers' apparent views on the medical records rather than reciting the opportunity given to me to address such recitations during the interview.

114.    The report states that Meyers stated and "Cameron concurred" that the treatment given by Cameron to the patient were for "symptoms without signs of disease". This statement does not state which symptoms were treated, which disease is referenced and what Meyers thinks that the "signs" of the unidentified disease should be and how Cameron got it wrong.

115.    In addition, the foregoing representation set forth in the ROI is patently false and made in furtherance of the staging of the bad faith prosecution.

116.    I have never concurred with Meyers on any issues regarding his rendition of the version of the ROI let alone his version of how patient IH was diagnosed or treated.

(v).    **Facts pertaining to the interview and ROI related to patient EW (Patient "E" in the SOC).**

117.    The OPMC restricted the investigation of patient EW to the month of July 2008 after aimlessly having requested her medical record without any disclosed basis or purpose. The stated issues identified in the initiating letters (Exhibits "2" and "3") are limited to my diagnosis

and treatment of Lyme disease with respect to this patient.

118.    The ROI (Exhibit "5" hereto) does not recite any specific issues or facts stating any professional misconduct perpetrated by me in the diagnosis and treatment of Lyme disease in patient EW.

119.    Nonetheless, that did not stop the Committee of the BPMC from approving my prosecution and the defendants from fabricating at pp. 6-7 of the SOC charges which have no relevancy to the issues identified in the initiating letters or appearing in the ROI.

120.    As stated in the Verified Complaint and in the memorandum of law, in addition from being prohibited by the provisions of PHL Sec. 230-b from prosecuting me for diagnosis and treating any patient for Lyme disease by ILADS standards, the New York statutory provisions prohibit the defendants form maintaining any prosecution without offing me the statutory interview and without identifying post interview issues related to specific patient.

**(vi)**    **Facts pertaining to the interview and ROI related to patient RJ (Patient "G" in the SOC).**

122.    In the October initiating letter (Exhibits "3 hereto) the defendants identify the specific issues to be discussed at the statutory interview as my diagnosis and treatment Lyme disease regarding patient "G" during August 2009 through September 2010.

123.    Meyers devotes some three full pages in the ROI (Exhibit "5") to this patient starting at the bottom of page 8 and ending at page 11. The short period of eleven months of care given to this patient between August 2009 and September 2010 somehow commended Meyers' comments for some three pages (Exhibit "5" hereto).

124.    It is impossible to discern the post interview issues identified in the ROI from the

-24-

prolix description of the ROI pertaining to this patient.

125.    One thing that is quite possible however is to identify in the ROI Meyers' personal disdain for my use of long term antibiotics and combination antibiotics in the treatment of Lyme disease and co infections pursuant to ILADS standards as related to this patient.

126.    As discussed in the Verified Complaint and accompanying memorandum of law, no legal grounds exist for prosecution under New York law for the use of long term antibiotics in the treatment of Lyme disease or for the diagnosis of Lyme Disease symptomatically or in the presence of sero negative tests under ILADS standards. Such prosecution is specifically prohibited by PHL Sec. 230-9b.

(vii)    **Facts pertaining to  the interview and ROI related to patient EK (Patient "C" in the SOC).**

127.    The initiating letters (Exhibits "2" and "3" hereto) identified the issues to be discussed at the statutory interview as my diagnosis and treatment of Lyme disease in this patient during a specified period between 1999 and 2007. Patient EK is discussed at pp. 11-12 of the ROI. (Exhibit "5" hereto).

128.    The last full paragraph on the ROI indicates that Meyers is purporting to report about questions and conversation had between him and the me during the interview with respect to treatment rendered to this patient on 4/15/08 and 07/18/08. Both initiating letters identified the period applicable to this patient to be June 1999 through 2007.

129.    Consequently, any questions regarding this patient asked at the interview beyond the period identified in the initiating letters (4/15/08 and 07/18/08) cannot form the basis for any prosecution for the reasons articulated in the accompanying memorandum of law.

130.    Moreover, the SOC (Exhibit "A" to the complaint) identifies periods of treatment between 1995 through 2009.

131.    No statutory interview to discuss my treatment of patient EK was offered to me for the period of 1995 through 1999. As set forth in the memorandum of law, the offering of a pre-charging interview to discuss the issues related to a particular patient is a condition precedent to bringing such charges against me. The fact that the SOC contains charges for a period of time which was never identified in the initiating letter nor discussed in the ROI is evidence of the staging of the bad faith prosecution.

