**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

────────────────────────────────

**DANIEL CAMERON,**

       **Plaintiff,**                **17-cv-3420 (JGK)**

       **- against -**

**HOWARD ZUCKER, ET AL.,**           **OPINION AND ORDER**

             **Defendants.**

────────────────────────────────

**JOHN G. KOELTL, District Judge:**

Daniel Cameron, a medical doctor, brings this action against numerous defendants accusing them of conspiracy to violate the Sherman Act, 15 U.S.C. §§ 1, 2. He also alleges that the defendants violated his constitutional rights and provisions of the New York Public Health Law. Dr. Cameron alleges that disciplinary proceedings have been initiated against him in a bad faith effort to interfere with his medical practice, which consists substantially of the treatment and care of individuals with Lyme disease.

The plaintiff moves pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction (1) enjoining the hearing on a Statement of Charges brought against the plaintiff by the New York State Board for Professional Medical Conduct, which is scheduled to begin on June 12, 2017, and any subsequent hearings; and (2) enjoining the defendants

1

from taking any further disciplinary action against the plaintiff's medical license, on the theory that the hearing and any such actions constitute a bad faith prosecution in violation of the plaintiff's constitutional rights and the Sherman Act.

The Court held an evidentiary hearing on the motion for a preliminary injunction on June 6, 2017. Having assessed the credibility of the witnesses and reviewed the evidence, the Court makes the following Findings of Fact and reaches the following Conclusions of Law.

**I.**

The following facts are based on the parties' submissions in connection with the preliminary injunction, and the evidence elicited at the hearing before the Court.

**A.**

The plaintiff is a medical doctor based in Mount Kisco, New York whose practice consists primarily of the diagnosis and treatment of patients affected by chronic Lyme disease. Cameron Aff. in Supp. of Mot. ("Cameron Aff.") ¶ 2. There are at least two different methodologies for the diagnosis and treatment of Lyme disease: one set of guidelines prescribed by the Infectious Disease Society of America ("IDSA") and another prescribed by the International Lyme and Associated Diseases Society ("ILADS"). Id. ¶¶ 2, 8; Complaint ("Compl.") Exs. B, C. Dr.

Cameron treats patients pursuant to the ILADS guidelines.
Cameron Aff. ¶ 2.

The Office of Professional Medical Conduct ("OPMC"), an
administrative unit within the New York State Department of
Health, is charged with investigating misconduct by medical
professionals, including physicians, physician assistants, and
special assistants. Nemerson Aff. in Opp. to Mot. ("Nemerson
Aff.") ¶ 4. The Director must "investigate each complaint
received regardless of the source." N.Y. Pub. H. L.
§ 230(10)(a). The Director of the OPMC may, in its discretion,
then present its investigation to a three-person Investigation
Committee of the State Board for Professional Medical Conduct
("BPMC"). Nemerson Aff. ¶¶ 10-11; N.Y. Pub. H. L.
§ 230(10)(a)(iv). The BPMC was created pursuant to New York
Public Health Law § 230(1) and is comprised of physicians and
laypersons appointed by the Commissioner of Health. Nemerson
Aff. ¶ 8; N.Y. Pub. H. L. § 230(1). The BPMC typically acts not
as a whole but through three-person Committees comprised of two
physicians and one layperson. Nemerson Aff. ¶ 8; N.Y. Pub. H. L.
§ 230(6). Those committees are authorized to take only certain
kinds of actions, all of which are set out in New York Public
Health Law § 230. If an investigation is presented to a BPMC
Investigation Committee, the individual being investigated has
the right to be interviewed by the OMPC in order to provide an

explanation of the issues being investigated. N.Y. Pub. H. L. § 230(10)(a)(iii). If a majority of a three-person Investigation Committee of the BPMC concurs with the determination of the Director of the OPMC that a hearing is warranted, the investigation is referred to the Bureau of Professional Misconduct ("Bureau"), where a Statement of Charges against the medical professional is drafted. Nemerson Aff. ¶ 4; N.Y. Pub. H. L. § 230(10)(a)(iv).

