H5GsCAM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

M.D. DANIEL CAMERON,

                Plaintiff,

           v.                        17 Civ. 3420 (JGK)

M.D. HOWARD ZUCKER, et al.,

                Defendants.

------------------------------x
                                     New York, N.Y.
                                     May 16, 2017
                                     5:15 p.m.

Before:

                   HON. JOHN G. KOELTL,

                                        District Judge

                        APPEARANCES

JACQUES G. SIMON
     Attorney for Plaintiff

NEW YORK STATE OFFICE OF ATTORNEY GENERAL
     Attorneys for Defendants
BY:  MATTHEW LAWSON
     MARYANN JAZINI DORCHEH

NEW YORK STATE DEPARTMENT OF HEALTH
     Attorneys for Defendants
BY:  HENRY WEINTRAUB
     ROY NEMERSON

H5GsCAM1

1            (Case called)

2            MR. SIMON:  Jacques Simon.  I represent the plaintiff.

3            THE DEFENDANT:  Matthew Lawson from the State Attorney

4    General office.  And with the court's indulgence, also at

5    counsel table with me today are my colleague, MaryAnn Dorcheh,

6    and two lawyers from the State Department of Health, Mr. Roy

7    Nemerson and Mr. Henry Weintraub.

8            Good afternoon, your Honor.

9            THE COURT:  Good afternoon.

10           This is an application for a preliminary injunction,

11   which includes a request for a TRO.  Now, I'm perfectly happy

12   to listen to the parties.  It's plain that I should give you a

13   schedule for the preliminary injunction, when the papers in

14   opposition will be submitted, when the reply papers will be

15   submitted.  Then there's the issue of the temporary restraining

16   order.

17           The plaintiff is attempting to stop a hearing with

18   respect to the defendant's practice, which is scheduled to

19   occur on June 12, almost a month away.  There are various

20   possibilities.  I'll certainly listen to the parties, but it

21   seems plain to me a temporary restraining order is only good

22   for 14 days, and though it can be renewed for another 14 days,

23   a temporary restraining order doesn't do anything with respect

24   to a hearing which is scheduled on June 12.  There is no

25   showing that I should grant a temporary restraining order

H5GsCAM1

1    putting off a hearing which is not yet scheduled to occur

2    within the 14 days.

3         Then the question really becomes how quickly the

4    parties could brief the preliminary injunction and are the

5    parties, are the defendants committed to a June 12 date for the

6    hearing.  Is it such that I have to decide the preliminary

7    injunction before June 12.  Sometimes parties are prepared to

8    put things over to give themselves a little more time to brief,

9    but those are some of my preliminary observations based on the

10    papers.

11         I'm happy to listen first to the plaintiff and then to

12    the defendant.

13         MR. SIMON:  Thank you, your Honor.

14         Yes.  My name is Jacques Simon.  I represent the

15    plaintiff.  Thank you for giving me an opportunity.

16         The reason why I came here with the TRO, same concerns

17    as your Honor, usually when bad faith prosecution claims are

18    concerned, there is a briefing schedule.  There may be, also,

19    there's a couple of districts that refer the cases out to the

20    magistrate for factual hearings, because there's got to be a

21    factual finding regarding whether or not there is, indeed, a

22    bad faith prosecution, when the DJ gets involved or approves or

23    denies what the magistrate finds out on top of the briefings.

24         Right now the briefings put forward, the briefings,

25    this is a two-tiered case, Judge.  One part has to do with bad

4

H5GsCAM1

1  faith prosecution, the other has to do with antitrust.  And

2  that's why I asked permission, I put in substantial memoranda

3  of law and asked permission to exceed the page limitation,

4  because the two issues are substantial.

5              THE COURT:  I know.  Your memo was twice as long.

6              MR. SIMON:  I asked permission in my affidavit to

7  exceed that because I am aware of the rule.  But I asked the

8  defendants, can we put off the hearing of the 12th to give us

9  an opportunity to brief this and do this in an orderly fashion.

10 They said no, and that's why I'm here on the TRO.  Otherwise, I

11 didn't want to come here with a TRO, you know, too close to the

12 date, and then you would have asked why did you wait so long.

13             I'm aware of the rule that says it is good for

14 14 days.  I was wondering, because I read the rule closely,

15 there was no notice and there was notice, and this is one way

16 we gave them notice to come here.  And I'm not sure if the

17 14 days applies to notice or no notice.  The rule was ambiguous

18 to me.  I'm here because pretty much I did everything that you

19 said to do and I asked them can we put this off to brief.  They

20 said no, so I'm here.

21             THE COURT:  It seems clear to me from what I said that

22 you're looking for a stay of the hearing which is scheduled for

23 June 12.

24             MR. SIMON:  Correct.

25             THE COURT:  A temporary restraining order just doesn't

H5GsCAM1

<div style="margin-left:3em"></div>

1   do you any good because a temporary restraining order is only

2   good for 14 days.  So if I entered a TRO today, I would stay

3   the hearing, but the hearing is only scheduled for June 12.