132.    In addition, once again Meyers falsely mentions with respect to the treatment of 4/15/08 that Cameron "confirmed that.... [the patient] had no sign of the disease.". This comment was never made by me and the medical records pertaining to this patient which Meyers reviewed, do not reflect that I notated anywhere "no sign of the disease"

133.    In short, the statutory interview process was used by the defendants to fabricate the ROI which in turn was used to facilitate the bad faith prosecution as alleged in the Verified Complaint.

**(f)     The allegations contained in the Statement of Charges
          evidence the bad faith prosecution sought to be conducted
          <u>by the defendants in this matter.</u>**

134.    In an apparent effort to create the impression that they are not staging a bad faith prosecution in violation of the prohibitions of PHL Sec. 230-b the defendants went through

-26-

significant efforts to disguise the allegations of the Statement of Charges into something other than what the admitted issues of their investigation, the statutory interview and the ROI state.

135.    As discussed above, the initiating letters (Exhibits "2" and "3" hereto), the ROI and the statutory interviews were focused on and specifically identified my diagnoses and treatment of Lyme disease in patients "A" through "G" which was rendered and offered pursuant to ILADS guidelines and not pursuant to IDSA guidelines.

136.    Since the completion of the interviews of 9/14/10 and 12/13/10 (Exhibits "2" and "3"), since the completion and forwarding of the ROI on 1/12/11 (Exhibit "4") all of which focused on my competitive medical services rendered to patients "A" through "G" by ILADS standards, PHL 230-9b became effective on March 12, 2015.

137.    That statute prohibits the prosecution of physicians such as myself based upon issues which are related exclusively to the treatment and diagnosis of Lyme disease by "nonconventional" approaches, which according to the defendants include the ILADS standards.

138.    Upon information and belief, as stated in the Verified Complaint, the statutory consensus of the Committee of the BPMC was secured before December 11, 2011 which was the first time when the defendants announced that they will file charges against me. No additional Committee consensus to prosecution was obtained by the defendants after the March 12, 2015 effective date of the prohibitions of PHL 230-9b.

139.    Consequently, the defendants continued their bad faith prosecution through the masquerading and couching of the Statement of Charges in languages which attempt to bypass the prohibitions of PHL Sec. 230-9b against the current prosecution.

140.    To the extent that the defendants contend that their statement of charges (Exhibit

"A" to the verified Complaint) seeks to prosecute me for issues other than my diagnosis and treatment of Lyme disease, those contentions are simply incorrect by defendants' own statements and admissions contained in exhibits "2", "3" and "4" attached hereto.

141.    As it can be seen from the memorandum of law, masquerading and disguising the SOC with language designed to bypass the prohibitions of PHL 230-9b does not make the present prosecution any less illegal and does not take the "bad faith" character out of this prosecution.

142.    The entire pre-hearing administrative process including the investigation, the ROI and the consensus reached by the Committee of the BPMC to prosecute me is based exclusively upon issues related to my diagnosis and treatment of Lyme disease in patients "A" through "G" pursuant to ILADS guidelines. See exhibits "2", "3" and "4" annexed hereto.

143.    As set forth in the accompanying memorandum of law, the defendants' pursuit of the instant prosecution based on the charges levied in the SOC is in bad faith because is brought in contravention of pre-charging mandates of New York statutory provisions.

144.    In addition, the charges regarding all the patients have the recurring and common theme of the use of long term combination antibiotics for the treatment of Lyme disease, an ILADS approach and treatment which is rejected by the defendants and IDSA physicians alike and sought to be eliminated from the menu of competitive medical services offered in New York.

145.    The additional issues set forth in the Statement of Charges were not identified in either one of the initiating letter (Exhibits "2" and "3") and were not discussed during the statutory interview as a pre-requisite to the filing of the charges. As it can be seen from the memorandum of law this is further evidence of defendants' bad faith prosecution.

## CONCLUSION

146.    For all the foregoing reasons, for all the reasons articulated in the Verified Complaint, in the motion seeking a temporary restraining order and a preliminary injunction and in the memorandum of law in support thereof, the relief sough in the Verified Complaint and in the motion, should be granted in its entirety.

_____

DANIEL CAMERON MD

Sworn to before me
this ___ day of May 2017

_____
Notary Public, State of New York

AMY GREEN
Notary Public - State of New York
NO. 01GR6323610
Qualified in Westchester County
My Commission Expires Apr 20, 2019

-29-