Counsel for the Bureau then presents the case to a BPMC Hearing Committee. Nemerson Aff. ¶ 8; N.Y. Pub. H. L. 230(10)(a)(iv), 10(e). A Hearing Committee performs adjudicative functions in cases brought against individuals by the Bureau, including making findings of fact, conclusions concerning whether the charges against the individual should be sustained or dismissed, and, if charges are sustained, determining the appropriate penalty. Nemerson Aff. ¶ 8; N.Y. Pub. H. L. § 230(10)(g). The Hearing Committee is not bound by the rules of evidence, but must base its conclusions on a preponderance of the evidence. N.Y. Pub. H. L. § 230(10)(f). Either party may appeal the determination of the Hearing Committee to the Administrative Review Board for Professional Medical Conduct ("ARB"), which consists of five members of the BPMC, including three physicians and two laypersons. N.Y. Pub. H. L. § 230-c(1), (2). Parties may seek judicial review of the determination of

the ARB in an Article 78 proceeding, N.Y. C.P.L.R. § 7801 *et seq.*, or may bypass the ARB altogether by appealing the determination of the Hearing Committee directly in an Article 78 proceeding. N.Y. Pub. H. L. § 230-c(5). The result of the Article 78 proceeding may then be appealed to the Appellate Division, Third Department. Id.

Thus, in sum, an investigation into a physician's medical conduct begins with the Director of the OPMC, who must investigate all complaints of misconduct. Only if the Director finds it appropriate will that investigation be presented to a three-person Investigation Committee of the BPMC. And then, only if –- after the physician has the opportunity to be interviewed –- the OPMC Director and a majority of the Investigation Committee concur that a Hearing is appropriate will a Statement of Charges be drafted and the case presented to a Hearing Committee for potential discipline.

## B.

The OPMC began an initial investigation of Dr. Cameron in 2000 after receiving two complaints about Dr. Cameron's care of certain patients and learning of an investigation of Dr. Cameron by Oxford Health Plans. Nemerson Aff. Ex. B. That initial investigation, which involved Dr. Cameron's care and treatment of eleven patients, lasted throughout 2001 and 2002 before being closed without being presented to a BPMC Investigation

Committee. Id. In 2008, the OPMC opened a new investigation into Dr. Cameron after receiving two patient complaints. That investigation eventually expanded to include a review of the care and treatment provided to ten patients, including six patients identified in the initial investigation.

As part of the investigation Dr. Cameron, accompanied by his lawyer, was interviewed over two days by Dr. Burt Meyers, a medical coordinator, and Patrick Sullivan. Dr. Cameron received a record of that interview, and his lawyer made a follow-up submission including comments and corrections to the interview record. Id. Dr. Cameron alleges that the Report of Interview was biased because Dr. Meyers "is a proponent and supporter of the IDSA treatment and of the exclusion of ILADS based treatments and diagnostic modalities." Cameron Aff. ¶ 79. At the hearing, Dr. Meyers credibly denied the charge and explained that he had never read the ILADS guidelines. Dr. Cameron also alleged "upon information and belief" that his lawyer's comments to the Report of Interview were never presented to the Investigation Committee (Cameron Aff. ¶ 69), but Nemerson testified credibly during the hearing that they were in fact presented. Dr. Cameron declined an opportunity for another interview. Nemerson Aff. Ex. B.

Upon review of the investigation, Keith Servis, the OPMC Director at the time, determined that a Committee Hearing was warranted and submitted the investigation to a BPMC

Investigation Committee in November 2011, which unanimously concurred with the Director's determination. Nemerson Aff. ¶¶ 10, 25. Associate Counsel of the OPMC, in consultation with a medical expert who reviewed the relevant medical records, then drafted a Statement of Charges against Dr. Cameron, which includes allegations of negligent, incompetent, grossly negligent, and grossly incompetent medical practice, and failure to maintain accurate medical records. Id. ¶¶ 26-27.