4            MR. SIMON:  Right.

5            THE COURT:  But what this means is, of course, that

6   the defendants have to respond to the motion for a preliminary

7   injunction and you have to reply and I have to decide.

8            You mentioned a magistrate judge.  I mean, this is a

9   matter that would usually be decided by the district court

10  judge as to whether to give you a preliminary injunction or

11  not.

12           Why don't you use this opportunity briefly to tell me

13  why you think you're entitled to a preliminary injunction.  I

14  mean, obviously you're aware that under <u>Younger</u>, federal courts

15  lack subject matter jurisdiction to interfere with or enjoin a

16  state court administrative proceeding, which is a stayed

17  administrative proceeding, which furthers a public interest.

18  And plainly a doctor's certification or decertification

19  proceeding is one of those administrative proceedings.

20           So the question is, are the defendants somehow

21  operating in bad faith, is it really bad faith for the

22  commissioning authorities to believe that one form of therapy

23  for Lyme disease is acceptable and one is not.  Those would, on

24  their face, appear to be medical judgments.

25           But let me listen to you for the argument that you

H5GsCAM1

1    want to make.  And I will ask for a response from the

2    defendants initially and an appropriate briefing schedule.

3           MR. SIMON:  That would be great, Judge.

4           That would be a medical judgment, except that in 2015,

5    the New York legislature stepped in, and precisely because of

6    this, because they were in the Lyme disease arena.  I don't

7    know if you're familiar with that.  Next door, Tony Blumenthal,

8    ex state attorney general, said that you had a similar issue

9    with the same group, the exact same group.  Because of this,

10   what happened, there are furious, furious legislators lobbying

11   up in Albany.  And in 2015, in a balanced way, they came up

12   with Public Health Law 230-B, and pretty much said that if you

13   treat Lyme disease by methodology, other than what's not

14   generally accepted, the state shall not prosecute, period, the

15   end.  That's all it says.  They went a step further.  They said

16   if you investigate this and it appears that this is the issue,

17   you shall not investigate further.

18          Now, they didn't call the two counts by name, Judge,

19   precisely because of the reason that they wanted to strike a

20   balanced language.  But really, this statute in 2015 pretty

21   much took doctors like Dr. Cameron, and Dr. Cameron is the one

22   who initially authored the 2014 guidelines.  He set the

23   forefront of that last group.  Pretty much the New York

24   legislature thought it was so important for patients of Lyme

25   disease to receive these services, that they would protect --

H5GsCAM1

1      just like in Massachusetts, just like in Connecticut -- that

2      they would protect doctors, such as Dr. Cameron, against

3      prosecution.

4           Now, of course, the next question is, but, Mr. Simon,

5      how do you know that they're prosecuting him for providing Lyme

6      disease services according to that?  I do.  I outlined it.

7      That's why we laid out a thick set of papers for you.  But we

8      have to state facts when it states bad faith, says the law, and

9      we did.  So pretty much the statutory scheme in New York goes

10     something like this.

11          In order to be able to prosecute somebody and to press

12     charges, you need to get the OK from a committee of the Board

13     of Professional Medical Conduct to go ahead with the

14     prosecution.  They investigated Dr. Cameron back in 2008, and

15     they started 2002.  That's not part of this.  They picked up

16     again in 2008 --

17          THE COURT:  By the way, there is a criminal matter

18     that's on and we are waiting for the government attorney.

19          MR. SIMON:  Should I leave?

20          THE COURT:  If all of the lawyers for the criminal

21     matter arrive, I always take criminal matters in preference to

22     any civil matter.  I just give you fair warning that we may

23     have to interrupt this.

24          MR. SIMON:  That's OK.  Sorry.

25          THE COURT:  Go ahead.

H5GsCAM1

1          MR. SIMON:  I understand.

2          The reason why, back to how it is that we know that

3     this is bad faith, Judge.  Back in 2010, their own letter,

4     they have to notify Dr. Cameron what it is that they are

5     investigating and to give him an opportunity to come to an

6     interview to dispel it.  The only thing that they notified him

7     of at that time is the matter in which you treated and

8     diagnosed Lyme disease, including these patients which are

9     now -- the list is down, but they are not part of this.

10         He went to the interview.  The only issues that were

11    the subject matter of the interview was his practice by the

12    guidelines.  But not only there, but they had an interviewer

13    that infused his own what should be, what shouldn't be in favor

14    of the guidelines.  Those are the only issues that could have

15    been presented to the committee to OK for prosecution.  Nothing

16    else.