A draft Statement of Charges was provided to Dr. Cameron's counsel in or around July 2012, at which point Dr. Cameron filed suit in New York state court. Id. ¶ 28, Ex. D. The Health Department consented to stay the disciplinary proceedings pending resolution of Dr. Cameron's lawsuit. Id. ¶ 28. Dr. Cameron brought an Article 78 proceeding in the New York State Supreme Court, New York County. He sought to prevent the filing of the Statement of Charges against him, arguing, among other things, that the investigative process had been inadequate and that he was being targeted for practicing according to ILADS guidelines. Id. Ex. D. The court denied the petition in its entirety. The court concluded that there was no basis for prospective injunctive relief, and that Dr. Cameron could present his arguments regarding the investigative process to the Hearing Committee itself if such a hearing was convened. Id. Ex. D. The court found that Dr. Cameron was entitled to bring an

Article 78 proceeding only after a hearing in the event that the charges were sustained. Id. Ex. D. The Appellate Division, First Department affirmed the judgment dismissing the petition. The Appellate Division concluded that Dr. Cameron must exhaust administrative remedies because "there is no legally cognizable injury to be suffered solely from being subjected to the disciplinary hearings with the possibility of a subsequent finding of professional misconduct." Nemerson Aff. Ex. D p. 49 (alterations and quotation marks omitted).

In February 2017, Dr. Cameron's motion for leave to appeal to the Court of Appeals was denied. Id. Ex. D. Thereafter, the OPMC served a Notice of Hearing and Statement of Charges on Dr. Cameron. Nemerson Aff. ¶ 29-30; Compl. Ex. A. That hearing is set to begin on June 12, 2017. Nemerson Aff. ¶ 29. The Statement of Charges against Dr. Cameron includes allegations regarding the care and treatment of seven of Dr. Cameron's patients. See Compl. Ex. A. In particular, it charges Dr. Cameron with negligence, incompetence, gross negligence, and gross incompetence in the practice of medicine, and with failure to maintain medical records. During the course of the hearing scheduled for June 12, an Administrative Law Judge ("ALJ") will be designated and will be authorized to rule on all motions and objections. Id. ¶¶ 32-33; N.Y. Pub. H. L. § 230(10)(e). Dr. Cameron will have a right to be represented by counsel, a right

to present witnesses and evidence, to cross-examine witnesses against him, and to have subpoenas issued on his behalf. Nemerson Aff. ¶ 32; N.Y. Pub. H. L. § 230(10)(c).

## C.

Dr. Cameron filed this action on May 9, 2017, seeking injunctive relief to prevent the conduct of the disciplinary hearing on June 12 or on any date thereafter. ECF No. 2. The defendants include Dr. Howard Zucker, the Commissioner of the New York State Department of Health; Keith Servis, the former Director of the OPMC, and a variety of other individuals currently or formerly associated with the OPMC and BPMC. Id. The Complaint also seeks several other forms of relief, including a declaratory judgment and a permanent injunction declaring the defendants' conduct "illegal and unconstitutional" and as having been carried out "in furtherance of a conspiracy [to] violate the Sherman Antitrust Act" and enjoining the defendants from "taking any action or causing any action to be taken against [the] Plaintiff's medical license." Id. ¶¶ 69, 73.

The Complaint alleges four causes of action. In the first cause of action, the plaintiff alleges violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. In essence, the plaintiff claims that the defendants have conspired to place unreasonable restrictions on the medical trade in New York by excluding competitive ILADS guidelines-based medical

services. The plaintiff also alleges that the defendants are seeking to form a monopoly of IDSA guidelines-based medical services. See Compl. ¶¶ 294-303. In the second cause of action, the plaintiff seeks a permanent injunction under 42 U.S.C. § 1983 because the plaintiff alleges that the defendants have violated and are about to violate his constitutional rights under the Fourteenth Amendment "to be free from bad faith prosecutions . . ." Compl. ¶¶ 306; see Compl. ¶¶ 304-309. In his third cause of action, the plaintiff seeks a declaratory judgment. Compl. ¶¶ 310-314. His fourth purported claim seeks a preliminary injunction. Compl. ¶¶ 315-325.

The plaintiff filed a motion for a temporary restraining order and a preliminary injunction, asking this Court to intervene in the state disciplinary proceedings and prevent the Hearing currently scheduled to begin on June 12. The plaintiff argues that such intervention is necessary because the hearing constitutes a bad faith prosecution that has been staged in order to harass the plaintiff and "stamp out ILADS based Lyme disease medical services." Cameron Reply Aff. in Supp. of Mot. ¶ 25; Mem. in Supp. of Mot. p. 7. The plaintiff argues further that he is entitled to a preliminary injunction because the bad faith prosecution itself constitutes irreparable injury, and because the plaintiff is likely to succeed on the merits of his claim for injunctive and declaratory relief. This Court denied

the plaintiff's request for a temporary restraining order and scheduled a hearing on the motion for a preliminary injunction. ECF No. 35.