17         Now, when you go and look at the statement of charges,

18    there's no mention of Lyme.  There is no mention of the issues

19    that are discussed in the interview.  There is no mention of

20    anything.  So what happened, we tell you, your Honor, is the

21    passage of the law came in between the interview and the filing

22    of the charges.  So now, in order to avoid the passage of the

23    new language of the new law, they fashioned the statement of

24    charges in such a fashion as to bypass whether they are

25    authorized to prosecute.

H5GsCAM1

1          Now, the law in New York is quite clear.  They cannot

2     file these charges without running it again by the committee

3     and get an OK by the committee.  We submit to your Honor that

4     the only thing they are prosecuting my client for is practicing

5     medicine by these guidelines.

6          THE COURT:  If you're right, why would you not be able

7     to raise that argument on appeal or in an Article 78 in the

8     state court if, in fact, any disciplinary action were taken

9     against your client for attempting to treat Lyme disease by

10    what you think the practice is that the state is trying to

11    discourage?

12         MR. SIMON:  The answer is multifold.  I'll start with

13    the bad faith prosecution first.

14         The law is clear, bad faith prosecution is a

15    constitutional wrong that the courts enjoin, number one.

16    Number two, the statutory scheme is as such that these issues

17    cannot be raised in the administrative forum for the courts of

18    the State of New York to subsequently consider.  Number three,

19    I believe -- and I should have pulled that case up, because I

20    ran into it -- that the case says that the availability of

21    state remedies or the state disciplinary process is not

22    adequate to vindicate bad faith prosecution.  Bad faith

23    prosecution should not take place, period, the end, and the

24    federal courts will enjoin that.

25         THE COURT:  OK.  Anything else?

1          MR. SIMON:  On the bad faith, that's it.

2          Then I have a lot on antitrust, but really, if you

3    don't find bad faith, you're going to kick me out.  I think

4    that I briefed it quite methodically, that the first thing

5    first, the court has to address the bad faith argument and if

6    there is bad faith or not, because if there is no bad faith,

7    there is no jurisdiction, end of it.  If you find that there is

8    bad faith, then there will be some for your Honor to entertain.

9          THE COURT:  Thank you.  That's very forthcoming.

10          I have a criminal proceeding which takes precedence.

11    I'll do that.  I don't think the criminal proceeding should

12    take that long, then we'll resume.

13          (Recess)

14          THE DEPUTY CLERK:  Continuation of Cameron v. Zucker.

15          THE COURT:  I think I was up to the defendants at this

16    point.

17          MR. LAWSON:  Thank you, your Honor.

18          First, I would like to take this back to the

19    fundamental requirements that are necessary for any TRO or any

20    preliminary injunction.  They are the same standard the courts

21    have recognized.  I would assert that none of those

22    requirements have been met here.

23          Number one, the plaintiff has to show he is likely to

24    succeed on the merits.  The plaintiff has not shown that and

25    cannot show it.

H5GsCAM1

1          Number two, the plaintiff is likely to suffer

2     irreparable harm in the absence of the injunctive relief.  It

3     has not shown it and cannot.

4          And two very important and often overlooked

5     requirements that would be also dispositive standing alone

6     here, number three, the balance of equities tips in the

7     plaintiff's favor.

8          And, number four, the plaintiff has to show that an

9     injunction is in the public interest.

10          I want to start with irreparable harm.  As the Second

11     Circuit has recognized, irreparable harm is the single most

12     important prerequisite to the issuance of a preliminary

13     injunction.  And in the absence of the showing of irreparable

14     harm, the preliminary injunction, or a TRO -- again, they're

15     the same standard -- should be denied on that factor alone.

16          Irreparable harm, again, is an injury that is not

17     remote, is not speculative, but it is actual and imminent for

18     which monetary work cannot be adequately compensated.

19          The first question is, where is the imminent

20     irreparable harm that requires an immediate TRO today?  He is

21     not complaining about any harm that is happening today or

22     tomorrow or next week or the week after that.  He is concerned

23     about the possible result of an administrative hearing that

24     doesn't even begin until the 12th of June.  That is not

25     imminent harm, but also not actual harm.

1          The plaintiff's position here, which the state

2     strongly disagrees with, is that the charges of misconduct and

3     incompetence and gross negligence, among others that have been

4     levied against this particular physician, the plaintiff is

5     claiming those are a sham, and he is claiming that he's

6     actually innocent of these charges.  Well, if that is true,

7     then the plaintiff has every right to go to this administrative

8     hearing that is to be convened on the 12th and seek exoneration

9     from the New York State Board for Professional Medical

10    Misconduct.  If he does that, then how is the harm here actual

11    rather than remote or speculative?