## II.

The plaintiff moves for a preliminary injunction: (1) preventing the hearing currently scheduled to begin June 12, 2017, and any hearings thereafter, from occurring; (2) enjoining the defendants from taking "any action" against the plaintiff's medical license; and (3) preventing the defendants from using the medical disciplinary process to restrict the plaintiff's practice of medicine. Proposed Order p. 2. The standards that govern the issuance of a preliminary injunction are well established. "A party seeking a preliminary injunction ordinarily must show: (1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008). But when, "as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." County of Nassau, N.Y.

v. Leavitt, 524 F.3d 408, 414 (2d Cir. 2008) (quotation marks omitted).

It is plain that the only basis on which the plaintiff seeks a preliminary injunction is the alleged violation of his constitutional right not to be subjected to a disciplinary proceeding brought in bad faith in violation of 42 U.S.C. § 1983. Although the plaintiff asserted antitrust claims in his Complaint, the defendants responded to the motion for a preliminary injunction, in part, by explaining that the plaintiff had not established a likelihood of success on the merits of his antitrust claims. The plaintiff did not respond to those arguments and conceded at the hearing that the antitrust claims cannot entitle the plaintiff to preliminary injunctive relief. In any event, the plaintiff has not attempted to explain how any irreparable antitrust injury would result if the disciplinary hearing moves forward, because the plaintiff remains free to practice medicine during the course of the proceedings in front of the Hearing Committee. There is no restraint on trade and no monopolization.

### A.

The threshold issue is whether this Court must abstain from enjoining the state proceedings under Younger v. Harris, 401 U.S. 37 (1971). The Younger abstention doctrine "generally requires federal courts to abstain from taking jurisdiction over

federal constitutional claims that involve or call into question ongoing state proceedings." Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002). Although the doctrine was "born in the context of state criminal proceedings, it now applies with equal force" to state "civil enforcement proceedings." Id.; Peters v. Neroni, 598 F. App'x 797, 798 (2d Cir. 2015) (summary order) (finding that "[s]tate-initiated disciplinary proceedings against lawyers for violation of state ethics rules constitute 'civil enforcement proceedings'" under Sprint Communications, Inc. v. Jacobs, 134 S. Ct. 584 (2013)); Mir v. Shah, 2012 WL 3229308, at *3 (S.D.N.Y. Aug. 8, 2012) (concluding that Younger applied to ongoing disciplinary proceedings initiated against a physician by the Department of Health and the BPMC). The doctrine "rests foursquare on the notion that, in the ordinary course, a state proceeding provides an adequate forum for the vindication of federal constitutional rights," and thus, "giving the respect to our co-equal sovereigns that principles of 'Our Federalism' demand," federal courts are generally prohibited from intervening in such matters. Diamond "D", 282 F.3d at 198 (quotation marks omitted). "[W]hen Younger applies, abstention is mandatory and its application deprives the federal court of jurisdiction in the matter." Id. at 197 (citing Colorado Water Conserv. Dist. v. United States, 424 U.S. 800, 816 n.22 (1976)).

In *Sprint*, the Supreme Court explained that abstention under *Younger* applies only in three "exceptional circumstances:" "(1) pending state criminal proceedings; (2) civil enforcement proceedings that are 'akin to criminal prosecutions'; and (3) civil proceedings that 'implicate a State's interest in enforcing the orders and judgments of its courts.'" *Schorr v. DoPico*, --- F. App'x ---, at *1 (quoting *Sprint*, 134 S. Ct. at 588, 591). Prior to *Sprint*, the Court of Appeals had applied a three-factor test to determine whether the court should abstain under *Younger*, namely, whether "(1) there is an ongoing proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D"*, 282 F.3d at 198. In *Sprint*, the Supreme Court made it clear that these factors were additional considerations to be taken into account before invoking *Younger*. *Sprint*, 134 S. Ct. at 593.