12          It is not.  Of course, that is not even the end of the

13    road.  He could file an Article 78 proceeding if he's unhappy

14    with the result reached.  The plaintiff in his papers, he

15    doesn't really address the irreparable harm point

16    substantively.  He merely says he doesn't have to.  He has

17    invoked the words "bad faith" as if this is some sort of

18    mantra.  The mere indication means he automatically gets a TRO,

19    but that's not the way it works.

20          The TRO is an extraordinary remedy and it requires an

21    extraordinary showing, which is the plaintiff hasn't even

22    approximated here.

23          THE COURT:  Let me just refocus you just slightly.  It

24    is plain for the reasons that I already told the plaintiff, and

25    the plaintiff seems to agree, there is no way that I could

1    invoke, could or would issue a TRO.  It makes no sense.

2          The TRO which is being sought, which is to stay the

3    state court administrative proceeding, which will not occur in

4    the next 14 days.  So if I issue a TRO, nothing happens over

5    the next 14 days, and I haven't done anything to put over a

6    hearing which is going to occur on June 12.

7          So the real issue is you're previewing your arguments

8    with respect to the preliminary injunction, as to which the

9    standards are the same, except TRO, perhaps, is slightly

10   stronger, and the TRO directs us to whether relief should be

11   granted for that period of time for which the TRO would

12   otherwise be in existence.

13         Preliminary injunction plainly could put over the

14   June 12 hearing, and the question then becomes whether, with

15   respect to irreparable harm, the conduct of the hearing itself

16   is irreparable harm if the plaintiff has a fair argument that

17   he is being prosecuted in bad faith.

18         MR. LAWSON:  If I could address that, your Honor?

19         THE COURT:  That would be the question, right?

20         MR. LAWSON:  If I could address that, your Honor?

21         The plaintiff has not made a case that that's the

22   case.  The cases that I've seen -- and I just got these papers

23   yesterday, so I just got this 53-page brief yesterday myself --

24         THE COURT:  That's all right.  I only got them today.

25         MR. LAWSON:  -- I looked at the cases that the

H5GsCAM1

1    plaintiff has cited for the notion specifically that a bad

2    faith prosecution can constitute irreparable harm without a

3    further showing, and it appeared that they all arose from a

4    criminal prosecution.  His lead case was Wilson v. Thompson,

5    Fifth Circuit, 1979.  That was an appeal --

6              THE COURT:  Could you hold off one second?  I have to

7    sign an order in a criminal case.

8              (Pause)

9              MR. LAWSON:  The lead case that he cited specifically

10   for the proposition that bad faith prosecution means

11   irreparable harm, and that is the population I'm focusing on.

12   I know he cited some bad faith cases in other contexts, but for

13   the key and independently important issue of whether bad faith

14   can constitute irreparable harm, the case was Wilson v.

15   Thompson.  It was a 1979 Fifth Circuit case.  It was an appeal

16   from a permanent injunction to stop a bad faith criminal

17   prosecution that the Orleans District Attorney was bringing for

18   perjury.  Before the injunction was entered, there was actually

19   a formal judicial finding that the prosecution was, in fact, in

20   bad faith.  Much different facts here.

21             This is not a permanent injunction where the parties

22   have had a full and fair opportunity to litigate the issue.

23   This is not a criminal prosecution.  There has been no judicial

24   finding of bad faith, and there are no facts in the record and

25   none that have been submitted today that can support such a

H5GsCAM1

1  finding.

2          Mr. Simon said that there was this letter from the

3  Department of Health that somehow shows that they're not really

4  concerned about poor care.  They really have some animus or

5  some vendetta against this particular unique Lyme disease

6  treatment modality.  It doesn't say that.  In fact, if I'm

7  looking at the same letter -- and, again, I just got this

8  yesterday -- I believe he was referring to an August 17, 2010

9  letter.  And yes, Mr. Simon was correct that the letter --

10          THE COURT:  One moment.  I'm sorry.  One moment.  I'm

11  just signing a criminal order, an order in a criminal case.

12          (Pause)

13          THE COURT:  Go ahead.  Thank you.  I'm sorry.

14          MR. LAWSON:  It does mention that the patients that

15  are at issue in this investigation were, in fact, being treated

16  for Lyme disease, but that doesn't reveal any animus against

17  the modality.  He claims that it somehow does massively

18  different from the statement of charges, but I'm not seeing

19  that.  There is a discussion about a differential, a failure to

20  appropriately conduct differential diagnosis in both.  So there

21  is no evidence and there will be no evidence that there was

22  somehow a vendetta against a particular technique.

23          The charges that were brought here and the charges

24  that will be heard beginning on June 12 relate to incompetence,

25  gross incompetence, negligence, such things as prescribing the

H5GsCAM1

1   wrong medications, including narcotics in at least one instance

2   without appropriate indications, failing to conduct a

3   differential diagnosis, failing to review prior records,

4   failing to follow up, failing to maintain proper records.