In this case, it is plain that the medical disciplinary proceeding, like the attorney disciplinary proceeding in *Schorr*, is a "civil enforcement proceeding" subject to *Younger* abstention, and that the three additional considerations in *Diamond "D"* are satisfied in this case. Indeed, the parties do not dispute that the proceedings against Dr. Cameron constitute state-initiated "civil enforcement proceedings" subject to

<u>Younger</u>. <u>Sprint</u>, 134 S. Ct. at 591. Nor do they dispute that the state proceeding affords the plaintiff the opportunity for judicial review of his federal constitutional claims.

Rather, Dr. Cameron relies exclusively on the "bad faith" exception to the <u>Younger</u> abstention doctrine. "Despite the strong policy in favor of abstention, a federal court may nevertheless intervene in a state proceeding upon a showing of 'bad faith, harassment or any other unusual circumstance that would call for equitable relief.'" <u>Diamond "D"</u>, 282 F.3d at 198 (quoting <u>Younger</u>, 401 U.S. at 54). The plaintiff bears the burden of establishing the "bad faith" exception, and must "show that the state proceeding was initiated with and is animated by a retaliatory, harassing, or other illegitimate motive." <u>Id.</u> at 198, 199. This means that a "state proceeding that is legitimate in its purposes, but unconstitutional in its execution –- even when the violations of constitutional rights are egregious –- will not warrant the application of the bad faith exception." <u>Id.</u> at 199. "[T]he subjective motivation of the state authority in bringing the proceeding is [therefore] critical to, if not determinative of," the bad faith inquiry. <u>Id.</u> Dr. Cameron must therefore establish that the defendants have "no reasonable expectation of obtaining a favorable outcome" in the disciplinary proceeding, but rather "brought the proceeding with a retaliatory, harassing, or other illegitimate motive." <u>Jackson</u>

15

<u>Hewitt Tax Serv., Inc. v. Kirkland</u>, 455 F. App'x 16, 18 (2d Cir. 2012) (summary order) (quotation marks omitted).

The plaintiff has not met this burden. He alleges that the disciplinary proceedings against him were initiated "simply because [he] offer[s] medical services based upon" the ILADS guidelines and that the proceedings are motivated by the defendants' desire to "stamp out ILADS based Lyme disease medical services." Cameron Aff. ¶ 7; Cameron Reply Aff. ¶ 25. Those allegations are conclusory and are not supported by the evidence. At the outset, the plaintiff spends considerable effort arguing that a bad faith prosecution is a violation of his constitutional due process rights. <u>See</u> Mem. in Supp. of Mot. pp. 4-6. He also argues that bringing disciplinary proceedings against him for the sole purpose of eliminating the practice of medicine according to the ILADS guidelines violates New York Public Health Law § 230(9-b), which states:

> Neither the [BPMC] nor the [OPMC] shall charge a licensee with misconduct . . . where <u>such report is determined to be based solely upon the recommendation or provision of a treatment modality</u> to a particular patient by such licensee <u>that is not universally accepted by the medical profession</u>, including but not limited to, varying modalities used in the treatment of Lyme disease and other tick-borne diseases.

N.Y. Pub. H. L. § 230(9-b)(emphasis added). The provision also states that "[t]he licensee shall otherwise abide by all other applicable professional requirements." <u>Id.</u> But the plaintiff has

failed to establish that the Statement of Charges at issue are in fact being brought against him "solely" because he provides treatment according to ILADS guidelines.

Rather, the Statement of Charges accuses Dr. Cameron of deviating from minimally accepted standards of care that apply to all doctors and that apply regardless of whether the patient at issue is being treated for Lyme disease in accordance with ILADS guidelines or not. For example, Dr. Cameron is alleged to have continued to provide narcotics to a patient who had a diagnosis of bipolar disorder/personality disorder and narcotics abuse from July 2003 through 2005 even though the patient had moved to Florida. Compl. Ex. A p. 2. In another case, the Statement of Charges allege that, over the course of ten years, the plaintiff treated a patient with an "ongoing and escalating antibiotic regimen" although the patient received only one physical examination during those ten years. Id. pp. 2-4. The charges accuse the plaintiff of failures such as the failure to take and note an adequate history, failure to perform an appropriate physical examination, prescription of medication without appropriate medical indications, failure to follow up when the patient experienced adverse reactions to the administered therapy, and failure to maintain adequate records. Id. pp. 3-4.