5   These are the types of charges that can be brought against a

6   doctor regardless of what type of specific unique modality or

7   technique he uses.  There is no evidence of that and there will

8   be no evidence.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H5GACAM2ps

1          THE COURT:  Is the plaintiff correct that the

2     defendants don't accept the type of treatment for Lyme disease

3     that the plaintiff practices?

4          MR. LAWSON:  I don't think that's correct, your Honor.

5     My colleagues will correct me if they have anything to

6     supplement.  But I understand that there is a statute that

7     contains certain recognition of this treatment method.

8          THE COURT:  As I read the statute, the statute doesn't

9     specify a specific method.  What the statute says is, you can't

10    use a method that's not generally accepted.  So if you use a

11    method that's not generally accepted, then, yes, you can be

12    accused of malpractice.  So then the question is left to the

13    medical profession about what's generally accepted or not.

14          One of your colleagues wants to say something on this.

15          MR. NEMERSON:  The statute asserts that which is

16    already in practice, which is the mere fact that a physician

17    engaging in a non-universally accepted modality is not in and

18    of itself misconduct.  That was the charge, misconduct.  You

19    can practice according to this school of thought, according to

20    these definitions, and if it's done prudently, the department

21    takes no objection to that.  If you practice absolutely

22    right-down-the-middle classic medicine and do it negligently,

23    the department prosecutes it.

24          So that statute does not say what Mr. Simon says it

25    says.  We would not and did not bring a case or charges

H5GACAM2ps

1    alleging that the doctor did wrong by using this set of

2    standards or using this modality of treatment.  We are

3    charging, and expect to prove, that in pursuing his own theory

4    of treatment, which is OK, he failed to adequately evaluate the

5    patient at the outset for her conditions.  And in choosing a

6    treatment modality that he favors and we don't object to, he

7    failed to follow that modality truly.  He did not monitor for

8    side effects.  When side effects were found he did not address

9    them appropriately.  The fact that these patients were

10   diagnosed with Lyme disease and that this physician enlists

11   with perhaps a minority school is actually irrelevant to our

12   case.

13           THE COURT:  OK.  And what would the normal course be?

14   The hearing is scheduled for June the 12th.  So there will be a

15   hearing on June the 12th, unless I issue a preliminary

16   injunction.  And is it usually a one-day hearing, or is it

17   extended over time?  Is there an opportunity for further

18   submission?

19           MR. NEMERSON:  Judge, a hearing such as this -- I

20   think there were maybe seven patients charged -- would

21   typically take at least four days for the department to present

22   its case, an unknown number for the resident in our proceeding

23   to respond.  There are lots of exchanges of papers.

24           What would not be clear to anybody outside the

25   department is, because our hearing committees consist of

H5GACAM2ps

1   citizens who are still in full-time practice, we don't do

2   back-to-back day hearings.  We don't even do week-to-week

3   hearings.  Typically there are three weeks between hearing

4   days.  So this case will be in hearing, with evidence being

5   taken, months into the future.  There are then post-hearing

6   submissions.  And then the committee deliberates.  That can

7   take a month or two or three.

8           Following that, there is a right to an administrative

9   appeal, with about a 45-day turnaround for submissions, and

10   then months of decision, and after that the Article 78.

11           THE COURT:  And I take it that whatever decision the

12   board makes would indicate what the basis for the decision was.

13   So if the basis for the decision was the decision by the doctor

14   to use a particular technique or theory of practice to treat

15   Lyme disease, that would be in the decision.  If, on the other

16   hand, the decision were based on, as you say, the failure to

17   accurately diagnose or treat, in whatever modality the doctor

18   was following, that would also be in the decision.  Right?

19           MR. NEMERSON:  Yes, sir.

20           THE COURT:  OK.

21           Thank you very much.  That's very helpful to me in my

22   thinking.

23           So if the state wants to continue?  Yes?  We were up

24   to irreparable harm.  Right?

25           MR. LAWSON:  Certainly.  Thank you, your Honor.  And

H5GACAM2ps

of course above and beyond irreparable harm.  There is a recent

Supreme Court case, *Winter v. Natural Resources Defense*

*Council, Inc.*, 555 U.S. 72008.  It's a Justice Roberts opinion,

I believe.  And it's very interesting, because it stands for

the proposition that even if the plaintiff can show actual and

irreparable harm, or a likelihood of incurring that irreparable

harm, and even if the question of success on the merits is at

least a close call, where it could be that there's evidence one

way versus the other, that the bottom factors, and that is the

last two factors, the balance in equities and the public

interest, can be dispositive and require denial of a

preliminary injunction standing alone.  And this is a case

where the balance of the equities and the significant concerns

about public interest profoundly weigh in favor of denial of

the TRO, but also in favor of any preliminary injunction.