This is only a sampling of the charges. But it is clear
that the charges are based on allegations of professional
misconduct and not the use of the ILADS modality. Indeed,
although the plaintiff alleges that the charges are actually an
effort to discipline him for practicing pursuant to the ILADS
guidelines, the plaintiff conceded at the hearing that the ILADS
guidelines do not allow or advise the conduct alleged in the
Statement of Charges.

In response, the plaintiff alleges that the wording of the
Statement of Charges is intended to obfuscate the true nature of
the proceedings, and "deliberately omits any reference to the
actual subject matter which was authorized for prosecution,"
which the plaintiff argues was "the elimination of Lyme disease
medical services provided by ILADS standards." Mem. in Supp. of
Mot. p. 15. The plaintiff argues further that the letters sent
to him by the OPMC in the course of the investigation confirm
that the true nature of the allegations is "restricted to
Plaintiff's offering and applying Lyme disease medical services
to [patients] by ILADS standards and not by IDSA guidelines."
Id.

The letters themselves belie the plaintiff's argument and
do not support a finding of bad faith. They simply outline the
patients involved in the investigation and offer a brief summary
of the "issues under investigation," which include general

descriptions such as "[t]he care you rendered to [Patient A]. Specifically, the appropriateness of the care and treatment you rendered to [Patient A] in July 2008 for Lyme disease and complaints of neck pain." Cameron Aff. Ex 2; see Cameron Aff. Ex 3. The fact that the investigation involved the care and treatment provided by Dr. Cameron to patients diagnosed with Lyme disease does not suggest that the proceedings were initiated for the purpose of "stamp[ing] out" ILADS-based medical services. Cameron Reply Aff. ¶ 25. Indeed, the fact that the patients at issue were treated for Lyme disease is unsurprising in light of the fact that Dr. Cameron's practice consists primarily of patients seeking treatment for Lyme disease.

In his Complaint the plaintiff pointed to the publication of an article in January 2017 by three authors who are members of the IDSA that was critical of some practices endorsed by the ILADS guidelines. Compl. ¶¶ 62-63. The Complaint also pointed out that Dr. Meyers is a member of the IDSA and attempted to link that fact and the publication of the article to the Statement of Charges dated April 27, 2017. See id. The Complaint characterizes the article as a "call to arms" that "called on medical Boards to prosecute physicians" who provide ILADS-based medical services. Id. ¶¶ 62, 64. However, there is no evidence that the article had anything to do with the Statement of

Charges, which were the product of an investigation that had been ongoing for years. Nor is there any evidence that Dr. Meyers had anything to do with the article, which does not, in any event, call for the prosecution of physicians who follow the ILADS guidelines. See Compl. Ex. E. In fact, Dr. Meyers' involvement in the investigation of Dr. Cameron appears to have been completed about six years before the article was published. There is no evidence linking the article to any of the decision makers involved in the disciplinary proceedings against Dr. Cameron.

There is nothing in the Statement of Charges, or anywhere else in the record, to suggest that the charges were initiated for any reason other than that the Investigation Committee and the Director of OPMC agreed that their investigation had revealed deviations from the minimally accepted standards of medical care. The plaintiff's conclusory allegations that the proceedings were initiated solely for the purpose of "stamp[ing] out" ILADS-based treatment is also inconsistent with the plaintiff's failure to identify a single doctor, other than himself, who follows the ILADS guidelines and who has been subjected to disciplinary proceedings. Indeed, the Bureau maintains that -- although on average hundreds of disciplinary actions have been initiated each year -- only three such actions initiated since the year 2000 have involved the treatment of a

patient diagnosed with Lyme disease. Nemerson Aff. ¶ 16. In
light of those statistics and the lack of evidence that the
disciplinary proceedings were initiated solely for the purpose
of eliminating the practice of ILADS-based treatment of Lyme
disease, the plaintiff's allegation that the proceedings were
brought in bad faith is not credible. See Jackson Hewitt, 455 F.
App'x at 19 (rejecting the argument that the New York State
Division of Human Rights' decision to bring an administrative
action against Jackson Hewitt was "nothing more than a thinly-
veiled attempt to eliminate a legal loan product that the
Division dislikes"); Mir, 2012 WL 3229308, at *3 (rejecting
physician's conclusory allegations that the BPMC pursued a
"phony investigation" against him); Diamond "D", 282 F.3d at 199
(noting that the prosecution at issue "was not retaliatory or
otherwise illegitimate in its motivation and, in fact, was
nothing more than a straightforward enforcement of the laws of
New York").