This is a case where a physician is charged with

incompetence in connection with the treatment of patients.  And

not only that, this proceeding has gone on for years.  I

understand that this same doctor first tried to pursue his

remedies and block any type of proceeding of this

administrative nature in state court.  And I understand he did

that at least five years ago.  And I also understand that that

case was unsuccessful.  So this is yet another bite at the

apple.

Meanwhile, the public continues to suffer the harm,

H5GACAM2ps

1    because this is a physician that's charged with incompetence,

2    negligence in treating patients.  And while roadblocks continue

3    to be thrown up against starting, finally, this administrative

4    proceeding, the harm continues to be suffered and the public

5    interest continues to receive the short end of the stick.

6            So I would say, your Honor, that those two factors,

7    which can be decisive standing alone, weigh heavily in favor of

8    denying the TRO and denying the eventual preliminary

9    injunction.  And that's going to be equally true in the future

10   as it is now if not more so.

11           And the final factor to discuss here is of course a

12   likelihood of success on the merits.  And your Honor correctly

13   recognized that the *Younger v. Harris* doctrine requires

14   extension here.  In fact, the only exception that the plaintiff

15   has invoked the *Younger* extension in his memorandum of law was,

16   once again, the talisman of bad faith, that -- and, again, that

17   theory completely falls on the complete lack of any substantive

18   evidence that there's any bad faith here.

19           There is no antitrust claim here, your Honor.  He is

20   alleging what appears to be both a Section 2 monopolization

21   claim and a Section 1 claim, which I guess would implicate some

22   alleged contract, combination, or conspiracy.  But the problem,

23   as I'm reading this complaint, it appears that the plaintiff is

24   claiming that he's treating different patients than his own

25   subgroup of patients.  It's almost as if he's alleging that

H5GACAM2ps

1    he's not even competing in the same market that's allegedly

2    being restrained.  And also of course there is the problem that

3    the Sherman Act is designed to protect competition as a whole

4    in the relevant market, not the individual competitors within

5    that market.  And that's the *Tops* case in the Second Circuit

6    from 1998.

7            But try as he may, what this complaint alleges is harm

8    to a single competitor.  He tries, desperately is trying here

9    to convert this into some type of animus or some type of

10   vendetta against the technique itself.  But it's just

11   conclusory allegations.  He hasn't, to my knowledge, I haven't

12   seen any identification of any other practitioner of this

13   technique, or any other competitor that could be harmed, other

14   than the plaintiff himself.

15           So that's the final factor.  But the likelihood of

16   success on the merits is a non-issue here, also weighs heavily

17   and independently against granting any injunctive relief at any

18   stage in this proceeding.

19           THE COURT:  All right.

20           MR. LAWSON:  It would seem that if the plaintiff were

21   correct about this type of assertion, that there could never be

22   any peer review in connection with an allegation of

23   professional misconduct, because peer review involves your

24   peers, involves your apparent competitors.  And so it's hard to

25   imagine how that allegation even makes any sense.

H5GACAM2ps

1          MR. SIMON:  Do I have any reply time?

2          THE COURT:  I'm sorry?

3          MR. SIMON:  Any reply time?

4          THE COURT:  Sure.  Thank you.

5          MR. SIMON:  We're getting off the track, Judge.  There

6    is -- it is not true that bad-faith prosecution only applies to

7    criminal cases.  In fact, my leading case is *Bassham v. State*

8    *Bar of Texas*.  And when you're getting into the hearings and

9    what it is that should and should not go on, that case is

10   instructive.  The Fifth Circuit is very instructive as to what

11   should and should not happen.  They particularly cited the case

12   and they said, the right is to be free of bad-faith charges and

13   proceedings, not to endure them until their speciousness is

14   eventually recognized.  That is the irreparable harm that the

15   courts, including the Northern District here, have recognized.

16          Unfortunately the Fifth Circuit developed that more

17   than the Second Circuit.  In the Second Circuit you have to be

18   specific in what you're saying, and there's got to be

19   subjective motivation, Judge.  But really when we're getting

20   into what process is due to the plaintiff in the face of a

21   bad-faith prosecution, which, we allege that is happening, and

22   it is, then he should not be forced to endure any hearing at

23   all, according to this case.  That's what the Fifth Circuit

24   says.

25          And the other thing is, Judge, they're trying to say

H5GACAM2ps

1  that we're suing them for something else, or we're prosecuting

2  for something else, other than the particular modalities that

3  he's using.  That is just not true.

4       And why is it not true, Judge?  Because I included the

5  report of the investigations in the exhibits, for you to see

6  what it is that their motivation is.  And time and again and

7  again and again, Dr. Meyers keeps on putting into their

8  report -- you have a question?