   Moreover, Dr. Cameron has not even attempted to establish
that the defendants have "no reasonable expectation of obtaining
a favorable outcome" at the Hearing as required to establish bad
faith. Diamond "D", 282 F.3d at 199; see Schorr, --- F. App'x at
---, *2 (rejecting argument of an attorney that disciplinary
proceedings had been brought in bad faith because the plaintiff
"cannot show that the committee would be unlikely to succeed in

proving its charges"). In sum, the plaintiff has not established that the proceeding against him was "initiated with" and is "animated by retaliatory, harassing, or other illegitimate motive," and therefore has not met his burden to establish an exception to Younger abstention. Diamond "D", 282 F.3d at 199. The Court is therefore required to abstain from federal intervention in the state enforcement proceedings.

**B.**

In addition to the requirement that this Court abstain pursuant to Younger, the preliminary injunction must also be denied because the plaintiff has failed to meet the requirements for a preliminary injunction.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks omitted). The plaintiff argues that his showing of a bad faith prosecution for purposes of Younger abstention also satisfies the requirement of showing irreparable injury for the purposes of obtaining a preliminary injunction. However, the plaintiff has failed to establish that the proceeding was initiated in bad faith. Moreover, the plaintiff has failed to point to any binding authority suggesting that merely being forced to withstand administrative charges of wrongdoing constitutes irreparable injury. No charges have yet

been sustained against the plaintiff; the plaintiff has suffered no limitations on his ability to practice medicine; and his license has not been suspended or revoked. Because there is "no legally cognizable injury to be suffered solely from being subjected to the disciplinary hearing with the possibility of a subsequent finding of professional misconduct," Galin v. Chassin, 629 N.Y.S.2d 247, 249 (App. Div. 1995), and because the plaintiff has not identified any other injury he will suffer "that is neither remote nor speculative, but actual and imminent," Wabtec, 559 F.3d at 118 (quotation marks omitted), the plaintiff has failed to make the essential showing that he will suffer irreparable harm in the absence of a preliminary injunction.

For the reasons explained above, the plaintiff has also failed to carry his burden to show that he is likely to succeed on his claim that the proceeding against him was brought in bad faith in violation of his constitutional rights. And the plaintiff has made no effort to show that he is likely to succeed on his antitrust claims.

Finally, the public interest weighs strongly against issuing a preliminary injunction in this case. The state's Board of Professional Medical Conduct -- which has a clear interest in protecting the health of the citizens of New York by regulating the practice of medicine -- has issued charges against Dr.

Cameron. <u>See</u> <u>Selkin v. State Bd. for Prof'l Med. Conduct</u>, 63 F. Supp. 2d 397, 402 (S.D.N.Y. 1999). Those charges will be adjudicated at the Hearing, and, if sustained, are subject to both administrative and judicial review. Dr. Cameron remains free to make the arguments made to this Court –– including that the interviews conducted were biased and inadequate, that the Charges were issued in violation of Public Health Law § 230(9-b), and that the Hearing itself will not adequately protect his due process rights –– to the Hearing Committee directly, to the ARB on administrative appeal, and to a state court in an Article 78 proceeding. On the other hand, enjoining the proceeding would prevent charges of serious misconduct from being adjudicated. The public interest therefore plainly favors denial of the preliminary injunction and adjudication of the charges before the Hearing Committee. <u>See</u> <u>Selkin</u>, 63 F. Supp. 2d at 402-405.

## CONCLUSION

The foregoing constitutes the Court's Finding of Fact and Conclusions of Law. The Court has considered all of the arguments of the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

For the reasons explained above, the plaintiff's motion for a preliminary injunction is **denied**. The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated:**     **New York, New York**
              **June 6, 2017**          \_\_/s/_____
                                         **John G. Koeltl**
                              **United States District Judge**