9       THE COURT:  Well, one of the issues for me -- I

10  understand your argument with respect to, if there is bad

11  faith, you ought not to have to undergo a hearing.  OK.  Your

12  argument for bad faith depends upon an argument that you're

13  undergoing a disciplinary hearing for using a certain modality

14  of treatment.  The defendants deny that.  They say that's not

15  what the hearing is going to be about, it's going to be about

16  how your client has practiced medicine.

17       Of course we'll know when the board comes out with its

18  decision as to whether that's right or wrong.  There would then

19  be an administrative appeal and an Article 78.  And we would

20  know.

21       On the other hand, what you're asking me to do is to

22  enjoin a state disciplinary proceeding for a doctor, the bottom

23  line of which would be that when the state licensing

24  authorities say, this doctor should be disciplined, in some

25  way, with respect to the doctor's treatment of patients, you

H5GACAM2ps

1    want me as a federal court judge to say, "No, stop it, state,

2    let him continue to practice," the downside of which would be,

3    if the state were correct and the hearing proceeded and their

4    final decision were made not on the issue of an incorrect

5    modality but on the way in which the doctor was in fact

6    practicing medicine, not only would you not have had a basis to

7    stop the state, but the state would have stopped what could be

8    a danger to the community.

9           MR. SIMON:  But here is the answer to that analysis,

10   Judge, because, in the context of New York law, the analysis,

11   with due respect, is flawed.  And why is it flawed?  Because if

12   indeed they are correct and they are now changing their mind

13   and they are prosecuting him for something else, other than

14   what they initially investigated and what was the subject

15   matter of the investigation, they have to tell him what the

16   subject matter of the investigation is, because that report of

17   the investigation goes before the committee that acts like a de

18   facto grand jury, that says you can go forward.  If they change

19   their mind, they've got to start from scratch and give him an

20   opportunity to address those issues again.

21          THE COURT:  Presumably.

22          MR. SIMON:  Yes.

23          THE COURT:  No, hold on.  You don't know what's being

24   presumed.  Presumably, that is an argument that could be made

25   to the board.

H5GACAM2ps

1           MR. SIMON:  No.

2           THE COURT:  No?

3           MR. SIMON:  No, I can't, because, again, that

4    prosecution, what happened is, there is a regulation.  The

5    judge, there's a JHO in the administrative proceedings.  The

6    JHO was divested of powers to dismiss the charges.  So instead

7    of stopping the bad-faith prosecution, they are subjecting him

8    to it.  And that is exactly when the harm happens, and that is

9    exactly what *Bassham* says it does and it should not.

10          THE COURT:  Is it true that you tried to block a

11   disciplinary proceeding in the state court, or your client did,

12   and that that was rejected by the state court?

13          MR. SIMON:  No.  Actually, yes, it's true, but not --

14   what happened, again, Judge -- and I disclosed that in the

15   complaint, I did not hide it, by the way.  It's up front.

16   There were state proceedings.  It had nothing to do with a new

17   law.  While that was happening, the new law passed.  If the new

18   law wasn't here, I wouldn't be here telling you that it's

19   getting prosecuted against the new law prohibiting what it is

20   that they're doing.  The new law, in between that state

21   prosecution and now, there was a new statute enacted.  That's

22   why I'm here.

23          THE COURT:  Well, were the proceedings begun before

24   the state statute?  Have these proceedings been going on?

25          MR. SIMON:  Yes.  The proceedings were just done

H5GACAM2ps

1    following this year.  Yes, they have been going on.

2              THE COURT:  For five years?

3              MR. SIMON:  They have been going on, yes -- I think

4    they started in 2012.  So, yes, the Court of Appeals, I think

5    it was this year.  The judge down here said quite a bit on the

6    decision.

7              But those issues, Judge, had nothing to do with what's

8    before your Honor right now because the new law wasn't there.

9              THE COURT:  No, OK.  But if the proceedings were

10   brought before the new law and had just been continuing, it's

11   sort of hard to make the argument that the board has been

12   proceeding in bad faith.  They started these proceedings over

13   five years ago.  They were attempted to be enjoined,

14   unsuccessfully, in the state court.  And now you say they're

15   being continued in bad faith.

16             MR. SIMON:  In violation of the new statute.

17             THE COURT:  Yes.  I know.

18             MR. SIMON:  That intervened, which I didn't have.

19             THE COURT:  I know that's the argument.  But it

20   doesn't seem quite right, when the proceedings were brought

21   before the statute.

22             MR. SIMON:  There were no proceedings, Judge.  There

23   was an investigation.  There were no charges filed.

24             THE COURT:  OK.

25             MR. SIMON:  OK.  This is the first time.  The formal

H5GACAM2ps

1    charges were just filed and served now.  So really the

2    proceedings, there was a threat that they were going to file

3    them, but there was no formal filing.  The formal filing just

4    got done right now, in the end of April.

5            THE COURT:  OK.  Well, all of this is helpful to me.

6    I thank you.  It seems to me I have to set a date for a

7    response.  And I hope that, in the response, I will get an

8    affidavit from someone with knowledge of the state proceedings

9    and what the medical standards are and what the board is doing,

10   because all of this is very helpful to me in understanding the

11   case.

12           So the response should be due May the 23rd.  The reply

13   May 26.  And I will hear you again on June the 7th at 4:30 p.m.

14   Let me just fill out order to show cause --

15           MR. LAWSON:  Your Honor, with the Court's indulgence,

16   we were wondering if it would be possible to extend the

17   briefing schedule on the preliminary injunction motion so that

18   the opposition papers would be due sometime maybe at the end of

19   June.

20           THE COURT:  What would I do with the June 12th date?

21   Ignore it?

22           MR. LAWSON:  June 12th is only the first day of the

23   hearing.

24           THE COURT:  I can't do that.  I mean, I can't do that

25   responsibly.  I have a plaintiff who comes in, and I've already

said, I'm not going to grant the TRO.  But I have a plaintiff

who looks for relief and he's got a date of June the 12th.  And

this is also not a case, frankly, where I would try to urge the

defendants to put over the hearing so that I would have more

time or you would have more time to decide it, or you submit

papers and I decide it.  I wouldn't do it, because there is an

argument of the public interest.  And I'm not going to say

that, when the state comes in and says, we're trying to take

disciplinary action against a doctor who we believe shouldn't

be practicing or should be disciplined or whatever the

discipline is going to be, however long it may take in the

state court, I shouldn't just ignore it and say, oh, look, to

give the lawyers some more time, why don't you just let, you

know, let the doctor continue to practice.  We think he is

negligently practicing.  But, oh, let it go on for a while

because the lawyers want more time to brief it and because your

Honor may need some more time to decide the preliminary

injunction.  That's just not responsible.  And it's not

reasonable for you to make the argument to me.

          I will make every effort, even though I spend my days

on a criminal trial, to get on top and make a decision, because

I actually bought your argument about balance of the equities

and the public interest.  But balance of the equities and the

public interest only go so far.  It only goes so far, as far as

I can hear, to the point where counsel may be inconvenienced by

H5GACAM2ps

1  the need to submit papers quickly.  That's not weighing the

2  public interest and the balance of the equities very much.

3          MR. LAWSON:  Understood, your Honor.

4          MR. SIMON:  June 4, your Honor?

5          THE COURT:  I'm sorry?

6          MR. SIMON:  You said June 4?

7          THE COURT:  Yes.

8          MR. SIMON:  4:30 again?

9          THE COURT:  Yes.

10          (Pause)

11          MR. SIMON:  He says it's a Sunday?

12          THE COURT:  I'm looking at the proposed order.  Yes,

13  first order in paragraph, you can submit the brief in excess of

14  the pages.  Ordered that, on the 16th day of May, the

15  plaintiff's motion for a temporary restraining order brought by

16  this order to show cause be and here is denied.  Ordered that

17  the defendants, their agents, etc., show cause, at a hearing on

18  plaintiff's application for preliminary injunction in Courtroom

19  12B on the 7th day of June, 2017 at 4:30 in the afternoon, why

20  an order should not be entered granting a preliminary

21  injunction in the form and substance set forth in the

22  accompanying verified complaint and the affidavit of Jacques G.

23  Simon.  Ordered that upon application the Court shall order

24  further relief as applied for.  I don't need that paragraph.

25  Ordered that service of a copy of this order to show cause

H5GACAM2ps

1    together with all of the papers on which it is predicated be

2    effectuated -- it's already been made.  The defendants have

3    copies of the papers, right?

4              MR. SIMON:  Yes.

5              THE COURT:  And you'll have a copy of this order to

6    show cause if you just wait around in the courtroom.  We'll

7    make a copy for you.

8              Service of a copy of this order to show cause,

9    together with all the papers upon which it is predicated as

10   recited above, has been accomplished.  Responsive papers must

11   be submitted by May 23.  Reply papers must be submitted by May

12   26.

13             MR. SIMON:  Electronic?

14             THE COURT:  I'm sorry?

15             MR. SIMON:  All on ECF, right?

16             THE COURT:  Yes.  You can serve the defendants with

17   ECF, and you can put the papers on ECF.  But courtesy copies

18   should be provided to the Court by hand or by fax if less than

19   25 pages.  And my fax number is (212) 805-7912, I believe.

20   Yes?  Yes?

21             You can call chambers.

22             May 16.  OK.  I have signed the order to show cause.

23   And we'll make a copy of this and give it to you.  So if you

24   wait around in the courtroom.  And I look forward to reading

25   the papers and hearing you at the hearing.

H5GACAM2ps

1          Thank you, all.

2          MR. SIMON:  Thank you, your Honor.

3          MR. LAWSON:  Thank you.

4                          o0o

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25