h662camH

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    M.D. DANIEL CAMERON,

 4                    Plaintiff,              New York, N.Y.

 5             v.                             17 Civ. 3420(JGK)

 6    M.D. HOWARD ZUCKER, in his
      official capacity as
 7    Commissioner of New York State
      Department of Health, et al.,
 8
                    Defendants.
 9
      ------------------------------x
10
                                             June 6, 2017
11                                           9:40 a.m.

12    Before:

13                          HON. JOHN G. KOELTL,

14                                           District Judge

15

16                          APPEARANCES

17    JACQUES G. SIMON
           Attorney for Plaintiff
18

19    ERIC T. SCHNEIDERMAN
           Attorney General of the State of New York
20    BY:  JAMES M. HERSHLER
           TODD A. SPIEGELMAN
21         Assistant Attorneys General

22

23    ALSO PRESENT:

24    HENRY S. WEINTRAUB,
           Chief Counsel
25         N.Y. State Department of Health
```

h662camH

1           (Case called)

2           MR. SIMON:  Jacques Simon representing Dr. Cameron.

3           THE COURT:  Good morning.

4           MR. SIMON:  And this is Dr. Cameron sitting with me.

5           MR. HERSHLER:  James Hershler, representing the

6   defendants.

7           MR. SPIEGELMAN:  Todd Speigelman, also for the

8   defendants.

9           MR. WEINTRAUB:  Henry Weintraub representing the

10  Department of Health.

11          THE COURT:  Okay.  I don't have your appearance.

12          MR. WEINTRAUB:  I'm not going to be participating.  I

13  am here really in my role as a client, not as an attorney *per*

14  *se*.

15          THE COURT:  Okay.  And your name is?

16          MR. WEINTRAUB:  Henry Weintraub, W-E-I-N-T-R-A-U-B.

17          THE COURT:  Thank you.

18          This is a motion for a preliminary injunction.  I

19  received all of your correspondence.  I received the

20  plaintiff's additional submissions, which I have accepted.  I

21  received the defendants' request to add Dr. Meyers, which was

22  agreed to.  The correspondence indicated that the parties

23  wanted me to receive in evidence all of the essentially

24  exhibits that have been submitted in connection with the motion

25  for preliminary injunction, and also to treat the prior

h662camH

affidavits that were submitted by Dr. Cameron and by

Mr. Nemerson as affidavits in lieu of direct testimony.

Of course I can consider on this motion for

preliminary injunction all of the papers that you have

submitted, including the affidavits that have previously been

submitted and all of the exhibits that you previously have

submitted, I will take all of those in connection with the

motion for preliminary injunction.

The reason for the hearing today was to allow you to

make any arguments and present any evidence that you wanted to

that you thought should be presented in live testimony, so you

are welcome to present anything you want in live testimony from

any of the witnesses, whether it is in addition to or

duplicates, anything that is in the affidavits, in support of

the motion for a preliminary injunction or in opposition to the

motion.

I am familiar with the papers.  I will listen to any

opening statements, and then I will listen to any evidence that

the parties wish to present.

I had indicated an hour for each side, which would be

only for your direct and redirect, not for any time that you

use in cross-examining the other party, so there is more than

enough time for you.  I wanted to give you some guidance with

respect to a reasonable time for the hearing, particularly

since you have submitted extensive affidavits and I have read

h662camH

1    the affidavits, and I will certainly consider those affidavits.

2            What you see going on now is an attempt to give me

3    realtime reporting, which I usually have in the course of any

4    evidentiary hearing.

5            So, with all of that, Mr. Simon.

6            MR. SIMON:  Good morning, your Honor.

7            Apparently in my zest to simplify matters, I

8    complicated them, because I did everything electronically.

9    Last night, before the day was over, I talked to the attorney

10   for the defendants, and we reached a stipulation that we put in

11   writing.  And, towards that, what I did to simplify things even

12   further, rather than coming up with boxes and boxes of paper, I

13   did a plaintiff's list of exhibits, of stipulated exhibits, and

14   I put it on USB for your Honor.  I gave it to the state

15   attorney.

16           We would like to simplify matters by moving the

17   exhibits on plaintiff's exhibit list into evidence.  Some of

18   them, as I said, are already part of the court file.  I marked

19   them in an abundance of caution.  I marked them by reference

20   into the list of exhibits.  The only new exhibits that we

21   have --

22           THE COURT:  Are the medical files.

23           MR. SIMON:  -- are the medical files, Dr. Cameron's

24   CV, and the two exhibits that the defendants have that I

25   understand I have no objection to is Mr. Nemerson affirmation

h662camH

1    that you already have in the court file and Dr. Meyers' CV

2    which I did not object to.

3              So, with that in mind, if I can pass this on to the

4    court, this is a complete list of exhibits.

5              THE COURT:  Okay.

6              MR. SIMON:  So I move all of those exhibits into

7    evidence as stipulated for the defendants, and there is no

8    objection to them.

9              THE COURT:  Yes, right.  The plaintiff's list of

10   exhibits that you have already described are admitted in

11   evidence and two defendants exhibits, which I take it are

12   Defendants' Exhibit 1 and 2.  Defendants' Exhibit 1 is?

13             MR. SIMON:  Mr. Nemerson's affirmation, I believe,

14   with various exhibits attached.

15             THE COURT:  And 2 is Meyers' affidavit?

16             MR. SIMON:  No, Meyers' CV.  Dr. Meyers is testifying

17   live.  I have heard and, again, I tried to simplify.  I was

18   very mindful of your Honor's order, and I saw everything -- the

19   court was working hard during the Memorial Day weekend.  I was

20   really mindful of the time that you allotted, and I didn't want

21   to encroach on that.  And I brought Dr. Cameron initially here

22   because I didn't know how the new submissions were going to

23   come out until the last moment last night, but I didn't really

24   want to take the court's time with repeating what is in the

25   affidavits unless your Honor wants to hear a little bit about

h662camH

1    Dr. Cameron's background, who he is, and the differences

2    between IDSA and ILADS, which I already put in the affidavit.

3    So I was trying to be very, very mindful and conservative with

4    the court's time, because I know the court's time is precious.

5            THE COURT:  Well, that is fine.  Whatever you want to

6    do is fine.  So whatever you want Dr. Cameron to testify to is

7    fine.

8            MR. SIMON:  I think the way I envisioned it and I

9    shared it with the defense counsel and I want to share it with

10   the court, is because Dr. Cameron said everything he had to say

11   in the affidavits, I am going to reserve him for rebuttal,

12   because I understand they are going to put Dr. Meyers on and

13   they may put Mr. Nemerson on.  So what Dr. Cameron will have to

14   say is in rebuttal to what the defense is going to say, because

15   pretty much everything was said in his affidavit, and the

16   exhibits are there.

17           THE COURT:  Okay.

18           MR. SIMON:  Unless will you want to hear a little bit

19   about...

20           THE COURT:  Whatever you want Dr. Cameron to testify

21   to is really up to you.  So if you don't want to put

22   Dr. Cameron on and you want to wait for the defendants to put

23   Mr. Nemerson on and Dr. Meyers, that's fine, and put

24   Dr. Cameron on in rebuttal, that's fine.

25           As you have said, there is a lengthy affidavit from

h662camH

Dr. Cameron, a lengthy affidavit from Mr. Nemerson.  Originally

the defendants said they may not put Mr. Nemerson on because he

said what he wanted to say in his affidavit, but they might

want to put him on, and then they asked to put Dr. Meyers on.

So whatever the parties want to do in terms of putting on

evidence.

              So Mr. Simon?

              MR. SIMON:  At this point I think I am going to

rely -- for the initial case, I am going to rely on what

Dr. Cameron said in the affidavit, and I think that's a

judicious time expenditure.

              THE COURT:  Okay.

              MR. SIMON:  And then I am going to bring him up on

rebuttal.

              THE COURT:  Okay.

              So then the next question is whether the defendants

want to cross-examine Dr. Cameron on anything that's in his

affidavit, right?

              MR. HERSHLER:  Thank you, your Honor.

              There are some issues that we would like to

cross-examine him on.  However, for two reasons, if it's all

right with everyone, we would reserve that until he is put on

in rebuttal.

              THE COURT:  Fine.  Sure.

              MR. HERSHLER:  The reason is --

h662camH

1          THE COURT:  So is there any other live testimony,

2     Mr. Simon, that you want to put on?

3          MR. SIMON:  No.  I think we said plenty in the

4     affidavits, like your Honor said, and I think that this is a

5     pretty good plan that the Attorney General said.

6          THE COURT:  Okay.  So then I will turn to the

7     defendants and ask what live testimony you would like to put

8     on.

9          MR. HERSHLER:  Thank you, your Honor.

10          We would like to call Dr. Burt Meyers first and, after

11     him, Mr. Nemerson.

12          THE COURT:  Okay.  Is Mr. Nemerson in court?  Yes.  He

13     is raising his hand.  If he is going to be a witness, shouldn't

14     he leave the court?

15          MR. SIMON:  Your Honor, I am going to request actually

16     that he does.  He is not a party to this action.  He is a

17     nonparty.

18          THE COURT:  So he will go to the witness room.  Thank

19     you.

20          Mr. Fletcher will show you the witness room.

21          If Dr. Meyers will take the stand.

22      BURT MEYERS,

23          called as a witness by the defendants,

24          having been duly sworn, testified as follows:

25          THE COURT:  Dr. Meyers, please keep your voice up.

1            Mr. Hershler, you may examine.

2            MR. HERSHLER:  Thank you, your Honor.

3   DIRECT EXAMINATION

4   BY MR. HERSHLER:

5   Q.  Dr. Meyers, your curriculum vitae is already in the record,

6   so I am not going to belabor your credentials and background.

7            MR. HERSHLER:  Does everyone have a copy of his CV?

8            MR. SIMON:  I'm not sure the judge does, because I

9   didn't --

10           THE COURT:  Okay, I have a copy of Dr. Meyers' CV

11  which is admitted in evidence as Defense Exhibit 2.  Okay.

12           MR. HERSHLER:  Thank you.

13  BY MR. HERSHLER:

14  Q.  I am going to try to cut to the chase as much as possible.

15           Dr. Meyers, could you just briefly summarize your

16  background, particularly your qualifications in the area of

17  infectious disease?

18  A.  So, after medical school, I took an internal medicine

19  residency; and then a fellowship in infectious diseases; and

20  then served in the Air Force; then went to Mt. Sinai, where I

21  was a resident; and then 35 years in the division of infectious

22  disease; rose to be a professor of medicine, and started a

23  section called -- and I became the director of transplantation

24  infectious diseases.  Most of the patients I saw were

25  inpatients in the hospital, critically ill.  I didn't really

H662camH                          Meyers – Direct

1    have an office practice.

2    Q.  When did you last actually treat patients?

3    A.  I left Mt. Sinai in 2004.

4    Q.  And currently what do you do?

5    A.  I am a contract worker, consultant for the New York State

6    Department of Health in OPMC.

7    Q.  Have you ever treated patients suffering from Lyme disease?

8    A.  Not at any office setting.  In a hospital setting possibly

9    as part of a differential diagnosis I may have been involved,

10   but I never personally took care of somebody, you know, because

11   most of those patients are outpatients with Lyme disease.

12   Q.  Back in 2010 and 2011, what was your position with the

13   Department of Health?

14   A.  I was a medical –– or and am a medical coordinator.

15   Q.  What does that position involve?

16   A.  What we do is basically review –– well, let me backtrack.

17   Complaints come in, I guess, up to Albany, and then they come

18   down to us, where a patient or the commissioner of health may

19   decide that something should be investigated.  So I am one of

20   the physicians who investigates.  And since my field is

21   infectious disease, most of the cases that I see and review are

22   infectious disease cases.

23   Q.  Were you involved at all in the investigation of

24   Dr. Cameron?

25   A.  Yes.

H662camH                           Meyers - Direct

1   Q.   In what capacity?

2   A.   So, I reviewed many of the charts, and then actually had an

3   interview or two interviews with Dr. Cameron.

4   Q.   What was the purpose of those interviews?

5   A.   The reason for the interview is to give the doctor a chance

6   to explain what and how he took care of a patient or patients.

7   It was his chance to tell his story.  That's what we tell them

8   when they come in.

9   Q.   Is that what happened in the case of Dr. Cameron?

10  A.   Yes.

11          THE COURT:  What were the years when those two

12  interviews occurred?

13          THE WITNESS:  I think they were 2011.  I have to look.

14          THE COURT:  Okay.

15          THE WITNESS:  I think they both were 2011.

16          MR. HERSHLER:  Let the record reflect that I did share

17  a copy of what was originally Exhibit F for plaintiff to

18  Dr. Meyers in preparation for his testimony; and Exhibit F

19  includes, among other things, Dr. Cameron's affidavit and the

20  reports of the interview that was conducted of him by the

21  Office of Professional Medical Conduct, as well as his response

22  to the report of the interview.

23  Q.   Is that correct, Dr. Meyers?

24  A.   No, I think it was 2010.

25  Q.   Have you reviewed -- have you had the chance to review

H662camH                          Meyers – Direct

1    Exhibit F?

2    A.  Yes.

3            THE COURT:  Dr. Meyers, are you reading something?

4            THE WITNESS:  No, no, I'm trying to see what the dates

5    of the interview are.

6            THE COURT:  I know, but you should testify from your

7    own recollection.

8            THE WITNESS:  Yeah.  Well, I said I thought --

9            THE COURT:  Hold on.  Put aside anything, all right?

10   Don't look at anything for purposes of your testimony.  If you

11   have got something on the witness stand, turn it over.  Tell us

12   what your recollection is.

13           If you need something to refresh your recollection,

14   say that it would be useful to refer to something to refresh

15   your recollection.  Okay?

16           THE WITNESS:  Okay, sure.

17           THE COURT:  Okay.

18   BY MR. HERSHLER:

19   Q.  Can you briefly describe how the interview progressed?  How

20   did it --

21   A.  There were a bunch of cases, and I would ask -- Dr. Cameron

22   and I would have the record, and I would ask a question about,

23   Did you examine this patient? did you do this? did you do that?

24   What was your plan of action? etc.  And we had a dialogue, he

25   and I, over at least these ten or eleven patients, over these

H662camH                         Meyers - Direct

1   two different interview dates.

2   Q.  I see.

3         Was someone recording what was said during --

4   A.  No, each of us -- Mr. Sullivan, one of the investigators

5   was there as well.  So since we don't record things, each one

6   of us takes notes, because eventually we are going to write

7   something.  So we are each writing notes, trying to recall what

8   was just said.  So each of us took notes.

9   Q.  I see.

10        At some point after the interviews were concluded, was

11  a report prepared?

12  A.  Yes.  We write something called an ROI, which is a review

13  of investigation.

14  Q.  Who prepared that?

15  A.  Myself and Mr. Sullivan, the two of us.  He is an

16  investigator in Albany.

17  Q.  Have you had the chance to look at the report of interview

18  that was generated in this case regarding Dr. Cameron?

19  A.  Yes.

20  Q.  Does it accurately record what took place during the

21  interview?

22  A.  Yes.

23  Q.  Do you stand by what it says?

24  A.  Yes.

25  Q.  Now, I think by now you know that Dr. Cameron has claimed

H662camH                          Meyers - Direct

1   that the report was fraught with fabrications, bias, and

2   knowingly false statements, and I am taking that from his

3   complaint, paragraph 2005, and his affidavit at paragraph 51.

4             Are those claims true?

5   A.  No.

6   Q.  He also claims that you were belligerent during the

7   interview and that you substituted your own opinions and

8   answers to your own questions.  He makes that claim in

9   paragraph 55 of his affidavit.

10            Are those claims true?

11  A.  No.

12  Q.  Do you have any idea why he might be making those claims?

13  A.  Well, what I did in the interview, as we do in all the

14  interviews, is ask a question:  Did you do a history?  Did you

15  do a physical?  Did you do a differential diagnosis?  Maybe he

16  took that as belligerent if I asked it for nine different

17  patients.  And then if I asked, Did you do a lab test?  Did you

18  not do a lab test?  So I tried to record basically everything

19  he said.

20            I never, to the best of my knowledge, ever criticized

21  any of the statements he made.  I may have said, You treated

22  for four months?  He said yes.  I didn't say, You shouldn't

23  have treated for four months.  You shouldn't have treated for

24  two years.  I don't think I ever said that.  I just recorded

25  what he said and what I said.

H662camH                        Meyers - Direct

Q.  He also claims that you falsely reported that he agreed

that there was no sign of Lyme disease in some of the patients

at certain times and that you flagrantly substituted your own

impression of multiple sclerosis?

A.  I have no recollection of that.  I don't think I ever did

that.

Q.  What were you looking for when you were doing this

interview?

A.  Well, this is a chance for him to tell a story.  Remember,

someone has made a complaint.  Most of the complaints we

realize, you know, there are two sides to every story, and this

is the chance for the doctor to tell his story.  So what we

want to hear is how did he take care of this patient?  That was

the bottom line.  That's what we wanted to hear.

Q.  I see.

        He has also claimed that there is this grand

conspiracy among the defendants to eradicate from the

profession doctors that use a certain modality for treating

Lyme disease.  Are you aware of such a conspiracy?

A.  No, and I'm not part of it if there is one.

Q.  I will ask you one more time, do you stand by what was

recorded --

A.  Yes, I do.

Q.  -- in your report and interview?

A.  Yes.

H662camH                          Meyers - Cross

1    Q.  Do you have any hidden agenda against Dr. Cameron?

2    A.  No, no, no, not at all, not at all.

3            MR. HERSHLER:  Thank you, Doctor.  I have no further

4    questions.

5            THE COURT:  Okay.

6            All right.  Mr. Simon, you may examine.

7    CROSS EXAMINATION

8    BY MR. SIMON:

9    Q.  Dr. Meyers, good morning.  I am shorter, so I am going to

10   bring --

11   A.  Pardon?

12   Q.  I am shorter than counsel, so I am going to bring the

13   microphone closer to me.

14           In 2010, Doctor, there were two interviews that you

15   had with Dr. Cameron, correct?

16   A.  Yes.

17   Q.  One was on about September of 2010, would you agree with

18   me?

19   A.  Yes.

20   Q.  And one was on about December 2010, correct?

21   A.  Yes.

22   Q.  And the reason why there are two interviews is because

23   there were several patients that the OPMC was examining

24   Dr. Cameron with respect to.  You couldn't finish the interview

25   on the first time?

H662camH                          Meyers - Cross

1   A.  Yes, that's right.

2   Q.  In 2010, what was your position with OPMC?

3   A.  I was medical coordinator.

4   Q.  As medical coordinator, what were your duties?

5   A.  As I said before, to read over -- investigate a complaint,

6   let's say, someone made a complaint; and to, then, if it was

7   against a doctor or a hospital, we would ask to review the

8   records; and after we reviewed the records, if it was

9   determined that a patient -- a physician or a hospital should

10  have an interview, an interview was given and, as I said

11  before, to have the doctor tell the story of a patient or

12  multiple patients.

13  Q.  In 2010, between -- in 2010, in the year 2010, do you

14  recall -- obviously Dr. Cameron was not your only interview,

15  correct?

16  A.  I didn't --

17  Q.  Dr. Cameron was not the only interview you conducted in

18  2010.

19  A.  Correct.

20  Q.  How many interviews did you have in 2010?

21  A.  Probably 12 maybe, one a month, or 18.  I don't recall

22  exactly.

23  Q.  And from 2010 until the present, how many interviews did

24  you have?

25  A.  Probably the same amount, you know.

H662camH                          Meyers - Cross

1   Q.  Is it your contention as we sit here today that the facts

2   pertaining to Dr. Cameron's interviews stick to your mind

3   independently in the matter that you testified to here today?

4   A.  No.  I reviewed materials, okay?

5   Q.  So in preparation for this hearing, you reviewed -- what

6   did you review?  The report of investigation?

7   A.  No.  This Exhibit F was given to me by the attorney.

8   Q.  Exhibit F was Dr. Cameron's affidavit --

9           MR. HERSHLER:  Objection, your Honor.

10  Q.  -- correct?

11          MR. HERSHLER:  Objection.

12  Q.  Can you -- withdrawn.

13          What was Exhibit F?

14  A.  It was also the ROIs that were written.

15  Q.  So you reviewed the ROIs, correct?

16  A.  Yes.

17  Q.  And the ROIs are what you have written, correct?

18  A.  With Mr. Sullivan, the two of us.

19  Q.  And it is your understanding that, as the medical director

20  or the medical coordinator, you should have no input into the

21  ROI as to what your views are.

22  A.  I am not the medical director.

23  Q.  I'm sorry, the medical coordinator.

24  A.  Medical coordinator.

25  Q.  The question still stands, sir.

H662camH                                Meyers - Cross

1   A.  Could you repeat it, then?

2   Q.  Yes.

3        Is it your view that, as the medical coordinator, you

4   should have no input as to what your personal views are towards

5   a certain diagnostic modality or treatment modality?  You

6   should not infuse your personal views into the report of

7   investigation?  Is that your understanding?

8   A.  No, no, you can certainly ask questions based on what you

9   think my personal views are, or what -- the medical community

10  and science community or what's in the literature.  You can

11  certainly ask questions.

12  Q.  But it's not your function to give the answers also,

13  correct, sir?

14  A.  Correct.

15  Q.  And it is certainly not your function to insert into the

16  report of investigation your own views on what should or should

17  not be, correct?

18  A.  Correct.

19  Q.  An interview, a statutory interview, you will agree with

20  me, is just like you described it, an opportunity for

21  Dr. Cameron to discuss with you the issues of concern to the

22  OPMC, correct?

23  A.  Yes, but we can respond by asking him questions about what

24  he means by that.

25  Q.  But not by stating what your views are with respect to what

H662camH                         Meyers - Cross

1   a particular medical modality should be with respect to a

2   particular patient.

3   A.   You can say them, but it doesn't mean that you disagree

4   with what he says.

5   Q.   Let's discuss this.  As you are a member of the Infectious

6   Disease Society of America.

7   A.   Yes, I was.

8   Q.   At the time.

9   A.   Yes.

10  Q.   You are not a member anymore?

11  A.   I haven't paid the dues yet.

12  Q.   In 2010, were you a member of the Infectious Disease

13  Society of America?

14  A.   Yes.

15  Q.   Are you familiar with their guidelines for the treatment

16  and diagnosis of Lymes, sir?

17  A.   Somewhat, yes.

18  Q.   And you agree with those guidelines, correct?

19  A.   Yes.

20  Q.   And in the treatment --

21  A.   They are just guidelines.

22  Q.   Correct.

23        And in your treatment, you said that you treated

24  certain patients in a hospital setting?

25  A.   No, no, I didn't say that.  Well, what I meant is they were

1    seen and there was possibly a diagnosis was considered, a

2    differential diagnosis was considered.  I don't personally

3    think I ever treated anyone with Lyme disease myself

4    personally.

5    Q.  So is it your view, as we sit at the trial, was it your

6    view at the time when you interviewed Dr. Cameron that any

7    antibiotic treatment past a 28-day period is not established

8    appropriate or scientifically based?

9    A.  No.

10   Q.  It is not?

11   A.  The view -- I said that was the view -- I either said the

12   CDC or the infectious disease guidelines.  I never said

13   Dr. Meyers thinks this is what you should do and if you don't

14   do it you are wrong.  If you review the record, I never said

15   that.

16   Q.  Please state for the record what is your understanding of

17   the diagnosis of Lyme disease?

18              THE COURT:  Could I pause for just a moment?

19              Do you know what, if any, the maximum period is under

20   the ILADS guidelines for treatment with antibiotics?

21              THE WITNESS:  Me?

22              THE COURT:  Yes.  Do you know?

23              THE WITNESS:  No.

24   BY MR. SIMON:

25   Q.  Are you familiar with the ILADS guidelines?

H662camH                          Meyers - Cross

1    A.  No.

2    Q.  Do you recognize the ILADS guidelines?

3    A.  It isn't I don't recognize them; I haven't read them.

4    Q.  I didn't finish the question --

5    A.  Sorry.

6    Q.  -- if it's okay.

7    A.  Sorry.

8              MR. HERSHLER:  Move to strike, your Honor.

9              THE COURT:  No.  I thought there was a question and

10   answer.

11             MR. SIMON:  I can move on.

12             THE COURT:  Go ahead.

13   BY MR. SIMON:

14   Q.  You never read the ILADS guidelines?

15   A.  No.

16   Q.  You are aware that the Infectious Disease Society of

17   America of which you are a member disagrees with the guidelines

18   of the -- of ILADS?

19   A.  I know they have their own guidelines.  Since I haven't

20   read the other guidelines, I can't say whether they partially

21   agree or totally disagree.  I only know the Infectious Disease

22   Society, so I don't know the answer.

23   Q.  Did you ask Dr. Cameron during the interview whether or not

24   he practices pursuant -- he treats -- I'm sorry, withdrawn.

25             Did you ask Dr. Cameron during the interview whether

H662camH                          Meyers - Cross

1    or not he practices medicine pursuant to IDSA guidelines or

2    ILADS guidelines?

3    A.  No, I don't think I ever asked that.

4    Q.  That was not of interest to you?

5    A.  No.  Because he told me when -- when he told me -- we went

6    through each patient -- how he treated them, I didn't say, Is

7    that part of any guidelines?  I only said, I think, at one

8    point the Infectious Disease Society guidelines were bloop.

9    Q.  You recognize as we sit here today --

10              THE COURT:  I'm sorry.  I didn't get it.

11              THE WITNESS:  What I meant was, it's a whole long

12   thing, infectious disease guidelines.

13              THE COURT:  I'm sorry.  You said you think at one

14   point you said that the Infectious Disease Society guidelines

15   were what?

16              THE WITNESS:  I meant they were -- there are a --

17              THE COURT:  There are a lot of them.

18              THE WITNESS:  Yes.  That's when I said bloop, meaning

19   a lot of them.

20   BY MR. SIMON:

21   Q.  Dr. Meyers, at the time when the interview took place,

22   before the interview takes place, the OPMC, the Office of

23   Professional Medical Conduct has to give Dr. Cameron notice of

24   what the issues are, correct?

25   A.  Correct.

H662camH                          Meyers – Cross

1   Q.  In this case there were two notices in which what was

2   identified was solely his care and treatment of Lyme disease

3   and differential diagnosis?

4   A.  No, no.  My recollection it was for each patient.

5   Q.  Correct.  For each patient.

6   A.  Care and treatment of.  I don't think they said.  I would

7   have to go back and look.  Because each individual person was

8   different.

9   Q.  Okay.  But in the initiating letters, and there were two of

10  them, and I don't know if you recall them, the issues

11  identified was Dr. Cameron's treatment and diagnosis of Lyme

12  disease in each one of the patients listed.

13  A.  I don't recall that.

14  Q.  Would anything refresh your recollection?

15          (Pause)?

16          THE COURT:  This is not a guessing game.  Would the

17  letters that were actually sent help to refresh your

18  recollection as --

19          THE WITNESS:  Sure.

20          THE COURT:  -- to what was said?

21          THE WITNESS:  No, what was asked.

22          THE COURT:  What the scope of the interview was

23  intended to be?

24          THE WITNESS:  Yes.

25          THE COURT:  Yes.

H662camH                        Meyers – Cross

1          MR. SIMON:  May I approach, your Honor, because I have

2     the letter electronically.

3     BY MR. SIMON:

4     Q.  I show you one of the letters is the letter of August 17

5     which is -- appears on the exhibit list as Exhibit J2, and I am

6     going to show you that -- the scroll button is down here, and I

7     am going to bring you down to the relevant part so that we can

8     save time, and I am going to show you the issues under

9     investigation involve, and I am going to ask you to read that

10    to yourself.  And when we are done let me know -- you can

11    scroll down with respect to every patient.

12    A.  "Care you rendered to" --

13    Q.  To yourself, Doctor?

14    A.  Oh.

15    Q.  So when you are done, you can let us know.

16    A.  Which is the scroll button?

17    Q.  Right here.

18          MR. SIMON:  Permission to approach?

19          THE COURT:  Yes.

20          (Pause)

21    A.  Okay.

22          MR. SIMON:  Your Honor, you had a question?

23          THE COURT:  No.  Go ahead.

24    BY MR. SIMON:

25    Q.  There is another letter which is the continuation.

H662camH                          Meyers - Cross

1    Remember we discussed the continuation of the interview, and

2    that would be -- I'm sorry, let me ask you a question.  You

3    finished reading?

4             You agree with me, do you not, that the scope of the

5    interview, the issues which were identified in the August 17

6    letter were Dr. Cameron's diagnosis and treatment of several

7    patients -- I didn't finish the question.

8    A.  I didn't answer.

9    Q.  -- of several patients with respect to Lyme disease?

10   A.  You are only telling half the story.  The meeting -- I

11   don't have it in front of me but, as I recall, it said the care

12   and treatment of a patient, Lyme disease, but not limited to

13   the care and treatment of neck pain, dah, dah, dah, and Lyme

14   disease, but not limited to Lyme disease.  In other words, it

15   was the -- I agree that Lyme disease was in there, but it was

16   also the care and treatment of all whatever some of those

17   complaints are.

18   Q.  Well, you are aware of the statutory requirements that the

19   OPMC has to give specific notice to Dr. Cameron of the issues

20   being investigated as opposed to saying everything under the

21   sun is under investigation, are you not?

22   A.  Yes.  Well, I think these letters are drafted by the

23   investigator.  I did see it back then.  But it was not just for

24   Lyme disease.  If you read some of them out loud, you will see

25   that they say other things.

H662camH                          Meyers – Cross

Q.  I am going to read with respect to the patients that the

letter talks, "the care you rendered to" and the name is,

should be redacted "specifically the appropriateness of the

care and treatment you rendered to the patient for Lyme disease

and complaints of neck pain," we have one.

        And then, for the next patient, "Specifically the

appropriateness of the care you rendered to Patient Two,

February 2008 to March 2008 including but not limited to the

diagnosis of Lyme disease, your differential diagnosis and

treatment," and so on and so forth.

        But the specific resounding theme here is the

treatment of Lyme disease, correct?

        MR. HERSHLER:  Objection, your Honor.  The letter

speaks for itself.

        THE COURT:  Sustained.

        MR. SIMON:  Okay.

        THE COURT:  Sustained.  The letters really do say what

they say.  I never like the objection that it speaks for

itself, because letters really don't talk, but when the

examination is simply limited to, This is what the letter says,

isn't it, then whatever the letter says it says.

        If you want to ask the witness what in his view that

encompassed, what "care and treatment" encompasses, what

"differential diagnosis and treatment" encompasses, those are

all fair questions.  But just to read the letter is not very

H662camH                     Meyers - Cross

1   helpful.

2              MR. SIMON:  Okay.  I am moving on.

3   BY MR. SIMON:

4   Q.  After the completion of the interview, you said you and

5   Dr. Sullivan authored the ROI which is the report of

6   investigation, correct?

7   A.  Mr. Sullivan.

8   Q.  Mr. Sullivan, yes.  I'm sorry.  He is an investigator,

9   correct?

10  A.  Yes.

11  Q.  And you have reviewed that that's attached to Dr. Cameron's

12  affidavit, correct, to Exhibit F that you reviewed?

13  A.  The ROIs, yes.

14  Q.  And you input into that, correct?

15  A.  (Nodding head).

16  Q.  Do you have any reason to believe that the report does not

17  reflect what it is -- that the ROI is incorrect or inaccurate

18  in any respects?

19  A.  No, I think it's accurate I said.

20  Q.  Do you have any reason to believe that -- as we sit here

21  today, you don't remember whether or not there were inaccurate

22  statements put in there?

23  A.  As we sit here today, I don't recall any.  I mean, there

24  may be a spelling error, something like that.

25  Q.  Then what happens in the process, after the doctor received

H662camH                         Meyers - Cross

1    the ROI, is being given a second chance to respond, correct, to

2    the ROI?

3    A.   Yes.

4    Q.   And then do you see the response to the ROI, the

5    corrections that Dr. Cameron sent?

6    A.   Normally.  I don't recall if I saw these.

7    Q.   And normally is the ROI corrected to reflect the

8    respondent's response?

9    A.   It may or may not be.  Or you can write another ROI or

10   something and say, what I wrote -- I stand by what I wrote, or

11   just leave it alone.  I haven't always responded to corrections

12   or statements from other physicians.

13   Q.   Okay.  In this case was another ROI issued after

14   Dr. Cameron's counsel responded?

15   A.   To the best of my recollection, no.

16   Q.   Dr. Meyers, when you say that there is no sign of Lyme

17   disease, what do you consider the signs of Lyme disease to be?

18   A.   I think I didn't say there is no signs of Lyme disease.  I

19   asked were there any signs of infection.  In other words, I

20   think I should explain the difference between symptoms and

21   signs.

22          A symptom is a complaint.  I feel fatigued, I feel

23   weak.

24          A sign is when you find something.  If you come in

25   complaining of, let's say, numbness or tingling, that's a

H662camH                    Meyers - Cross

1   symptom.  A sign would be you do a neurological exam and you

2   find out that there is, let's say, decreased reflexes or

3   decreased motor function.

4          So I always asked -- probably Dr. Cameron a lot,

5   because we had a lot of patients -- were there any signs of

6   disease, and when he said, They don't need a sign or the

7   symptoms were the equivalent of a sign, I just noted it.  I

8   didn't say, No, you are wrong.  I never said, No, you are

9   wrong.  If you didn't do -- I said, Did you do a differential

10  diagnosis?  And he said no, I just recorded no.  And many times

11  he said I didn't or I thought it but I didn't write it.  I

12  recall some of those.  Did you do a history and a physical?  Of

13  course.  In other words, if someone had a complaint where you

14  might examine somebody, if someone has pain in the leg, you

15  think the doctor, any doctor might examine someone with pain in

16  the leg to see if there is a sign meaning pain in the leg.

17         So I never criticized him as far as I recall for

18  anything he said.

19  Q.  And do you agree with me, Dr. Meyers, do you not, that Lyme

20  disease does not always manifest itself with pain in the leg?

21  A.  Of course.

22  Q.  So an examination for pain in the leg is not necessarily

23  appropriate in Lyme disease?

24  A.  No, no, but I'm saying if a patient complained to

25  Dr. Cameron or anyone that they had pain in the leg, it would

1    be appropriate for me to ask, Did you examine the leg?  If

2    someone had tingling, okay, did you do a neurological?

3    Q.  As an example.  I see what you are saying.

4    A.  Yes.

5    Q.  It is not disease specific.

6    A.  Correct.

7           MR. SIMON:  I have no further questions.

8           THE COURT:  Thank you.

9           MR. HERSHLER:  I just have one or two redirect, your

10   Honor.

11          THE COURT:  Sure.  Go ahead.

12   REDIRECT EXAMINATION

13   BY MR. HERSHLER:

14   Q.  Just to clarify something, Dr. Meyers, in your mind, was

15   the interview supposed to be limited just to Lyme disease

16   without considering any other possible illnesses or conditions?

17   A.  No.  As I thought I tried to point out, it was not limited

18   to Lyme disease.  In fact, we thought we said that.  But that's

19   why I asked about differential diagnoses in almost every single

20   case, because it is possible a patient didn't have Lyme

21   disease.  In other words, a physician, you know, and probably

22   Dr. Cameron did, considers in his mind all of the possibilities

23   that may occur when someone has a symptom.  And so it was not

24   limited to Lyme disease.  It was limited to the care and

25   treatment of the patient.

H662camH                          Nemerson - Direct

1          MR. HERSHLER:  Thank you.  No further questions.

2          THE COURT:  All right.  Thank you, Doctor.  You may

3    step down.

4              (Witness excused)

5          MR. SPIEGELMAN:  Your Honor, we would like to call

6    Mr. Nemerson to the stand.

7     ROY NEMERSON,

8          called as a witness by the defendants,

9          having been duly sworn, testified as follows:

10         THE COURT:  You may examine.

11   DIRECT EXAMINATION

12   BY MR. SPIEGELMAN:

13   Q.  Mr. Nemerson, where do you work?

14   A.  I work for the New York State Health Department, Division

15   of Legal Affairs.

16   Q.  And what is your position there?

17   A.  I am a deputy counsel in the unit that deals with the

18   professional misconduct subject area.

19   Q.  And did you swear to an affirmation in opposition to

20   plaintiff's motion for a preliminary injunction in this case?

21   A.  I did.

22   Q.  That affirmation and the exhibits to it are in the record.

23         About how many physicians are there in New York State

24   currently?

25   A.  There are -- if I can draw a distinction, the number of

H662camH                          Nemerson - Direct

1   licenses granted to physicians in New York is not a number I

2   know.  Physicians may -- physicians retain their license until

3   death or until the health department takes away the license,

4   and I am unaware of what the count currently is on living

5   licensees.  However, under state law, physicians are required

6   to register their license every two or three years, and

7   currently there are approximately 95,000 physicians who have

8   registered a license.  Of those 95,000, approximately 75,000

9   list a New York State practice address with the state education

10  department, which is the licensing authority.

11  Q.  Now, of those registered physicians listing an address of

12  New York State, is there any legal restriction on them from

13  treating Lyme disease?

14  A.  No.

15  Q.  You stated in your affirmation that the Office of

16  Professional Medical Conduct investigates physician misconduct.

17  Could you briefly describe what kind of records the Office of

18  Professional Medical Conduct, which I will abbreviate at OPMC,

19  keeps?

20  A.  Certainly.

21          MR. SIMON:  Objection, your Honor.

22          THE COURT:  Overruled.

23  A.  OPMC will open a file upon receipt of a complaint or a

24  report of possible misconduct.  That is opened with regard to a

25  particular physician.  The initial report of complaint is

H662camH                    Nemerson - Direct

1     reviewed.  It may or may not state facts that, if proven, would

2     be misconduct.  If not, very little else will go into that

3     file.

4              If it is not so clear, an interview may be performed

5     with the complainant.  That would be written up as a

6     memorandum.  Medical records might be obtained with regard to

7     the patient whose care is being questioned.  Those medical

8     records will be obtained and reviewed at least by an in-house

9     staff person.  If there is a summary written of that review,

10    that would be in the file.  If facts need to be tied down,

11    other witnesses may be interviewed.  Those are written up and

12    maintained in the file.

13             In those cases where it does appear, for example, if

14    there has been substandard medicine practiced, an outside

15    expert will be consulted.  His or her opinion will go into the

16    file.

17             At some point, in some cases, the licensee about whom

18    the complaint has been made will be interviewed.  That

19    interview is written up and put in the file.  That licensee is

20    free to add any additional submissions that he or she feels we

21    should have.

22             That material goes into the file.

23    Q.  What, if any, records would OPMC keep on any given

24    physician in New York State on whether they treat Lyme disease?

25    A.  There would be no such record, unless of course we are

H662camH                          Nemerson - Direct

1   investigating an allegation of care of a patient with Lyme

2   disease, it would be obvious in that file from the physician

3   records or from the interview that Lyme disease was an issue or

4   a factor.

5   Q.  Are you familiar with the OPMC investigation into

6   Dr. Cameron?

7   A.  I am.  I did not participate, but I have been involved in

8   the subsequent litigation and the currently pending charges are

9   issued by my office and signed by me.

10  Q.  But have you reviewed the 2010 report of interview in this

11  case?

12  A.  I have.

13  Q.  Do you recall who was present at that interview?

14  A.  Yes.  The interview of Dr. Cameron was performed by

15  Dr. Meyers, who testified earlier today; by Patrick Sullivan,

16  who is a nurse investigator of long standing with OPMC;

17  Dr. Cameron was there; and Dr. Cameron's prior attorney,

18  William Wood, of Wood & Scher, which was for many, many years

19  the leading law firm for licensees under investigation by OPMC.

20  Q.  And you are familiar with Mr. wood, I take it?

21  A.  I am.

22  Q.  Dr. Burt Meyers, who was present at the interview, what is

23  his role in the investigation?

24  A.  Dr. Meyers is one of several medical coordinators is the

25  title given them by OPMC.  His role is not a statutory one.

H662camH                         Nemerson - Direct

1   Since our investigators, some are nurses, some are lay

2   investigators, there is a need to have some staff people who

3   understand medical terminology, some medical concepts, who may

4   in some cases be better or more conversant and able, therefore,

5   to discuss things with the licensee under investigation, with

6   an expert.  Dr. Meyers plays that role.  He will occasionally

7   educate my staff or lawyers, nonphysicians, to help them

8   understand the facts and opinions in a given case.  Dr. Meyers

9   happens to be a contract employee.

10  Q.  Is Dr. Meyers considered the medical expert in this case?

11  A.  Although I'm sure he has plenty of expertise, no, he is not

12  the medical expert.  In our process, in order for an

13  investigation to be presented to what's called an investigation

14  committee we need to consult, under the statute, a medical

15  expert.  We have long interpreted that to mean an outside

16  medical expert, and that is the person who plays the ultimate

17  role in helping the director make his determinations and,

18  should we go to hearing, to testify.

19  Q.  And who was the medical expert in this case?  Do you know?

20  A.  I do know his name.  Dr. Sanders.

21  Q.  Thank you.

22           Was an investigation committee convened in

23  Dr. Cameron's case?

24  A.  Yes.

25  Q.  Were you at the meeting where the investigation committee

H662camH                          Nemerson - Direct

1    considered the case?

2    A.  I was.

3    Q.  And do you recall who was on that committee?

4    A.  Yes.  Mr. Madonia, a social worker; Dr. Sears, who is an

5    orthopedic surgeon that happened to be the chairman of the

6    board in those days; and Dr. Putterman, a pediatrician.

7    Q.  As far as you know, do the two physicians on the

8    investigation committee specialize in Lyme disease treatment?

9    A.  I have no reason to think they did.

10   Q.  What documents does the investigation committee consider?

11   A.  That investigation committee, as in all our investigation

12   committees, presented with a report of the investigation.  By

13   2010, the statutes had been amended to quite clearly specify

14   what goes into those reports.  It includes the initial

15   complaint or report or complaints or reports; it includes any

16   medical review; it includes any interview reports done; it

17   specifically includes the report of interview of the licensee

18   under investigation; it includes any submissions or corrections

19   or other types of submissions made by the target licensee prior

20   to the investigation committee.  All those things were included

21   in this report.

22   Q.  Dr. Cameron has asserted that the -- his response to the

23   ROI was not submitted to the investigation committee.  Is that

24   true?

25   A.  It is not.

H662camH                    Nemerson - Direct

1   Q.  I would like to refer to the statement of charges that is

2   in evidence as Plaintiff's Exhibit I1.

3   A.  Do I need to have that in front of me?

4   Q.  Not yet.

5          Do you remember signing the document?

6   A.  I do.

7   Q.  Who prepared it?

8   A.  An associate counsel on my staff.

9   Q.  Did you review it?

10  A.  I did.  Multiple times.

11  Q.  What documents are typically considered when preparing a

12  statement of charges?

13  A.  When a prosecutor -- which I no longer am, but once was --

14  receives a case file and instructions to draw charges, the

15  entire investigation report is reviewed, particularly our

16  expert opinion, particularly the submissions made by the

17  licensee to begin to learn the facts and medicine of the case.

18  The medical records will obviously at some point be reviewed;

19  but, because we are lawyers and not doctors, first we typically

20  review the medical opinions.  Certainly our own outside expert,

21  our medical coordinator, if he has given us a memo and if the

22  licensee has submitted their version, which is sometimes the

23  case, that will be reviewed.

24  Q.  Do you have a recollection of the factual allegations in

25  the statement of charges about Patient A?

H662camH                        Nemerson - Direct

1   A.  I do in a generic fashion.

2   Q.  Do you recall some of the concerns about Dr. Cameron's

3   treatment of Patient A?

4   A.  Yes, yes.  And I believe they were similar to the other

5   patients and to things that I said in my affirmation,

6   specifically, the criticism that we are bringing and prepared

7   to prove, include a failure on multiple occasions to take an

8   adequate medical history and to note it, which is required;

9   failure to perform an adequate physical exam and report it.

10  These are standard for virtually every medical case we bring.

11  There was a failure in this and several of the cases to work up

12  a differential diagnosis, which I have come to learn over the

13  years means, when presented with a patient, a prudent physician

14  doesn't just pick a single diagnosis and work with it, he or

15  she considers what other potential diagnoses might also fit the

16  fact pattern, and then systematically reduces it to what is the

17  best, most likely diagnosis.  That was not done, we allege, in

18  this case.

19  Q.  Those concerns you just mentioned, are those unique to

20  physicians who treat Lyme disease?

21  A.  Absolutely not.

22  Q.  Have you been involved in other investigations and

23  prosecutions that have raised similar concerns?

24  A.  Several hundred.

25  Q.  And what types of physicians have been involved in those

H662camH                          Nemerson - Direct

1    cases?

2    A.  All kinds.  Every specialty.

3    Q.  And what were some of the charges that were brought against

4    those physicians?

5    A.  By "charges" --

6              MR. SIMON:  Objection, your Honor.

7              THE COURT:  Sustained.

8    A.  -- I take it you mean --

9              THE COURT:  Sustained.

10   BY MR. SPIEGELMAN:

11   Q.  Moving on to the committee hearing that is upcoming,

12   Dr. Cameron has received an expert medical report from

13   Dr. Sanders and has objected to it.  Will Dr. Sanders testify

14   at the hearing?

15   A.  He will.

16   Q.  Will Dr. Cameron have the ability to contest that

17   testimony?

18   A.  Several ways.

19   Q.  How could he contest it?

20             THE COURT:  I'm sorry.  Dr. Cameron isn't required to

21   testify at the hearing, is he?

22             THE WITNESS:  He is not.

23             THE COURT:  Given the opportunity, but he is not

24   required to testify.

25             THE WITNESS:  Yes, Judge.

H662camH                    Nemerson - Direct

1    BY MR. SPIEGELMAN:

2    Q.  How can Dr. Cameron counter any testimony from Dr. Sanders

3    at the hearing?

4    A.  Our hearing procedure under the statute provides that the

5    department will put on its case, including the medical

6    expert --

7                MR. SIMON:  Judge, I'm going to object and move to

8    strike.  We do not contest that within the administrative

9    process we don't have a way of questioning the fundamental

10   basis of what goes on.  That's not what this case is about.  I

11   believe it is about --

12               THE COURT:  Okay.  Overruled.

13   Q.  You can continue.

14   A.  In the majority of cases, once the department finishes its

15   proof in chief, which in this case I believe will simply be the

16   introduction of medical records and the expert testimony, there

17   will be a respondent's case.  But before we get there, after

18   Dr. Sanders testifies, Mr. Simon will have a full opportunity

19   to cross-examine that expert.  After Mr. Simon is finished, the

20   hearing committee will typically also ask questions of the

21   expert.  After that is concluded, if appropriate, there will be

22   redirect and recross until everybody has exhausted.

23               After the department's case is presented, the

24   respondent, called in our proceeding, will present his case.

25   The licensee may or may not testify.  If he testifies, it may

1    be only about facts, he may give his medical opinion.  He will

2    also have the opportunity to present an expert witness other

3    than himself.  In the typical cases, those experts will have

4    already reviewed the testimony of our expert and may give

5    testimony as to why they disagree with it.  They may have

6    reviewed the medical charts in evidence and they will explain

7    why they feel it was adequate care and why it was not negligent

8    or incompetent, and then the department cross-examines and the

9    committee asks questions.

10           At the end of the hearing process, both parties make

11   oral and written submissions where, again, one has the

12   opportunity to pick apart the opposition's expert witness.

13   Those submissions all go to the hearing committee who then

14   deliberate.

15   Q.  If Dr. Cameron chooses to call an expert witness, could

16   that expert testify about the ILADS guidelines?

17   A.  Absolutely.

18   Q.  If Dr. Cameron objects to whether his treatment of Patients

19   A through G have run afoul of a physician -- our case, that his

20   treatment of those patients have run afoul of a physician

21   standard of care, is that something that he can dispute at the

22   hearing?

23   A.  That is exactly what's disputed at the hearing, and that's

24   exactly what our hearing will determine in the first instance.

25   Q.  I would like to turn your attention to Public Health Law

H662camH                    Nemerson - Direct

1    230(9-b).  Are you familiar with that provision?

2    A.  I am familiar with it.  I don't have it committed to

3    memory.

4    Q.  As best you can, what does section (9-b) say about whether

5    a hearing committee may find a physician guilty of misconduct

6    based solely on his or her use of an effective treatment

7    modality that is not universally accepted?

8    A.  What that means in conjunction with the last clause of that

9    section, which says that all other standards -- all other -- I

10   think the word is requirements must be met, what that means is

11   that the mere fact that a particular physician is practicing a

12   modality, a philosophy, a diagnostic style that differs -- it

13   says is nonuniversally accepted, it typically comes up when it

14   differs from the mainstream, from the centers of distribution

15   of practitioners, that by itself is not misconduct.  That was

16   not misconduct before that amendment was brought.  We have 50,

17   51 definitions of professional misconduct.  If a physician

18   practices specialty X or style X and there is no negligent

19   practice and no incompetent practice or none of the other 48

20   definitions of misconduct, that can't be charged as

21   professional misconduct, won't be charged as professional

22   misconduct.  And if for some reason my office did charge it,

23   which it wouldn't, the hearing committee could not sustain

24   those charges.  Simply practicing a modality outside the

25   universally accepted modalities is not misconduct.

H662camH                    Nemerson - Cross

1    Q.  But does it mean that a doctor using an alternative

2    treatment modality like ILADS could never legally be charged

3    with misconduct?

4    A.  It does not mean that at all.  The statute is not a shield.

5    It's not a magic protection that once you do something that is

6    out of the mainstream or not universally accepted, you can do

7    whatever you want.  Still basic standards of prudence and

8    prudent medicine have to apply.  And the statement of charges

9    reflects that.

10            MR. SPIEGELMAN:  Thank you.  That's all the questions

11   I have.

12            THE COURT:  All right.

13            Mr. Simon.

14   CROSS EXAMINATION

15   BY MR. SIMON:

16   Q.  Good morning, Mr. Nemerson.

17   A.  Good morning, Mr. Simon.

18   Q.  A couple of questions.

19            Did you have a chance to review Dr. Sanders'

20   curriculum vitae?

21   A.  Very briefly.

22   Q.  Are you familiar with the IDSA -- the fundamental

23   differences between IDSA guidelines in treatment and diagnosis

24   of Lyme and ILADS guidelines in treatment and diagnosis of

25   Lyme?

1  A.  I am in one sense, yes.

2  Q.  Is Dr. Sanders an IDSA or an ILADS doctor?

3  A.  I apologize.  I lose track of the acronyms.

4  Q.  I'm sorry.  IDSA is Infectious Disease Society of America.

5  A.  He is that.

6  Q.  Okay.  And I was wondering, sir, why, if Dr. Cameron tells

7  you that he practices by ILADS guidelines, is there not a

8  physician that is selected --

9          THE COURT:  I'm sorry.  You don't mean that.

10          MR. SIMON:  Sorry?

11          THE COURT:  You said why if -- I thought you meant

12  Dr. Sanders.  I'm sorry.  Go ahead.

13          MR. SIMON:  I'm still asking about the OPMC selection

14  of Dr. Sanders in order to substantiate these charges.

15          THE COURT:  Yes.

16          MR. SIMON:  I am going to go backtrack a little bit.

17  BY MR. SIMON:

18  Q.  It is your position, is it not, that Dr. Cameron is not

19  being prosecuted for practicing medicine by ILADS guidelines,

20  ILADS is the International Lyme and Associated Diseases

21  Society.

22  A.  Dr. Cameron is being prosecuted for practicing medicine in

23  the manner he did.

24  Q.  And not because he practices pursuant to ILADS guidelines,

25  correct?

H662camH                      Nemerson - Cross

A.  I'm not a medical expert but, to my understanding, one can

practice by general ILADS standards but do it prudently, doing

a full physical exam, doing a history, doing all the things we

are alleging were not done in this case.

Q.  So if indeed Dr. Cameron, your contention is correct that

he is not getting prosecuted for practicing by ILADS

guidelines, then why did your office select Dr. Sanders as an

expert who only practices by IDSA guidelines?

A.  Dr. Sanders is a board certified physician, quite skilled

in his field.  He knows anatomy.  He knows physical exams.  He

knows how to take a history.  He knows how a prudent physician

practices medicine.  This case and his opinion is not focused

particularly on whether it is ILADS or the other standards, it

is whether an adequate physical was done, history, differential

diagnosis, follow-up, mitigation of errors, mitigation of

injury.

        We choose our experts based upon their qualification

as experts, not as to whether or not they belong to the same

organization as the licensee under investigation.

Q.  Agreed, but there is a fundamental -- agreed with what you

said regarding how you chose it.

        However, when you are prosecuting somebody, for

example, for using long-term antibiotics past 28 days, is it

not important to find an expert who is familiar with that

particular modality rather than somebody who repudiates it?

1          MR. SPIEGELMAN:  Objection.

2          THE COURT:  Overruled.

3   A.  If that were in fact the charges we were bringing, I might

4   be able to answer that question.  We are not charging the

5   licensee with using an antibiotic for 28 days.  We are not

6   charging him with using that set of standards.  I won't repeat

7   myself for a third time.  The statement charges lays out quite

8   specifically what we intend to prove and, for that, Dr. Sanders

9   is an ideal expert.

10  Q.  I understand what the charges lay out, but there is a big

11  discrepancy between what the charges lay out and the report

12  that was disclosed, Dr. Sanders' report that directly attacks

13  Dr. Cameron for not diagnosing Lyme disease pursuant to what's

14  known IDSA guidelines.  And, indeed, I submit to you, if you

15  compare Dr. Sanders's report to Exhibit C to the verified

16  complaint, he follows to a T the IDSA guidelines.  Do you not

17  agree?

18  A.  I can't agree because I don't understand what you just

19  said.

20  Q.  Okay.  I will rephrase it.

21  A.  Thank you.

22  Q.  Does Dr. Sanders' report -- he has two reports, actually.

23  One is about Patient G, and he refers back to the general

24  report about Patients A and F.  Do you remember those?

25  A.  Not --

H662camH                        Nemerson - Cross

1   Q.  Would you like to see them?

2   A.  No.

3   Q.  You reviewed them in preparation for this hearing, correct?

4   A.  I did.

5   Q.  Okay.  Did you compare his reports to what is annexed as

6   Exhibit C to the verified complaint, which are the IDSA

7   guidelines?

8   A.  I did not compare his report to the guidelines.  Are you

9   asking about the guidelines or about my charges?

10  Q.  But yet that is the expert and the testimony that the

11  department is going to propound at the hearing, correct?

12  A.  Dr. Sanders is expected to testify in support of the

13  charges that are pending.

14  Q.  In accordance with his report.

15  A.  One would expect him not to change his view.

16  Q.  And you disagree with me that his report does not -- I'm

17  sorry, disagree with me that his report parallels almost word

18  by word the IDSA guidelines as opposed to the ILADS guidelines?

19  A.  I don't know what it parrots, or parallels.  I didn't quite

20  hear that.  And although I did see in his report that there are

21  references to differing standards for the diagnosis and

22  treatment of Lyme disease, you will note that the charges,

23  which are also consistent with his expert opinion, do not run

24  afoul of that problem.  They state what I have already said

25  they state.  Those charges are drafted by an attorney skilled

1   in this area of practice, familiar with the statutes, familiar

2   with the misconduct definitions, who is then educated by the

3   expert, who works with the expert to determine whether in fact

4   there is medical expertise to be brought to bear on the facts

5   we can prove to establish possible misconduct.  That possible

6   misconduct is found in the statement of charges.  So I don't

7   doubt, although I don't know, that Dr. Sanders probably

8   disagrees with long-term antibiotic care, he probably disagrees

9   with particular criteria that your client is using to diagnose.

10  Many people do.  It is not particularly relevant because our

11  testimony will be eliciting framework of our charges and that

12  will go to the adequacy of the history, the advocacy of the

13  physical, the working up of a differential diagnosis, the

14  monitoring for side effects, and addressing the presence of

15  side effects, etc.  So whether you are able to cross-examine

16  him based upon his current philosophy is up to you and the

17  administrative law judge, but the charges are the charges.  His

18  testimony will, we expect, support that.  The hearing committee

19  will decide.

20  Q.  Let me ask you a question.  In 2015, we discussed public

21  law 230(9-b).  That's when that law came into effect, correct?

22  A.  Yes.

23  Q.  And from what I remember from your affirmation, the

24  committee that OK'ed Dr. Cameron's prosecution was convened

25  sometime in 2011, correct?

H662camH                    Nemerson – Cross

1   A.   The investigation committee specifically plays a single

2   role, which is to concur or to fail to concur in the director's

3   determination that a hearing is warranted.   That proceeding

4   took place before the amendment, that is correct.

5   Q.   Did a proceeding take place after the amendment?

6   A.   It's what I just said.

7   Q.   I'm sorry.   Withdrawn.

8         Did another committee -- was another committee

9   convened after the amendment took place?

10  A.   No.   None is required.

11  Q.   I'm sorry?

12  A.   None is required and none was --

13  Q.   I'm going to move to strike.

14        THE COURT:   Overruled.

15  Q.   So if the committee gives its consent to prosecute a

16  physician before a change in the law takes place -- and this is

17  a hypothetical -- and the change in the law does take place

18  which prohibits the prosecution of certain conduct, it is not

19  required that the committee be reconvened and be made aware of

20  that change in the law?

21  A.   It depends on what law has changed and what the facts of

22  the case are.

23  Q.   Now, Dr. Sanders speaks about the fact that you cannot

24  diagnosis Lyme disease in the absence of erythema migrans rash.

25  Do you recall that in the report?

H662camH                          Nemerson - Cross

A.  I'm not sure.

Q.  Would you like to see the report?

A.  I am willing to believe you that it is there.

Q.  Is the diagnosis of Lyme by erythema migrans rash a

criteria of the Infectious Disease Society of America?

A.  I gather that it is.

Q.  Is that diagnosis also a -- is the diagnosis rejected or

accepted by ILADS?

A.  I don't know.

Q.  So if you prosecute somebody for diagnosing Lyme disease in

the absence of an EM -- I'm going to call it EM for short --

rash --

A.  If I do that?

Q.  Yes.  Hold on.  If you prosecute somebody for diagnosing

Lyme disease in the absence of an EM rash, when other

guidelines tell you that it is okay to diagnose somebody with

Lyme disease in the absence of EM rash, is that a good-faith

prosecution in your opinion?

A.  Cases are not prosecuted based upon guidelines.  They are

not prosecuted based upon particular criteria.  They are based

upon a stepwise analysis of what a physician knew at a given

point in time, and whether the next thing that physician did

was or was not consistent with the behavior of a reasonably

prudent physician who is managing and mitigating risk.  It may

in a given case have to do with one does procedure X in the

H662camH                      Nemerson - Cross

absence of sign Y.  I don't know.  I'm not a physician.  But if
we cannot work with an expert and learn why step by step the
decisions that were made were either incompetent or negligent,
then there is no case.  Whether a particular standard or
particular scientific test or a particular x-ray is needed in a
particular fact pattern, it may well be.  I'm not an expert in
this case.  I can't tell you what changes would have been
necessary in Dr. Cameron's behavior that would have avoided a
hearing other than, once again, adequately taking a history,
physical, differential diagnosis, etc., etc.  Nowhere in those
charges have we alleged you looked at the left knee, you should
have looked at the right knee.

Q.  The charges, Mr. Nemerson?

A.  Yes, sir.

Q.  And in the expert's opinion that goes to support the
charges.  You agree with me?

A.  The expert's testimony will support the charges.

Q.  Correct.  And the expert's testimony, by administrative law
judge's order, has to be disclosed to us and the reports that
was disclosed -- that were disclosed to us were Dr. Sanders'
reports, yes?

A.  I don't mean to pick nits, but what was disclosed to you
were the expert's written opinions given to us in the course of
the investigation.  Obviously his testimony at hearing will
correlate with that.  It is the same subject matter, it is the

H662camH                        Nemerson - Cross

1   same expert.  As we present the case, the questioning and the

2   answers we expect to address why each of the numbered charges

3   add up to negligent and incompetent practice.  On your

4   cross-examination, you will ask whatever you want based upon

5   the prior statements of our expert in his opinion to us.  We do

6   not offer a written prior opinion in our case in chief.  We put

7   on a live testimony.  You will cross-examine it.

8   Q.  But in this case there was an administrative -- you are

9   familiar with the administrative order that told you, the

10  department, to disclose the expert's testimony seven days

11  before the hearing?

12  A.  I know nothing of the sort.  What we were told to disclose

13  and what we did disclose was not testimony.  Testimony is what

14  I am doing now.

15  Q.  But you said that the testimony is going to be consistent

16  to the report?

17  A.  Will correlate with it, yes.

18  Q.  And you also agree that if Dr. Cameron practices by ILADS

19  guidelines, that in and of itself is not subject to

20  prosecution.  You said so.

21  A.  It is not subject to prosecution unless he fails to take an

22  adequate history, etc., etc., etc.

23  Q.  Okay.  But the practice by ILADS guidelines, such as using

24  long-term antibiotics in the treatment of Lyme disease, is not

25  subject to prosecution, correct?

H662camH                    Nemerson - Cross

A.  To my knowledge that does not by itself create an undue

risk that would be negligence if properly performed, including

all of the "et ceteras" I recited before.

Q.  And the diagnosis of Lyme disease, and I am just giving

examples, referring you to the Sanders' report, diagnosis of

Lyme disease in the absence of an erythema migrans rash is not

an improper procedure, correct?

          MR. SPIEGELMAN:  Objection.

Q.  For which you would get prosecuted.  I'm sorry.

          THE COURT:  I think that question was already asked,

but can you answer that.

          THE WITNESS:  I can't really, Judge.  I don't know

that specific medicine, and those two facts, those two

occurrences need to be in a constellation of behavior.  They

don't hit you in the street when getting off the bus.  There is

a history.  There is a physical.  Those things all need to be

done.  I can't tell you, because I'm not a medical expert, what

would need to be done.  So if those are the only two facts I

had, could I draw a statement of charges?  No.  But that's not

a hypothetical that tracks any reality that I experienced.

          MR. SIMON:  I don't have any further questions.

          THE COURT:  All right.  Anything further?

          MR. SPIEGELMAN:  No redirect, your Honor.

          THE COURT:  Okay.  Thank you.  You are excused.  You

may step down.

1            (Witness excused)

2            THE COURT:  Anything further from the defendants?

3            MR. HERSHLER:  No, your Honor.  We just reserve the

4    right to cross plaintiff.

5            THE COURT:  Okay.  Plaintiff?

6            MR. SIMON:  I call Dr. Cameron.

7            THE COURT:  Okay.

8     DANIEL CAMERON,

9         called as a witness by the plaintiff,

10        having been duly sworn, testified as follows:

11

12            THE COURT:  Mr. Simon, you may examine.

13   DIRECT EXAMINATION

14   BY MR. SIMON:

15   Q.  Dr. Cameron, good morning.  I would like to direct your

16   attention, first, to the Exhibit A, which is your CV.

17            MR. SIMON:  May I approach, your Honor?

18            THE COURT:  Yes.

19   Q.  I would like to you briefly tell the court about the

20   background, starting with your education, with your expertise,

21   and publications.

22            So let's start, where did you go to medical school?

23   A.  I went to medical school at the University of Minnesota,

24   and then I went to graduate school in the School of Public

25   Health and received an MPH in epidemiology at the University of

H662camH                        Cameron - Direct

1    Minnesota.

2    Q.   How long have you been practicing medicine?

3    A.   Since approximately 1982.

4    Q.   Have you been in private practice since then?

5    A.   Well, I had finished residency for those three years at

6    Beth Israel Medical Center and Mt. Sinai.   Then I was assistant

7    professor of medicine at New York Medical College for a year or

8    two.   And then I have been in practice in Mount Kisco, New

9    York, for 30 years.

10   Q.   Do you have -- for 30 years in Mount Kisco that's in

11   Westchester County?

12   A.   Yes.

13   Q.   Do you have any board certifications?

14   A.   I have a board certification in internal medicine.

15   Q.   As an internal medicine practitioner, can you explain to

16   the court what type of patients do you see?

17   A.   I train with mostly adolescents and adults, so I have been

18   working in primary care for the last 30 years and also as an

19   attending.   So for the first 20 years, I would routinely admit

20   people to Northern Westchester Hospital for admissions and

21   evaluation and treatment.

22   Q.   What professional societies are you a member of?

23   A.   I am a member of the AMA, and also a member of the

24   International Lyme and Associated Diseases Society, ILADS.

25   Q.   Are you a member also of the IDSA?

H662camH                          Cameron - Direct

1    A.  Yes.

2    Q.  So you are a member of both, correct?

3    A.  Yes.

4    Q.  Did there come a time when you started treating Lyme

5    disease patients -- diagnosing and treating Lyme disease

6    patients?

7    A.  Yeah, at the end of 1987, I had three people that had

8    unusual illnesses, and after working with them in primary care

9    for a while, it became clear that Lyme disease was a problem

10   for them.

11   Q.  Please explain to me, how many patients with Lyme disease

12   have you seen since 1987?

13   A.  I believe it's over 20,000 patients with Lyme disease in my

14   practice.

15   Q.  And you are familiar with the guidelines for diagnosis and

16   treatment of both IDS and ILADS, correct?

17   A.  I am familiar with both the IDSA and ILADS guidelines.

18   Q.  Tell me, did you have any involvement with the ILADS

19   guidelines?

20   A.  Yes.  I was the author, the first author for both the 2004

21   ILADS guidelines and also I was the first author for the 2014

22   ILADS guidelines, and in both cases with a different group of

23   professionals I was working with as coauthors.

24   Q.  When I say IDSA guidelines, they have several guidelines,

25   but I am talking about the guidelines specific to Lyme disease.

H662camH                         Cameron - Direct

1   Do you understand?

2   A.  I am familiar with the IDSA guidelines.  I am just author

3   of the ILADS guidelines, one of the authors.

4   Q.  Can you please explain to the judge the fundamental -- I'm

5   sorry, withdrawn.

6              Are there any difference between the two guidelines?

7   A.  Yes.

8   Q.  Can you please give the judge the highlight of the

9   differences first of the diagnosis and then of the treatment of

10  Lyme with respect to the two divergent guidelines?

11  A.  The IDSA guideline focused ostensibly on the two-tier

12  laboratory tests, where you have to have a positive ELISA, and

13  a positive confirmatory western blot test, and it will say that

14  most people will have that criteria.  In terms of clinical

15  presentations, the IDSA guideline refers primarily to an EM

16  rash.

17  Q.  EM rash stands for what?

18  A.  Erythema migrans rash.  It will also refer to a Bell's

19  palsy, which is a facial palsy, and encephalitis, sometimes a

20  heart block.  There is -- you can have a swollen knee, which is

21  like a synovitis pattern, and some people have an arthritic

22  pattern.  There is also an entity called encephalopathy, Lyme

23  encephalopathy that's mentioned.  Those are the diagnostic

24  categories that make up the IDSA guidelines.  In terms of --

25  Q.  Dr. Cameron, I want to ask you, are those bright line

H662camH                         Cameron - Direct

1     categories, meaning, in the absence of those symptoms and

2     diagnosis -- in the absence of what it is that is of those

3     constituents, that there should be no diagnosis of Lyme?

4     A.  I don't think they say in there that you can't have other

5     clinical presentations.  They just took what they considered

6     like the CDC list, the list that's in the CDC surveillance

7     criteria and a couple other of the criteria that are in the

8     literature, but I don't believe it says that that is an

9     exhaustive list, and just it's a list that they picked and have

10    included in the IDSA guidelines.

11    Q.  Dr. Cameron, the CDC surveillance criteria, can you please

12    tell the judge what that is?

13    A.  The CDC realized that there is a broad range of clinical

14    presentations, but there is only several that seem to be

15    reasonable to start with to help identify the number of cases

16    there are in America, so they picked an EM rash in an area that

17    has a lot of ticks.  The rash should be over two inches.  They

18    looked at Bell's palsy, heart block, and arthritis and

19    encephalitis, and those are the -- what's typically in a case

20    report form, and then it is used for surveillance.  They

21    have --

22    Q.  What does that mean, for surveillance?

23    A.  Surveillance is public health goal of keeping track of

24    cases and the growth of cases, where the cases are, and it's

25    not intended for a clinical diagnosis.  In fact, in the

H662camH                         Cameron - Direct

1   morbidity weekly report, in other words morbidity and mortality

2   weekly report, they point out that it is not intended for a

3   clinical diagnosis.

4   Q.  I am going to actually direct your attention to what is in

5   evidence right now, Exhibit I4, Doctor.  CDC came with Lyme

6   case definitions, correct, in which they specified what you

7   said right now, the criteria for surveillance?

8   A.  They tried to specify, so that they could do surveillance,

9   what size a rash would be and various criteria.

10  Q.  Does the CDC contend that its surveillance criteria for

11  diagnosis and treatment of Lyme disease, do they say that it is

12  appropriate for the clinical diagnosis and treatment of Lyme

13  disease?

14  A.  I think they point out that it is not intended for a

15  clinical diagnosis.  There are doctors who will use it and say

16  they don't make the diagnostic criteria and they will cite the

17  CDC surveillance definition.  But, in practice, it is the

18  surveillance definition doesn't include all of the other types

19  of clinical presentations that have been prescribed in the

20  literature and have been seen in practice.

21  Q.  I am going to show you what's been in evidence right now as

22  Exhibit I4, which is the CDC surveillance criteria that was

23  developed from 1995.  Then I believe there are other following

24  years.  I am going to ask you to read the comment --

25          MR. SIMON:  May I approach Judge?

H662camH                        Cameron - Direct

1              THE COURT:  Yes.

2    Q.  -- in I4 from the CDC that it contains in its surveillance

3    criteria on Exhibit I4, and you can read it out loud.

4    A.  Okay.  Under comments, "This surveillance case definition

5    was developed for national reporting of Lyme disease and is not

6    appropriate for clinical diagnosis" and they put "not" in

7    capital letters.

8    Q.  And the IDSA took the CDC surveillance criteria and

9    incorporated it in its guidelines?

10   A.  Yes, although they will sometimes talk about chronic-like

11   encephalopathy type issues and -- but it is unclear from that

12   document whether one should ever make a diagnosis of it.  They

13   just discuss the entity.

14   Q.  Let's talk about the flip of the ILADS guidelines in the

15   diagnosis of Lyme disease.  What does that entail?  Can you

16   tell the judge.

17   A.  Well --

18   Q.  Withdrawn.

19              How does that differ if at all from the IDSA

20   guidelines?

21   A.  Well, the IDSA guidelines said that there is no evidence

22   that chronic Lyme diseases exist as a distinct diagnostic

23   entity, and that any symptoms that someone might have --

24   Q.  You mean the ILADS guidelines?

25   A.  Yeah, the -- no.  IDSA says that chronic Lyme does not

1    exist as a distinct diagnostic entity.  They also point out

2    that any symptoms are nothing more --

3              THE COURT:  I'm sorry.  You are on the IDSA --

4              THE WITNESS:  Yes.  Sorry about that.  I meant that

5    there were two other things that were in the IDSA that set up

6    my description of ILADS.

7              THE COURT:  All right.

8              THE WITNESS:  That's why the focus.

9              THE COURT:  Go ahead.

10   A.  The two extra things that were quite clear from IDSA are

11   that chronic Lyme disease does not exist as a distinct entity,

12   but that has been interpreted by most readers that it doesn't

13   exist.  They also said that the chronic manifestations are

14   nothing more than the aches and pains of daily living, and

15   that -- so that is the IDSA.

16             Now, from an ILADS perspective is that there are a

17   growing number of other clinical manifestations, other findings

18   that are being described in literature, that are seen in

19   practice.  There is a growing number of coinfections which are

20   different kinds of infections, like Babesia, in those ticks.

21   And so the complexity of the illness and practice is not

22   reflected in the IDSA guidelines.  So the practice, I need to

23   have a guidelines that were reflective of all of the different

24   kinds of diagnoses that I see in practice, all the different

25   diagnoses that are seen in the literature, and I needed that

H662camH                    Cameron - Direct

1   type of organization to help guide me in my diagnosis and

2   treatment.

3   Q.  The ILADS guidelines, are they scientifically published?

4   A.  The ILADS guidelines were prepared by this professional

5   society that I am a member of, that I have been president of in

6   the past.  This guideline -- and there are two of them -- the

7   most recent one was prepared using guidelines proposed by the

8   Institute of Medicine, the IOM, and those guidelines used the

9   state of the art way of assessing evidence.

10          THE COURT:  I'm sorry the Institute of Medicine, what

11  is the Institute of Medicine?

12          THE WITNESS:  The Institute of Medicine is a

13  governmental body that advises on a number of topics, but in

14  this case they are advising how does one prepare guidelines,

15  how does one have guidelines that reflect the evidence.

16          THE COURT:  Is that part of the National Institutes of

17  Health?

18          MR. SIMON:  It's part of the Department of Health,

19  Judge.

20          THE WITNESS:  It's a U.S. government body that might

21  be independent, but they weigh in on a number of issues.

22          THE COURT:  Okay.

23  A.  In this case they were looking at what the standards should

24  be for evidence-based guidelines, and so the Institute of

25  Medicine thought that the best way is to give some guidance on

1   how guidelines are prepared.  So they used a grade system,

2   which is a formal way of looking at the strengths and

3   weaknesses of the evidence, and looking at the biases in the

4   evidence, and working through a process of coming up with

5   evidence-based guidelines.  That set of guidelines was prepared

6   by the organization, it was sent to a journal, it was peer

7   reviewed by a journal, expert review of infectious diseases,

8   and it was published in a journal listed in *PubMed*, which is

9   the National Library of Medicine.  And there is also another

10  governmental agency that looks at guidelines to see whether

11  guidelines are up to a certain standard, and that was listed in

12  a National Guideline Clearinghouse, and it's available in a

13  National Guideline Clearinghouse Web site, and it has been used

14  extensively and cited extensively.

15  Q.  What is the National Guideline Clearinghouse?

16  A.  The government, to try to get various views out of what are

17  the different guidelines, what guidelines are available, has

18  created what they call a quasi government organization; and, if

19  they feel that the guidelines meet the criteria that they --

20  for each disease, they will take applications, review the

21  guidelines, and if you meet the guidelines, they will accept

22  them and post them on their Web site.

23  Q.  Is Lyme disease treated with antibiotics?

24  A.  Yes.

25  Q.  Can you explain to the judge what the difference in the

H662camH                        Cameron - Direct

1    treatment of Lyme disease is between the IDSA guidelines and

2    the ILADS guidelines?

3    A.   The treatment with the IDSA is that you should not treat

4    more than four weeks, with only one exception: that if you

5    actually have arthritis, they advise an additional four weeks

6    of therapy.  That's it.

7    Q.   Okay.  And you read Dr. Sanders' report --

8            THE COURT:  And what does ILADS say?

9            THE WITNESS:  ILADS says that one should use clinical

10   judgment; that one should weigh the risk and the benefits of

11   the disease, the treatment; one should use shared

12   decision-making, weighing the risks and benefits, let the

13   patient be aware of it.  The ILADS guidelines does point out

14   that there are differences between the two different

15   organizations and there are differences in the guidelines,

16   differences in the recommendations.  But ILADS, after using

17   grade, felt that the clinical judgment was important.

18           THE COURT:  Would a course of antibiotic over ten

19   years be consistent with the ILADS guidelines?

20           THE WITNESS:  Well, the ILADS guideline does not give

21   a specific number of years or time frame.  They use, after 30

22   days, a reassessment.  They also advise that, in addition to a

23   diagnosis of Lyme is that one can reconsider, reevaluate as one

24   goes along, in case another diagnosis emerges or some other

25   illness occurs.  So they don't have an exact time frame.

H662camH                         Cameron - Direct

1              THE COURT:  So ILADS wouldn't give a safe harbor to a

2    prescription of antibiotics after four weeks.  It would depend

3    upon how the doctor, under all of the circumstances, was

4    treating the patient.

5              THE WITNESS:  Yes.

6              THE COURT:  So it would be possible, for example, that

7    if a doctor treated a patient for ten years with antibiotics,

8    that that would not be sanctioned by the ILADS guidelines.

9              THE WITNESS:  Well, it gives clinical discretion to

10   the doctor, but it advises the doctor assess and reassess based

11   on the risk/benefit.  So it doesn't give exactly ten years.

12   There are people that get better in 30 days and don't need

13   anything on reassessment, and there are people that, two years

14   later, they are still sick.

15             THE COURT:  The ILADS guidelines don't deal with

16   prescribing narcotics for a patient, do they?

17             THE WITNESS:  They don't give -- other than just

18   following the patient, taking care of their illness, it doesn't

19   give any guidelines as to how to manage pain.

20             THE COURT:  There is nothing in the ILADS guidelines

21   one way or another as to what a prudent level of care for a

22   patient by treating with narcotics would be.

23             THE WITNESS:  It focuses on the care of the patient

24   rather than -- and focusing a lot on the diagnosis and

25   treatment of tick-borne illnesses, but not explicit as to what

H662camH                      Cameron - Direct

1    to do with a wide range of symptoms and pain and fatigue and

2    other issues that that patient might have.  That will have to

3    be based on the -- and that's why they stress that follow-up is

4    important, reassessment is important, weighing the risk and

5    benefits, taking probiotics, for example, to prevent diarrhea,

6    but reassessment is important.

7            THE COURT:  Okay.  Thank you.

8    BY MR. SIMON:

9    Q.  Let's talk about the testing for Lyme disease.  Is there a

10   difference between the ILADS guidelines in the testing of Lyme

11   disease and the IDSA guidelines in the testing and methodology

12   of Lyme disease?

13   A.  Well, the IDSA expects the two-tier to be positive for Lyme

14   disease.  The ILADS knows that sometimes it is positive and

15   sometimes it is negative, so that one will have to -- might get

16   a positive ELISA, borderline ELISA, but one can't rely on the

17   test to diagnose cases of Lyme disease.

18   Q.  Are you familiar with the term zero negativity?

19   A.  Yes.

20   Q.  What is that?

21   A.  Well, zero negative is when the test does not meet the

22   two-tiered criteria, although everybody has their own

23   definition of what negative tests are.  The NIH had four

24   clinical trials, so one of the four trials was called a zero

25   negative trial.  That means they had enrolled only patients in

1    that trial that had a negative test.  So they recognized that

2    that was an important group.

3    Q.  So do patients with -- did you define the term "zero

4    negativity" as being zero negative to ELISA/western blot

5    testing?

6    A.  Zero negative is -- they might still have some positive

7    serologies, so it is a broad category.  Some have had positive

8    tests on some criteria, but that, given, as always, the concern

9    and practice of what's a false positive, what's a false

10   negative, is that instead of having it as an absolute criteria,

11   it is important to look back at the whole history.  Anything

12   that comes up on a physical exam, anything that comes up over

13   time, the consultants, and it is the whole story rather than

14   just the test.

15   Q.  There are any other differences between the two guidelines

16   that you didn't speak about today?

17   A.  I think that is the crux of the guideline I can think of

18   right now.

19   Q.  Twenty-something thousand patients that you have seen with

20   Lyme disease, have you diagnosed and treated them by ILADS or

21   IDSA guidelines?

22   A.  I treat within ILADS guidelines.  Although, I recognize

23   that some patients get better in 30 days quite easily, some

24   people have a -- meet the CDC's criteria.  There are certainly

25   plenty of people with rashes that were available and treated in

1    a timely manner that do well.  So -- but ILADS guidelines gives

2    me the flexibility to and a range of treatment options, the

3    diagnostic options to take care of my patients.

4    Q.  Are the ILADS guidelines considered conventional or

5    nonconventional by the IDSA group?

6    A.  The ILADS guidelines are considered not conventional by the

7    IDSA guidelines.

8    Q.  Let's talk about the IDSA group.  Is the view that a breach

9    of the IDSA guidelines should be tolerated in the treatment and

10   diagnosis of Lyme?

11   A.  They don't tolerate the ILADS guidelines.

12   Q.  And what is the view of the IDSA group that should happen

13   when somebody does not practice by the IDSA guidelines in the

14   treatment and diagnosis of Lyme?

15   A.  I have found that the IDSA guidelines and those that

16   support the IDSA guidelines are not supportive of doctors who

17   treat under the ILADS guidelines.

18   Q.  In fact, Doctor, I am going to direct your attention to

19   Exhibit I5 -- I'm sorry -- yes, Exhibit I5, which are annexed

20   to the affidavit.

21         MR. SIMON:  May I approach, Judge?

22         THE COURT:  Yes.

23   BY MR. SIMON:

24   Q.  Which, for identification, is an accepted manuscript, and I

25   am going to ask you to have a look at it.  I am going to ask

H662camH                          Cameron - Direct

1    you if you are familiar with it.

2    A.  I am familiar with this article.

3    Q.  Okay.  And can you summarize for the judge what that

4    article says.

5    A.  Well, the title is called False and Misleading Information

6    about Lyme Disease, and there are three authors, Dr. Shapiro,

7    Dr. Baker, and Dr. Wormser, and it was the *American Journal of*

8    *Medicine*, which is a common journal for doctors to read, and it

9    was accepted January 12 of this year.  It doesn't say exactly

10   when it was listed on *PubMed*.

11          The article itself was focusing on some of the

12   problems that the doctors have had in proving like sexual

13   transmission or proving a persistent infection, which there

14   are.  It's very difficult in disease.  It's very difficult to

15   document.  It's very difficult.  Even the sexual transmission

16   data is -- I'm not comfortable with.  I don't think the data is

17   good enough for me to rely on.  But the -- they decided that

18   anything that disagreed with the view, the IDSA view, was

19   considered like false or -- I mean fake tests, fake diagnoses,

20   fake treatments.  So they are characterizing anything that I do

21   as fake.

22          There is also one other item that they threw in at the

23   end of -- you know, other than the appearance that anything I

24   do is fake and anything that ILADS does is fake, they also

25   threw in one other thing, which is that, at the end, is that

1   politicians -- can I read it?

2   Q.  Yes, please.

3   A.  "Politicians are attempting to displace mainstream

4   physicians as diagnosticians in the complex world of Lyme

5   disease by passing legislation that encourages use of unproven

6   treatments and that requires health insurances to pay for

7   unsafe remedies with no documented benefit and well-documented

8   adverse effects.  This makes it difficult for medical review

9   boards to safeguard public health by disciplining those who put

10  patients at risk."

11  Q.  And what is your understanding of that last paragraph?

12  A.  My understanding is that politicians who had passed this

13  particular bill to protect doctors who have unconventional

14  approaches, they disagreed with that law.  Although they didn't

15  characterize it completely, because that law didn't say

16  anything to do with requiring payment, so they added that extra

17  thing.  It only said that they should be allowed to have

18  unconventional treatment.

19  Q.  Are you familiar with --

20          THE COURT:  Hold on.

21          MR. SIMON:  I'm sorry.

22          THE COURT:  Does the article refer to the ILADS

23  guidelines at all?

24          THE WITNESS:  No, they said that they are referring to

25  the types of things that ILADS does without naming it, the type

H662camH                          Cameron - Direct

1   of things that we do, and so that's why I said they are more

2   characterizing what we do without mentioning ILADS.

3            THE COURT:  Does the article refer to the New York

4   Public Health Law?

5            THE WITNESS:  No, but -- it doesn't specifically say

6   the public health law, but it does refer to the politicians,

7   that they are passing laws.  And the first part of the sentence

8   does refer to the intent of the law and the language of the

9   law, but not specifically, they don't cite the law.

10            THE COURT:  Are there laws in other states similar to

11   the New York Public Health Law 230(9-b).

12            THE WITNESS:  There are several states that have

13   similar legislation.  Rhode Island is one of them.  That was

14   the first one.  Connecticut has some similar legislation that

15   allows them treatment.  So we are not the first.

16            THE COURT:  Okay.  Thank you.

17   BY MR. SIMON:

18   Q.  Dr. Cameron, are you familiar with Patients A through G?

19   A.  Yes.

20   Q.  They were your patients, correct?

21   A.  Yes.

22   Q.  What did you treat these patients for?  I'm sorry.  First

23   of all, what did you diagnosis them for as a group?

24   A.  Well, each of the patients was quite different, so they

25   typically had a broad range of diagnoses when they came in.

H662camH                     Cameron - Direct

1    Because I am in primary care, I am used to having more

2    complicated cases than what get evaluated in clinical trials.

3    Some of them have quite an extensive list of diagnoses that

4    were there on presentation or emerged over the years that I was

5    their doctor.

6    Q.  Was there a primary diagnosis and treatment that you

7    rendered for these patients?

8    A.  Well, they varied.  Like one of the cases that I had taken

9    care of for over a decade, he had bronchitis initially, and

10   then later he had an infection of the leg called cellulitis,

11   which he received IV for, then he had recurrence.  So it was 11

12   years before he was ever diagnosed with Lyme.  And the Lyme was

13   discussed by one of the surgeons, but that he was never

14   diagnosed and treated for the Lyme for 11 years.

15   Q.  Do you recall which patient that was, A or --

16   A.  A.  It is -- the last letter is EK I believe.

17   Q.  Which one was it?

18   A.  EK.

19   Q.  Okay.

20   A.  I don't know what letter it is.

21   Q.  Did you treat all of the -- did you diagnosis all of the

22   patients, A through G, with Lyme disease at some point?

23   A.  At some point they were all -- they all received a

24   diagnosis of Lyme at some point during their care.

25   Q.  But that wasn't your initial diagnosis of them, correct?

H662camH                          Cameron - Direct

1    A.  Well, at the beginning, sometimes there were a broad range

2    of diagnoses that were there in the beginning, but Lyme was one

3    of them.

4    Q.  When you diagnosed Lyme disease in these patients, did you

5    diagnose it uniformly by ELISA/western blot positive testing?

6    A.  No.

7    Q.  Why not?

8    A.  Well, I find that the ELISA and western blot, which is

9    called the two-tier system, only work for some patients some of

10   the time, and I would leave a lot of patients untreated and

11   undiagnosed if I relied solely on those tests.

12   Q.  Did you have a chance to review the two reports from

13   Dr. Sanders?

14   A.  Yes.

15   Q.  And Dr. Sanders -- does Dr. Sanders -- one of his opinions

16   faults you for diagnosing Lyme disease in the absence of a

17   two-tier test, ELISA/western blot positive testing?

18   A.  Yes.

19   Q.  And is that IDSA or ILADS guidelines?

20   A.  He is making those conclusions, it appears, from an IDSA

21   perspective.

22   Q.  And the charges uniformly -- and you are familiar with the

23   statement of charges in this case, correct?

24   A.  Yes.

25   Q.  And they uniformly accuse you of making the wrong diagnosis

H662camH                          Cameron - Direct

1   and missing something else, correct?

2   A.  Yes.

3   Q.  And is it your understanding that that is based on

4   Dr. Sanders' opinion that there is no ELISA and western blot

5   zero positivity?

6           MR. HERSHLER:  Objection, your Honor.

7           THE COURT:  Sustained.

8   Q.  You read the charges, right?

9   A.  Yes.

10  Q.  And you read Dr. Sanders' opinions, correct?

11  A.  Yes.

12  Q.  What is your understanding that you are being prosecuted

13  for.

14  A.  My understanding is I am being prosecuted for the treatment

15  of -- diagnosis and treatment of Lyme disease.

16  Q.  I wanted to point you, there came a time when you came

17  under investigation, correct?

18  A.  Yes.

19  Q.  And you heard Dr. Meyers testify as to the interview,

20  correct?

21  A.  Yes.

22  Q.  I want to approach the witness and I want to show you what

23  has been marked Exhibit J2, which is a letter from August 17,

24  2010, from the OPMC director to you.  I am going to ask you to

25  have a look at it.

H662camH                    Cameron - Direct

1    A.  Yes.

2    Q.  Are you familiar with that letter?

3    A.  Yes.

4    Q.  That was a letter that the OPMC has sent you before the

5    first interview took place, correct?

6    A.  Yes.

7    Q.  And I believe it notices the first interview on September

8    13, 2010?

9    A.  Yes.

10   Q.  And from reading that letter, what was your understanding

11   that the issues under investigation were?

12   A.  They repeatedly say what I already read, which was that

13   they were looking at the diagnosis of Lyme disease and

14   treatment of Lyme disease.

15   Q.  There is another exhibit, which is Exhibit J3, which is a

16   letter from the OPMC of October 28, 2010.  Doctor, I am going

17   to ask you to have a look at it.

18   A.  Every one of those patients, Lyme disease was one of the

19   diagnoses, and they were asking for an evaluation of each of

20   these patients.

21   Q.  What was your understanding, from that letter, that the

22   issues under review were for the second part of the interview?

23   A.  They say it is through the differential diagnosis and a

24   treatment of Lyme disease and treatment.

25   Q.  Differential diagnosis, what is that?

H662camH                          Cameron - Direct

1    A.   In medicine, there is a variety of diagnoses that might

2    explain the symptoms and there is something we are well trained

3    on, I am experienced in, and so it is the -- it is trying to

4    address what the final diagnosis will be.  I am in primary

5    care, so even if I have a diagnosis after extensive workup,

6    there is still a differential diagnosis that stays from the

7    beginning to the end of my care.

8    Q.   Can you explain to the judge what is IDSA's position with

9    respect to differential diagnosis when it comes to Lyme, the

10   IDSA guidelines position?

11   A.   My understanding of the IDSA guidelines is that if they

12   don't meet the surveillance case definition, if they don't meet

13   the two-tier serologic test definition, they don't have Lyme

14   disease.

15   Q.   Did Patients A through G meet the two-tier serologic

16   definition?

17   A.   Most of them did not.

18   Q.   Did these patients get diagnosed by you with Lyme disease

19   in the absence of erythema migrans?

20   A.   Lyme disease was certainly on the differential, but the way

21   I practice is that there is also a possibility of another

22   diagnosis.  So as long as they are under my care, I am going to

23   be directing tests and directing specialists to get involved to

24   make sure I don't miss another diagnosis.

25   Q.   The accusations that Dr. Sanders throughout his report

H662camH                          Cameron - Direct

1    makes is that the testings for Lyme came back negative in each

2    of the patients and yet you kept on treating them for Lyme

3    disease.  Did you see that?

4    A.  Yes.

5    Q.  Is that an IDSA or ILADS approach?

6    A.  That's an ILADS approach.

7    Q.  I'm sorry.  Dr. Sanders's view, is that --

8    A.  His -- Dr. Sanders' interpretation was consistent with the

9    IDSA approach.

10   Q.  And in the ILADS approach you diagnose these patients with

11   Lyme in the absence of two-tier ELISA/western blot.  Is that

12   right?

13   A.  Yes.

14   Q.  That's considered nonconventional by IDSA standards,

15   correct?

16   A.  Yes.

17   Q.  Is it your understanding you should be prosecuted for using

18   nonconventional methodology of diagnosis of Lyme?

19   A.  I should not be prosecuted for nonconventional treatment of

20   Lyme disease.

21   Q.  How about --

22          THE COURT:  Doctor, Patient B you treated from 1998

23   through 2008.  There was eventually the result of a lumbar

24   puncture test which was negative for Lyme disease, but positive

25   for proteins that were consistent with the diagnosis of

H662camH                     Cameron - Direct

1    multiple sclerosis.  Does that mean that the patient did not

2    have Lyme disease?

3          THE WITNESS:  Well, the spinal tap is not very good

4    for Lyme disease.  Only 10 percent, 1 out of 10 people have an

5    abnormal spinal test with Lyme.  So she had been followed by a

6    neurologist at the same time.  So there is always a chance that

7    there is a dual diagnosis, that there is Lyme and multiple

8    sclerosis.  That's why I encouraged her to stay with the

9    neurologist.

10         The extra problem with multiple sclerosis and Lyme is

11   that there is always uncertainty as what is multiple sclerosis.

12   Even when you have an abnormal spinal tap, there seem to be

13   some oligoclonal bands and myelin basic proteins that show up

14   in both conditions.  So as long as a patient is aware that

15   there is a possibility of two diagnoses, I feel that as long as

16   they are informed, as long as they have a neurologist

17   following, looking for when to treat, and I am following them,

18   then the differential is covered.

19         THE COURT:  Was it your conclusion at the end, after

20   the ten years of treatment, that the patient did or did not

21   have Lyme disease?

22         THE WITNESS:  I'm not sure if she had ten years of

23   treatment because she had been off for a while.  She just came

24   back and said a neurologist was going to try multiple

25   sclerosis.  But I didn't find out whether or not -- whether the

H662camH                    Cameron - Direct

1    differential including multiple sclerosis turned out to be

2    correct either.  I just didn't have that extra information to,

3    you know -- they were treating, I documented, but I can't be

4    sure that it was multiple sclerosis, but the neurologist felt

5    they should treat.

6              THE COURT:  But you say you can't be sure whether it

7    was multiple sclerosis.  Can you be sure it was Lyme disease?

8              THE WITNESS:  No, I can't be sure of Lyme either.

9    That's why I maintained some treatment for Lyme, follow up with

10   a neurologist, because the differential included both of the

11   diseases.

12             THE COURT:  A moment ago I thought you said that you

13   were convinced that all of the patients at issue in the

14   statement of charges had Lyme disease?

15             THE WITNESS:  Well, they ultimately were diagnosed

16   with Lyme, but the problem with practice since I am in primary

17   care is even if I was to mention Lyme and discuss Lyme, I'm

18   still following, because it might turn out that over time that

19   another diagnosis emerges.

20             THE COURT:  So with respect to the seven patients at

21   issue, Lyme was a possible diagnosis, but you are not -- it was

22   one of the differential diagnoses in each of the cases, but you

23   don't know to a reasonable degree of medical certainty, as they

24   say, that each of the patients in fact had Lyme disease.

25             THE WITNESS:  Well, each of the patients, and I'm glad

H662camH                          Cameron - Direct

1    I get to answer this and discuss it, because sometimes I don't

2    get the chance to get my thoughts out, so thanks, but some of

3    these patients in over the course of five to ten years, with

4    all the consultations that I would call in, would have

5    diagnoses including psychiatric diagnoses, substance abuse

6    diagnoses, back injuries, cellulitis.  So I couldn't be sure

7    that Lyme was all or part of it.  So the differential in

8    primary care saves lives.  When they say there is no diagnosis,

9    no differential diagnosis is that -- in real practice is that

10   there is always a differential, and I am never satisfied with

11   just Lyme as the diagnosis.

12            So that's why the Sanders letter or statement only

13   reflected a couple of the diagnoses that he picked out of the

14   chart.  Many of these patients had fairly complicated,

15   exhaustive, prolonged diagnostic evaluations, as was apparent

16   in some of those other exhibits, and never completely sure

17   except that Lyme was -- in some cases I might treat, but I am

18   always looking for the other diagnoses.

19   BY MR. SIMON:

20   Q.  So when you say the Sanders' letter, you mean Sanders'

21   report?

22   A.  The report which reviewed some of the charts and mentioned

23   some of the charts.  You know, like, for example, the

24   psychiatric diagnosis on one patient from Rhode Island, it is

25   true, the person has psychiatric -- was seeing a psychologist,

H662camH                              Cameron - Direct

seeing a psychiatrist, getting treatment for it, some of those

treatments were changing.  We had communications with them.

But, still, the difficulty he was having teaching was quite

different than what he had had before and that underneath the

differential of the psychiatric issues, a decision was made,

clinical judgment, Lyme was a part of the story.

THE COURT:  So, Doctor, what was the basis for

continuing to prescribe narcotics for the patient who moved to

Florida whom you couldn't see or examine or know what the

effect of the narcotics would be, particularly with a past

history of narcotics abuse?

THE WITNESS:  Well, one of the things that happens

when you look back at a chart, I didn't realize at the time how

complicated, how severe the Lyme part would be, and also the

back injuries that she had after the motor vehicle accidents.

So the first narcotic was done by somebody else.  The first

antianxiety was by somebody else.  So, in hindsight, I didn't

realize how complicated these patients can get.  You know, like

almost every pain management person will say that there are

some cases in hindsight that they would have done differently

as they piece it together.

I didn't realize that I would get turned down for pain

management by an insurance company.  So that was in the record

of denial for access to care.  I didn't realize that she would

have a motor vehicle accident related to a subdural hematoma

H662camH                          Cameron - Direct

1    and that she would have multiple fractures or at least multiple

2    injuries in her spine; that in weighing the pain management --

3    at that time, you know, the pain management people were -- when

4    I go to conferences, were saying there is that complexity of

5    pain abuse versus pain management and that if you are weighing

6    it, is that it is a complicated -- they actually are that

7    suffering.

8              In hindsight, there weren't many controls at the time.

9    I made a calculated decision to restart after all of those

10   injuries.  I didn't realize I would get denied by insurance.

11   I didn't realize that in Florida I would get -- she couldn't

12   get access to pain management, and so -- and I didn't realize

13   there was an act of God, which was a major hurricane in

14   Florida.  So the only thing I had left, if I didn't have

15   insurance cooperation, didn't have pain management cooperation,

16   was to do a detox with taper medicines, and so that's why that

17   fall was trying to -- if all my other resources were gone, then

18   all I have got left is the detox and taper, and I tapered over

19   the next couple months.

20             But, in hindsight, did I do a good job?

21             THE COURT:  Well, I'm not --

22             THE WITNESS:  It was not a good job, but did I do --

23             THE COURT:  I'm not, I'm not asking you that.

24             THE WITNESS:  No, but it's -- I learned a lot in

25   reading it.

H662camH                     Cameron - Direct

1          THE COURT:  The reason I asked that question is, it is

2     one of those things that seems as though -- and I am not here

3     to try what's before the hearing, but it is one of those things

4     that appears to be quite different from the differences between

5     the ILADS guidelines and the IDSA guidelines.  It doesn't seem

6     to be covered even by the ILADS guidelines.  And yet it is

7     plainly within the statement of charges for which you had begun

8     to give your explanation to the statement of charges, but it

9     appears to be unrelated to an ILADS/IDSA issue, doesn't it?

10         THE WITNESS:  Well, the only thing it touches -- there

11    isn't much overlap -- is that the IDSA guidelines says it is

12    nothing more than aches and pains of daily living.  The ILADS

13    guidelines goes extensively into how severe it is, how much

14    pain there is, how severe the fatigue is, anxiety, the

15    neuropsych issues.  So that reflection of how severe it is is

16    what I have seen in practice.  So it doesn't necessarily say

17    how you should manage pain, except that it acknowledges pain,

18    acknowledges that it is important.  So that ILADS guidelines do

19    acknowledge how serious it is and that one should address it,

20    but not specifically what the mechanism should be.

21         THE COURT:  Thank you.

22    BY MR. SIMON:

23    Q.  Dr. Cameron, out of the seven patients, how many patients

24    did you treat for pain management?  Just one?

25    A.  Only one that I am aware of.

1   Q.  Okay.  And I wanted to go back to the interview because you

2   heard Dr. Meyers testify as to the interview.  Were you at both

3   interviews present personally?

4   A.  Yes.

5   Q.  And who else was there?

6   A.  The nurse.

7   Q.  Mr. Sullivan?

8   A.  That's it.

9   Q.  And Dr. Meyers was there?

10  A.  Yes.

11  Q.  And your past attorney was there, correct?

12  A.  Yes.

13  Q.  And there were two interviews, correct?

14  A.  Yes.

15  Q.  And do you recall how -- you heard Dr. Meyers testify here

16  as to the interviews, correct?

17  A.  Yes.

18  Q.  And you put in an affidavit and a verified complaint in

19  this action, correct?

20  A.  Yes.

21  Q.  And you put in your recollection of the interviews,

22  correct?

23  A.  Yes.

24  Q.  And you also put in your -- you also read what it is that

25  was said in the report of the interview that was subsequently

1    generated, correct?

2    A.  Yes.

3    Q.  And do you stand by those statements in your affidavit?

4    A.  Yes.

5    Q.  Okay.

6         Can you please summarize to the judge your

7    recollection of how the interviews went.

8    A.  Well, I have a different recollection of my ability to tell

9    the story as the doctor was referring to.  You know, how do I

10   arrive at what is a differential?  He would -- for example, his

11   characterization of the differential is that I should have a

12   paragraph in one section.  He didn't say that in the ROI, but

13   it should be a specific paragraph related to a differential,

14   how can I have Lyme disease on the differential if they didn't

15   have a rash or they didn't have a positive test.  So then --

16   Q.  A positive test meaning?

17   A.  Positive two-tier test.

18   Q.  And when you say a rash, what do you mean by that?

19   A.  An erythema migrans rash.

20   Q.  Is that what Dr. Meyers said?

21   A.  Yes.

22   Q.  But that wasn't included in the written report?

23   A.  I didn't feel that that was reflected.  The differential

24   which would keep recurring, come up was not that I didn't have

25   a differential, but -- because clearly I did extensive

H662camH                        Cameron - Direct

1   laboratories reflecting whether it is rheumatologic issues,

2   thyroid, blood, anemia, diabetes.  The number of consultants

3   was much higher and broader than is reflected in any of these

4   reports.  All of those things is that I didn't seem to be

5   writing it in a fashion or in the narrative style that he was

6   using, but he wouldn't really be specific.  He said it is not

7   written the right way.  And despite any of my discussions on

8   the differential diagnosis, he just said that it wasn't there.

9   And I could never guess -- he kept asking over and over again,

10  and it just wasn't there, the style that he is looking for.

11  Q.  Did you state that the disease, there is no signs of the

12  illness or the disease at any time to Dr. Meyers?

13  A.  Well, every time I mentioned signs and symptoms, then I

14  would get a lecture on what a sign is, which I already know

15  because I am an epidemiologist and I am an internist, board

16  certified, is that so many of the findings in Lyme disease are

17  symptom-based.  The poor memory, the poor concentration, the

18  fatigue, the lightheadedness, the poor mood, the paresthesias,

19  all of these types of things are symptoms.  But he kept coming

20  back to he is looking for the certain signs, a rash -- an

21  erythema migrans rash, a swollen joint or Bell's palsy, and so

22  everything else I would bring, he would say that doesn't count.

23  Q.  What are those signs, ILADS or IDSA guidelines?

24  A.  I felt he kept using the IDSA guideline signs and anything

25  else I had to say, he said that, well, then he would go back in

H662camH                        Cameron - Direct

1    the definition of what a sign is, then he would say, well, none

2    of those things count because those aren't the signs.  He

3    seemed to be focusing on the signs that the IDSA reflects.

4    Q.  And what are those signs?

5    A.  Erythema migrans rash, swollen knee, and Bell's palsy.

6    Q.  We heard him today speak about signs and the difference

7    between signs and symptoms.  Is that how he articulated it to

8    you?

9    A.  Except that here he was rather straightforward and simple,

10   but he gave me a narrative in my case.  As soon as I would

11   bring something up, I wouldn't be able to have a chance to

12   finish it.  He would wait until he found a "no," and as soon as

13   I said, no, that's not a sign, it's a symptom, then the "no"

14   would show up -- it would show up in the ROI.  And so it seemed

15   like whenever the "no" word would pop up, no matter what the

16   context was, he said that he would only put in his recall of

17   something, and there were certain -- when I would say "no" it's

18   not a sign.

19   Q.  Do you feel -- and you saw the ROI, correct?

20   A.  Yes.

21   Q.  And you stated in your initial affidavit what the

22   discrepancies were with the ROI, correct?

23   A.  Yes.

24   Q.  And do you stand by those?

25   A.  Yes.

H662camH                        Cameron - Direct

1    Q.  Do you feel that the ROI accurately reflected the two

2    interviews?

3    A.  I thought there was plenty of things in the ROI that, like

4    that I had concerns with; that I wasn't able to tell my story,

5    wasn't able to lay out my understanding of the patients, and so

6    that was not reflective.  What was reflective was pretty

7    simplistic, looking for a "no," looking for something, some

8    simplistic narrative without all of the language in it and the

9    understanding as an internist that internists tend to be kind

10   of complicated in their answers.

11   Q.  Do you feel that Dr. Meyers infused his own views into the

12   ROI?

13   A.  I feel for some reason an ROI reflected his interpretation

14   of it, very concise.  When he got a "no," he would grab it and

15   he would do something.  And I just didn't think it reflected

16   the true discussion that should take place on this complicated

17   topic.

18   Q.  Was the IDSA/ILADS view discussed during the interview?

19   A.  Yeah, I would say I practice with ILADS, and that didn't

20   seem to get reflected very clearly in the ROI.  It seemed like

21   it was always coming back to an unstated criteria, which is the

22   IDSA.

23   Q.  The interview, when I say "the interview," there were two

24   parts of the interview.  You remember that there was one in

25   September and one in December, correct?

H662camH                          Cameron - Direct

1   A.  Yes.

2   Q.  What was the reason that the interview was conducted in two

3   parts?

4   A.  Well, these charts would often be like 400, 500, 600 pages

5   long, and so by the time you get to that many charts, it is

6   hard to reflect eight hours of discussion.  So I felt that,

7   even though the ROI looks long, it doesn't reflect the range of

8   topics that we either talked about or I wasn't allowed to talk

9   about.

10  Q.  So when Dr. Meyers stated today, you heard him, that the

11  interview was an opportunity for you to explained issues

12  identified in the letter, was that opportunity given to you

13  during the interview?

14  A.  I didn't feel that I was able to discuss the case or the

15  mandate of being able to share my views were overshadowed by

16  his views.

17  Q.  By and large, the subject matter covered during the two

18  interviews, what was it?

19  A.  Well, on treatment, for example, is that the repeated

20  questions of how can I treat more than 30 days if they don't

21  have Lyme, so over and over again is how can I be treating more

22  than 30 days?

23  Q.  And what view does that reflect?

24  A.  That reflects my understanding of the IDSA view.

25  Q.  Okay.  And did the interview focus on anything else other

1   than the treatment and diagnosis of Lyme or was that the

2   primary subject matter?

3   A.   They were all Lyme patients or at least sometime during

4   their history they had had Lyme, so the focus of all of the

5   interviews was Lyme disease.

6   Q.   You said that, along with Lyme disease, you treated these

7   patients for other matters, correct?

8   A.   Yes.

9   Q.   And those matters are, to your understanding, they are not

10   subject to -- are they the subject matter of Dr. Sanders'

11   report?

12   A.   I don't think Dr. Sanders did much -- reflected any of the

13   broad range of diagnoses that were in the chart.  They just

14   focus on just Lyme.  I think the exception might have been that

15   why was I using Rifampin in somebody that was taking Valproic

16   acid; and, in that case, it was done in consultation with

17   psychiatrist, psychologist that he was seeing, and it was also

18   done where we were checking blood levels to ensure that there

19   were adequate blood levels.  But Dr. Sanders did not reflect

20   the broad range, even for one example that there was some

21   characterization of this case with obesity with lap band

22   surgery, well, the problem there is that he didn't have obesity

23   and he didn't have diabetes, he didn't have heart disease,

24   didn't have atherosclerotic heart disease when I first saw him.

25   It was only over the course of 11 years and after two cases of

H662camH                         Cameron - Direct

1   cellulitis of his legs that he finally got diabetes with

2   hemoglobin A1C of 6.1, his cholesterol, his weight was up, we

3   stopped him smoking successfully, he was diagnosed, finally the

4   lap surgery was done.  And then finally, after 11 years, he was

5   diagnosed with Lyme, and then not treated with diabetes, he was

6   treated with oral.

7   Q.  Dr. Sanders in that case does not focus on the other

8   treatments other than Lyme, correct?

9   A.  I think Dr. Sanders did more of a snapshot.  He would take

10  a couple diagnoses of diabetes, for example, and lap band and

11  not reflect.  And primary care is that people accumulate

12  illnesses over time; and if you just take a snapshot, you are

13  not reflecting the differential, the making diagnostic

14  assessments and reassessments over time.  And he just said a

15  snapshot, this was the problem, why was I treating somebody for

16  Lyme who had obesity.

17          THE COURT:  Mr. Simon, how much time do you have left?

18  You exceeded --

19          MR. SIMON:  My time is up?  Yes.

20          THE COURT:  You have exceeded your time already.

21          MR. SIMON:  Okay.

22          THE COURT:  Go ahead.

23          MR. SIMON:  I got two minutes.  One minute?

24          THE COURT:  Sure.  Go ahead.

25  BY MR. SIMON:

```
 1    Q.  Dr. Cameron, I have one question.
 2              You put in an affidavit discussing Dr. Sanders'
 3    reports, the supplemental affidavit that we submitted yesterday
 4    and you discussed his reports, his CVs.  Are you familiar with
 5    that, sir?
 6    A.  Yes.
 7    Q.  And that is Exhibit M and Exhibit M1 through 3, correct?
 8    A.  Yes.
 9    Q.  Do you stand by those statements sir?
10    A.  Yes.
11    Q.  Okay.  I exceeded my time, so I have to cut off.
12              MR. SIMON:  Thank you, your Honor.
13              THE COURT:  Okay.  We will take two minutes, three
14    minutes.
15              (Recess)
16              MR. SIMON:  Your Honor, am I permitted one more
17    question, just one?
18              THE COURT:  Sure.
19              MR. SIMON:  A clarification question.
20    BY MR. SIMON:
21    Q.  Dr. Cameron, when Judge Koeltl asked you about you being
22    sure of the diagnosis of Lyme disease in certain patients along
23    with the other differentials, your answer was, you started to
24    talk about the differential, but the question was were you sure
25    about your diagnosis of Lyme disease.  Can you please elaborate
```

H662camH                         Cameron - Cross

1   whether you are sure or not?

2   A.   I have looked at these charts carefully, and every one of

3   them I'm comfortable with the diagnosis of Lyme.  I treated for

4   Lyme.  I was comfortable with the diagnosis for Lyme.  So just

5   because I am an internist, I am always -- they are my patients,

6   but that, yeah, every one of these had Lyme disease.

7   Q.   So your prior answer when you said that you were not sure

8   of the diagnosis of Lyme disease, can you please elucidate that

9   for us?

10  A.   I was focusing on the differential and misunderstood the

11  question, so I'm sorry for misleading on whether I was

12  comfortable with the -- that they all had Lyme as a diagnosis

13  in my effort to discuss the differential.

14           MR. SIMON:   Thank you, your Honor.

15           THE COURT:   Okay.

16           Mr. Hershler.

17           MR. HERSHLER:   Thank you, your Honor.

18  CROSS EXAMINATION

19  BY MR. HERSHLER:

20  Q.   Good afternoon, Doctor.

21  A.   Good afternoon.

22  Q.   You have made some claims about the inadequacy of your

23  interview with Dr. Meyers.  You said that he kept lecturing

24  you, he didn't allow you to respond, that your recollection of

25  what happened differs from what appeared in the report of the

H662camH                          Cameron - Cross

1    investigation.

2             You responded through your attorney to the report of

3    investigation, did you not?

4    A.   Yes.

5    Q.   Do you have a copy of Plaintiff's Exhibits J1 through J5?

6             MR. SIMON:  I can pull them up.

7    Q.   I can bring one and show it to you if you want.

8             MR. HERSHLER:  May I approach, your Honor?

9             THE COURT:  Yes.

10   BY MR. HERSHLER:

11   Q.   I direct your attention to the final portion of this

12   exhibit.

13            MR. SIMON:  Which one?

14            MR. HERSHLER:  Exhibit 5, I believe.

15   Q.   That's the letter dated February 3, 2011, from the law firm

16   Wood & Scher to the New York State Department of Health, signed

17   by William L. Wood, Jr.

18            Did you see this letter way back when in February of

19   2011?

20   A.   I believe so.

21   Q.   My question is, these complaints that you are now making

22   about your interview, how come we don't find them anywhere in

23   this letter?

24   A.   I think that over time that putting together -- I didn't

25   realize how difficult the IDSA position was going to be and how

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

H662camH                         Cameron - Cross

1    difficult it was in being interviewed under the IDSA type of

2    statutes, and so when I looked at the ROI and that interview,

3    that's why I have a clear picture of why that interview did not

4    reflect my history, examinations, clinical judgment or

5    follow-up.

6    Q.  Your license was on the line back then, was it not?

7            MR. SIMON:  Objection.

8            THE COURT:  Overruled.

9    A.  I think it didn't feel at the time that this was going to

10   be on the line, I was going to be dealing with complicated Lyme

11   patients with a diagnosis of Lyme and they wanted to hear my

12   perspective, hear my understanding, and be able to present it.

13   It is only in hindsight that I realized that I wasn't able to

14   reflect my care of the patient.

15   Q.  But you have claimed that Dr. Meyers was belligerent.  That

16   was not apparent at the time?  You needed to reflect on that

17   over the past five years?

18   A.  Well, I think that it is always difficult to, you know,

19   when you try to be polite, courteous, friendly, you know,

20   realizing that, rather than trying to carefully communicate and

21   discuss cases, it would come this far, that they would take

22   action that would jeopardize my livelihood, that would

23   jeopardize my ability to practice unconventional medicine as

24   defined by ILADS, it has become clear that I have to be more

25   straightforward and explicit in my concerns about those

1    interviews.

2    Q.  Is there any mention of the ILADS or the IDSA guidelines in

3    that letter in your response to the report of the

4    investigation?

5    A.  Well, at the outset reflection of trying to be

6    professional, you know, hoping that, through the ILADS

7    guidelines process, getting the 2014 published again, is that

8    the dialogue would take place that would not involve

9    jeopardizing my livelihood, jeopardizing patients who have

10   Lyme, jeopardizing other of my colleagues who treat Lyme under

11   ILADS guidelines; and, given the gravity of it, I felt that it

12   was better that I reflect the interview.

13   Q.  Let me give you another example.  Regarding Patient DG, you

14   claim that the report of the interview falsely reported that

15   you had agreed there was no sign of Lyme disease, and I am

16   taking that from your own affidavit at paragraph 98.  You

17   further contend that Dr. Meyers flagrantly infused his own bias

18   into the report by substituting his own impression of multiple

19   sclerosis for that patient, and that's at paragraph 101.  Yet

20   your responsive letter didn't say anything like that, anything

21   like that in responding.  These are rather powerful and serious

22   allegations.  It did not occur to you at that time to raise so

23   much as an eyebrow as to what happened?

24   A.  I always find in medicine that trying to get a dialogue,

25   keep things going, to reflect ILADS' positions, is not to take

H662camH                    Cameron - Cross

1    a combative approach or a dismissive approach in

2    characterizing.  But now that it is becoming clear that there

3    is a divide that's not getting solved, that I'm not and my

4    colleagues alike are not able to practice, even with the intent

5    of the legislation, that also the inability to practice under

6    the -- in New York under the current climate, it was clear that

7    I had to be more forthcoming in my ability to reflect the

8    interview.

9    Q.  Is your recollection of the interview better now than it

10   was in February of 2011?

11   A.  My recollection of it was quite good then.  It just didn't

12   ask me to clarify the nature of the interview.  I didn't

13   realize -- it is just as clear then as it is now.  I am just

14   reflecting that I didn't get a chance to communicate the cases.

15   You know, I got to hear Dr. Meyers' positions, got to hear

16   Dr. Meyers' conclusions, got to see those in the ROI, some of

17   his impressions, but that clarity is there.

18   Q.  But it didn't occur to you to put your side of the story

19   when you responded?

20   A.  Well, I didn't -- wasn't sure what this goal of trying to

21   get something done with Lyme, whether it's IDSA or ILADS, it

22   just didn't work, so that's why I have to be clear now.

23           MR. SIMON:  Judge, I also object because the statute

24   doesn't give a --

25           THE COURT:  Overruled.

H662camH                              Cameron - Cross

Q.  Doctor, in your complaint, at paragraph 6, you complain
that there are open and systematic efforts by the defendants to
limit Lyme disease to the IDSA guidelines and to eliminate the
use of the ILADS guidelines.

        Aside from your own disciplinary case, what are those
efforts?

A.  Well, I think they are what we talked about earlier, where
they make clear that they want to get on to the disciplinary
hearings and no more of this legislation that protects doctors
who treat unconventionally.  Also, I frequently get the denials
by insurance companies for services for my Lyme patients and
they cite the IDSA guidelines.

Q.  Are you saying the insurance companies are part of the
conspiracy as well?

A.  I don't think they are part -- they are part of reflecting
the IDSA position.  You characterize it as conspiracy.

Q.  Isn't that your claim that there is a conspiracy to violate
antitrust laws?

A.  Yes.

Q.  You did refer to that article entitled False and Misleading
Information about Lyme Disease, and I have it in front of me.
It is my only copy, actually.  I will show it to you in a
second.  My eyes aren't so good.  I really read this closely,
and I could not find anything in here that openly calls for the
prosecution of doctors not following IDSA guidelines.  If I

1   show this to you, can you point out to me where this calls for

2   the prosecution of doctors?

3          MR. HERSHLER:  May I approach?

4   A.  I started out the discussion by saying the two, the three

5   authors, Dr. Wormser, the third author, he is the first author

6   for the IDSA guidelines that were published in 2000.  He is the

7   first author for the 2006 IDSA guidelines; and so when

8   Dr. Wormser characterizes, and he is one of the authors, that

9   this is fake, this is all fake, and calls upon the legislative

10  bodies, the politicians to stop these measures, that may not be

11  a mentioned IDSA but, given he is the voice and the authorship

12  for IDSA, it is pretty clear to the reader what his position

13  is.

14  Q.  He closes this article saying, "The real shame in all of

15  this is that the time, attention, and resources that are being

16  misdirected could be better spent on research that is designed

17  to address, to understand, and to try to remedy the problems

18  that these patients have.  By so doing, we might begin to

19  improve the lives of those who are genuinely and indisputably

20  suffering, not just from Lyme disease."  Do you disagree with

21  that?

22  A.  Yeah, I think it is pretty clear that Dr. Wormser's

23  conclusion in the guidelines that chronic Lyme doesn't exist,

24  that it is nothing more than aches and pains of daily living,

25  is not supported by the literature.  The ILADS guidelines

H662camH                    Cameron - Cross

1    clearly lay out how severe the problems are, how people are

2    failing intravenous, they are failing oral therapy.  And so

3    when he is not reflecting here that there is extensive

4    research, there is NIH support for the complexities of Lyme.

5    And so when he says it is a real shame that there isn't

6    attention, time, or resources, there are a lot of resources and

7    time and attention that reflect the severity of Lyme.

8            THE COURT:  Doctor, the question before was, in your

9    complaint you say that this article "called on medical boards

10   to prosecute physicians, such as the plaintiff, who disagree

11   with the IDSA views and who provide competitive medical

12   services by standards other than those of the IDSA."  So the

13   question is, is there anything in the article which calls on

14   medical boards to prosecute physicians?

15           THE WITNESS:  Well, the sentence, "This makes it

16   difficult for the medical review boards to safeguard public

17   health by disciplining those who put patients at risk," and so

18   being in practice in New York for this many years and what I

19   have seen, what my colleagues have seen, they didn't put

20   exactly "those who follow ILADS standards," but that's the

21   appearance that I get from reading that sentence.

22           THE COURT:  Okay.  Thank you.

23   BY MR. HERSHLER:

24   Q.  Doctor, would you agree that if the net result of the

25   statute passed by New York in 2015 is to immunize doctors who

H662camH                          Cameron - Cross

1  follow the ILADS guidelines from being prosecuted for any

2  misconduct would be a bad result?

3  A.  Well, I think that it still -- there are safeguards in

4  there to treat unconventional for Lyme, but also to still have

5  the normal role of supervising doctors who treat in New York.

6  There are still safeguards there.

7  Q.  Such as maintaining the standard of care, correct?

8  A.  Well, the standard of care in this case, there is the IDSA

9  standard, but the unconventional approach in ILADS is some

10 people might characterize that as a standard also.

11 Q.  Are you saying that these guidelines are not guidelines but

12 instead they reflect standards of care?

13 A.  Well, they are guidelines, and I think Dr. Meyers earlier

14 said guidelines are guidelines, they help us in our practice of

15 medicine, and so that the standard of care is a different

16 definition, a broader definition.  They are both guidelines.

17 Q.  You have further claimed that members of the State Board

18 for Professional Medical Conduct are followers of the IDSA

19 group and are seeking to place ILADS physicians out of

20 business.  Do you know which members of the State Board you are

21 talking about?

22 A.  I find it is unclear who all the members are of the board

23 and who is picked by the state to represent them.  I know that

24 they didn't pick -- at least I don't see that they picked

25 somebody comfortable and experienced in ILADS guidelines on the

H662camH                        Cameron - Cross

1    committee that set the charges, and it doesn't appear as if the

2    doctor they have selected as expert witness for the upcoming

3    hearings is an ILADS physician, so it is not clear that they

4    even have somebody that is familiar and experienced with

5    unconventional approach to Lyme disease.

6    Q.  So are you saying only a doctor who is a follower of the

7    ILADS guidelines can properly sit on the committee that hears

8    your case?

9    A.  No.  I am reflecting that for me to practice unconventional

10   treatment of Lyme disease to be judged by the panel is –– seems

11   to interfere with due process, interferes with the intent of

12   the bill that was passed by the legislative body, and it

13   affects my ability to practice in New York.

14   Q.  Is it your position that all members of IDSA share this

15   desire to drive the ILADS physicians out of business?

16   A.  No.  I'm sure there is diversity in the IDSA organization,

17   as there is in all physicians.  It is just that in this

18   particular case, because New York has this process, this

19   statutory process of reviewing doctors, for some reason it

20   comes across as denying my ability to practice with

21   unconventional medicine which was the legislative attempt.  It

22   also seems to be interfering with my ability to offer a

23   different approach for Lyme patients who are sick.

24   Q.  Isn't your practice booming right now?

25   A.  Well, I think it is –– all practices are busy because of

H662camH                         Cameron - Cross

1  how many Lyme patients there are out there, and also that the

2  Affordable Healthcare Act, I would think most physicians would

3  say that having patients have access to care is booming for

4  many physicians.

5  Q.  You claim to have 20,000 Lyme disease patients.

6            MR. SIMON:  Objection.  That is not what he --

7            THE COURT:  Yes, sustained.

8            You said that you treated in the course of your

9  practice 20,000 Lyme disease patients.

10           THE WITNESS:  Yes.

11 BY MR. HERSHLER:

12 Q.  How many Lyme disease patients do you currently have?

13 A.  It's hard to tell, because most of them are better.  The

14 reason I can fit patients in my practice is that a lot of

15 people get better in a reasonable length of time, four weeks,

16 six weeks, eight weeks.  There is a lot of turnover, especially

17 if they realize they should get treated in a timely manner.  So

18 because I have been around for 30 years, I have so many

19 patients who get better in a short period of time frame, that I

20 seem to have time for complicated cases.

21 Q.  Can you give us an approximation of how many of your

22 patients are currently suffering from the disease?

23 A.  It's hard to tell, you know, because they can't -- can't be

24 sure.  I just know that I have enough time in my day to do

25 evaluations, treat them, follow them, doing my phone calls, and

1   have a family.

2   Q.  As a member of the IDSA organization, you would agree that

3   the mere fact that someone is a member of that organization

4   doesn't mean that they are trying to put the other modality out

5   of business.

6   A.  Well, I think there is diversity in the IDSA community, but

7   my concern is that, given the responsibility that the state has

8   to review licenses and review these practices, is that that

9   particular position by IDSA and their guidelines has been

10  interfering with my ability to practice, interfering with my

11  ability to take care of patients with unconventional

12  approaches.

13  Q.  Then why are you still a member of IDSA?

14  A.  Well, as I said earlier, you know, I still have a dream or

15  goal that, as we pour on the research, as we pour on the

16  understanding of Lyme, that there will be more and more doctors

17  who will take on the complexities of Lyme.  So rather than be

18  combative or at war or those things, I will try to be as

19  professional as I can.  It is just in this case I ran into

20  the -- how can I participate in the dialogue that we need if

21  the state restricts my practice?

22  Q.  Looking at the statement of charges in this case, I think

23  we have already been over this, so I don't believe I need to

24  show it to you, but it alleges basic acts of misconduct, such

25  as, failing to take and/or note an adequate history, failing to

1  perform and/or note an appropriate physical examination,

2  failing to appropriately construct differential diagnosis,

3  failing to timely follow up when a patient develops possible

4  adverse reactions to therapy, inappropriately prescribing

5  narcotics and other medications, and failing to maintain

6  accurate medical records.

7          Would you agree that a doctor that doesn't do these

8  things should be brought up on misconduct charges?

9  A.  Well, I think that whenever you micromanage a chart and

10  look back at a chart, I think that it is still important to ask

11  those kind of questions, but I think it is, when you drill

12  down, you are going to run into there is always something

13  somewhere on some chart that doctors can respectfully disagree

14  on.

15  Q.  So are you saying that these charges can never be proven in

16  any case?

17  A.  No, they are important in the practice of medicine.  We are

18  just running into a situation where it is the interpretation by

19  this particular process doesn't give me a fair representation

20  of this type of unconventional treatment, and it has taken us

21  down a different path.  Still those are all standards that I

22  maintain.

23  Q.  Is there anything to stop you at the upcoming disciplinary

24  hearing from demonstrating that you are adhering to all of

25  those standards?

H662camH                    Cameron - Cross

A.  Well, I think that my concern at the disciplinary hearing

is that it is a two-out-of-three vote based on a group of

doctors who are selected, but for some reason I am going to be

laying things out in due diligence but that I am not sure that

I have the ability to lay out if I am not -- if I don't get to

keep my license that I will be able to adequately reflect my

care, reflect my care and have the appeal afterwards.  The

details I am not completely sure of, other than it is a set-up

I can't really characterize very well.

Q.  It's not your position that the ILADS guidelines allow you

to do any of the things that are stated in the charges, such

as, not doing a history, or an appropriate physical, not

following up on adverse reactions, failing to keep medical

records.  The ILADS guidelines don't allow a doctor to do that,

do they?

A.  No.

Q.  Similarly, the IDSA guidelines don't allow that either, do

they?

A.  No.

Q.  So would you not agree that if these charges are true that

misconduct has occurred irrespective of whatever treatment

modality you used?

A.  My concern is that there seems to be an adherence to a

particular set of guidelines, the IDSA, and that the panel

reflects that the IDSA type approach, the consultant, Sanders,

H662camH                           Cameron – Cross

reflected that, and so therefore, with that reflection, my

history, my physical exam findings, my differential, my

following up with patients, following up will not -- I am not

comfortable that they will be adequately understood in that

context.  So therefore I don't feel that I will have adequate

representation of how I practice, and therefore I will end up

running the risk that the statutes won't be met, I won't be

able to practice in New York, my patients won't have access to

alternative strategies.

Q.  You don't know who is on the hearing panel, do you?

A.  No.  I know the consultant I think they picked to review

the case, which is I think Dr. Sanders, and I have seen his CV.

So, given that he is going to be presenting the state's side,

I'm not sure that's going to reflect my practice with

alternative approaches.

Q.  You will have -- your attorney will have the opportunity to

cross-examine Dr. Sanders, will he not?

A.  Yes.

Q.  And you will have the opportunity to present direct

testimony and to present whatever physical evidence or medical

records you feel supports your treatment.

A.  Yes.

Q.  And if, at the end of the day, there should be a hearing

determination against you, you will have the opportunity for

administrative review, correct?

H662camH                          Cameron - Cross

A.  Well, the administrative review process is pretty weak and
the options that I have -- so therefore, if the IDSA position
is the predominant position of the -- as I am being judged, and
I am being asked afterwards to -- if there is an adverse
determination it is that I don't see that I am going to be able
to have access to my rights as a doctor, access to my rights
with this legislation, or access to being able to practice in
the State of New York.

Q.  Are you saying that you think the administrative review
board would sustain a finding of misconduct even if it was in
violation of the state law?

A.  Say it again.

Q.  If there is a finding in your case that you violated --
that you committed misconduct strictly because you used a
different treatment modality or used one that isn't universally
accepted, are you saying that you think the administrative
review board will sustain that misconduct finding?

          MR. SIMON:  Objection.

          THE COURT:  Overruled.

A.  I think there is enough uncertainty in the process, there
is enough uncertainty in the players that are being asked to
judge this unconventional treatment that I am seeking today an
extra layer of protection that I don't feel I am going to have
as a doctor in New York.

Q.  Can you point to any decision by the administrative review

H662camH                         Cameron - Cross

1   board or by any hearing committee of the State Board for

2   Professional Medical Conduct which has upheld a misconduct

3   finding contrary to the state law?

4   A.  Well, I don't think necessarily that I have the experience

5   and knowledge to -- first of all, I don't have the information

6   or the experience to judge whether anything adverse took place

7   or any questions were raised, so I couldn't answer that.

8   Q.  Let's say the ARB, or the Administrative Review Board,

9   makes a mistake.  You can appeal, can you not?

10  A.  I'm not sure that the appeal process allows very many

11  rights.  I am not convinced I can practice comfortably because

12  I don't think the appeal would give me very many options.  It

13  certainly doesn't give me the option to -- that I feel I need,

14  as a doctor, to practice.

15  Q.  But you are not unfamiliar with article 78 proceedings.

16  Didn't you in fact bring one and, as a result, this case was

17  delayed by several years?

18            MR. SIMON:  Objection.

19            THE COURT:  Sustained.

20  Q.  Would you at least concede that there are -- there is the

21  option of going to state court to challenge the final

22  determination in your case?

23            MR. SIMON:  Objection.

24            THE COURT:  We know the answer to that question.  It

25  is yes.  It's a matter of law.  Move on.

1              MR. HERSHLER:  I have no further questions.  Thank

2    you, Doctor.

3              THE COURT:  All right.  Anything further?

4              MR. SIMON:  Redirect, Judge?

5              THE COURT:  Yes.  You have exhausted your time, but I

6    will allow you some questions.

7    REDIRECT EXAMINATION

8    BY MR. SIMON:

9    Q.  Really quick, Dr. Cameron, you have seen the statement of

10   charges, correct?

11   A.  Yes.

12   Q.  I am going to read this charge:  "Respondent treated the

13   patient inappropriately with an ongoing and escalating

14   antibiotic regimen without appropriate sequential physical

15   examinations and clinical reassessment for reconsideration of

16   any alternative diagnosis and/or treatment."  What does that

17   statement mean to you?  And this is regarding Patient D.

18   A.  I regularly do physical examinations.

19   Q.  What does the statement mean to you?

20   A.  Oh.  They are trying to, with that particular patient,

21   trying to take something from a patient and to see whether I

22   meet the statutes.

23   Q.  And what does the statement "respondent treated the patient

24   inappropriately with an ongoing escalating antibiotic regimen"

25   mean to you?

H662camH                        Cameron - Redirect

1    A.   That means there is some judgment on the unconventional

2    treatment of Lyme disease the way it is written, the way it is

3    paraphrased, is that it already puts me in a negative stance.

4    Q.   Does that invoke the IDSA, ILADS --

5    A.   It's clearly an IDSA type of assessment overtly in that

6    particular statement.

7    Q.   And when there is a charge that's resonating throughout all

8    patients, which reads, "The respondent ordered and/or

9    prescribed parenteral antibiotics without medical necessity."

10            Are you familiar with this charge?

11   A.   Yes.

12   Q.   And this resonates with respect to all patients, correct?

13   A.   Yes.

14   Q.   What does that mean to you?

15   A.   Well, that means that is being judged based on the IDSA

16   position that four weeks of antibiotics is a limit, no more

17   than four weeks of antibiotics, and that is the -- that is the

18   impression that is given when they make that judgment.

19   Q.   And what is an appropriate physical examination in the case

20   of a patient that has Lyme disease according to IDSA?

21   A.   Well, I don't think the IDSA explicitly says how much

22   should be in a physical, but what they are looking for is a

23   erythema migrans rash, a Bell's palsy, and a swollen knee,

24   which, here, what I do in a physical is, if those are positive,

25   those are noted.  Like in one of the patients, EK, they had

H662camH                    Cameron - Redirect

1    rashes, it is just that the rash was cellulitis.  The negative

2    physical exam findings, I do a physical, I just don't write the

3    negatives.

4    Q.  Where there is a charge saying, "Respondent repeatedly

5    failed to perform and/or note an appropriate physical

6    examination in the context of these patients," what does that

7    mean to you that you stand accused of?

8    A.  Well, I do the physical exam, but I only write down the

9    pertinent physical findings.  And the pertinent physical

10   findings would the erythema migrans rash, a Bell's palsy, or a

11   swollen knee.

12   Q.  So that means to you that that was not included in your --

13   A.  Well, no, the rest of the physical exam I complete on a

14   regular basis, I just don't write them down as often as I

15   should.

16   Q.  I have one more question.  You agree, do you not, that

17   there is no immunity that PHL 230(b-2) confers upon an ILADS

18   physician for the practice of medicine other than what's

19   nonconventional by ILADS guidelines?

20   A.  Yes.

21   Q.  In other words, for example, if there is a misdiagnosis or

22   if there is something other than the treatment of Lyme disease

23   by ILADS guidelines, there is no immunity for that, correct?

24   A.  No.  I am still responsible for my patient.

25   Q.  Is it your understanding that you are being prosecuted

H662camH

1    here -- from reading the statement of charges and Dr. Sanders

2    report, is it your understanding that you are prosecuted here

3    for anything other than the diagnosis and treatment of Lyme

4    disease by ILADS guidelines?

5    A.   I am being judged for my unconventional treatment of Lyme

6    disease.

7    Q.   I'm sorry?

8    A.   I'm being judged for my unconventional treatment of Lyme

9    disease.

10   Q.   You mean you are being prosecuted?

11   A.   Yeah, prosecuted.

12           MR. SIMON:  All right.  I have no further questions,

13   your Honor.

14           THE COURT:  All right.  Dr. Cameron, you are excused.

15   You may step down.

16           THE WITNESS:  Thank you.

17           (Witness excused)

18           THE COURT:  All right.  Anything further from either

19   side?

20           MR. SIMON:  Not by way of evidence.

21           MR. HERSHLER:  No, your Honor.

22           THE COURT:  No.  All right.  I am familiar with the

23   arguments.  I am familiar with the record.  If the parties want

24   to make any closing argument to me in favor or in opposition to

25   the preliminary injunction, they can.

H662camH

1          Mr. Simon.

2          MR. SIMON:  If I may briefly, your Honor, and I want

3     to refocus this whole thing.  It is really whether or not

4     Dr. Cameron is being prosecuted in derogation of PHL 230(b-2).

5     It is not how many physicians before him are prosecuted for

6     what he is doing.  It is not statistics of the OPMC.  It is

7     about him being prosecuted in derogation of 230(b-2), and I

8     respectfully submit that his affidavits, Dr. Sanders' reports

9     and the statement of charges, which is disguised other than

10    what it is that Dr. Sanders' report speaks about, clearly

11    demonstrate that Dr. Cameron here is being prosecuted in bad

12    faith, in derogation of 230(b-2), for practicing -- for

13    treating Patients A through G for Lyme disease under the ILADS

14    guidelines.

15          Now, if the OPMC wants to dress it up as anything else

16    and state in the charges whatever they want, that is fine,

17    which is what they did, but when it came to the meat of it and

18    they disclosed what this case was about by showing their hand

19    and showing what Dr. Sanders' opinions are about, it is quite

20    clear that this is a prosecution of IDSA -- what they consider

21    that it is conventional treatment by IDSA guidelines *vis-à-vis*

22    nonconventional treatment by ILADS guidelines.

23          Thank you.

24          THE COURT:  You are not relying on any of your

25    antitrust allegations for purposes of the preliminary

H662camH

1    injunction?

2              MR. SIMON:  Well, the antitrust allegation, I thought

3    that the reason for the preliminary injunction is we got to

4    get -- there are two preliminary injunction applications.  One

5    of them had to do with the antitrust.  One of them had to do

6    with bad faith.  If I don't get past bad faith, which is the

7    exception to the *Younger* abstention, I don't believe that you

8    can hear anything else.  There is a separate, there is a

9    separate allegation regarding antitrust, and I believe, from

10   what I -- from the law that I cited, that the facts, the

11   Supreme Court of the United States disfavors the dismissal of

12   antitrust lawsuits.  Why?  Because the facts of the actual

13   conspiracy is within the control of the defendants.

14             THE COURT:  Wait a moment.  Wait a moment.

15             In opposition to the motion for preliminary

16   injunction, the defendants argued, among other things, that

17   there are several reasons why the antitrust claims are unlikely

18   to have merit, including state actors, including *Noerr* v.

19   *Pennington*, all of which you didn't respond to at all.

20             MR. SIMON:  Actually, I put it in in my initial

21   memorandum, Judge.

22             THE COURT:  Yes, of course there is an initial memo,

23   there is an opposition, and then there is a reply.  In the

24   reply, you don't mention the antitrust laws at all.

25             MR. SIMON:  Correct, because I thought I covered it in

H662camH

1   the initial.  I didn't want to repeat myself, and I thought I

2   covered in the initial memorandum.

3          THE COURT:  No, actually you didn't, but over and

4   above that, what is the antitrust injury that occurs while the

5   hearing is going on?  Dr. Cameron continues to practice

6   medicine.  He is not restricted in any way.  Competition is not

7   affected.

8          MR. SIMON:  Right.

9          THE COURT:  There is no effect on competition.  What

10  is the irreparable injury from the alleged violation of the

11  antitrust laws while the hearing is going on?

12         MR. SIMON:  Correct.  I see it the way you do.

13         THE COURT:  What is it?

14         MR. SIMON:  The antitrust irreparable injury is if the

15  services get restricted, correct.

16         THE COURT:  Which doesn't occur until after the

17  hearing.

18         MR. SIMON:  Correct.

19         THE COURT:  So the antitrust laws are not and cannot

20  be a basis for a preliminary injunction.

21         MR. SIMON:  Right, correct.

22         THE COURT:  Okay.

23         My next question is, with respect to the argument that

24  it is necessary to have a preliminary injunction in order to

25  prevent the alleged bad faith conduct of the hearing, you argue

H662camH

1    that the bad faith conduct of the hearing is a violation of due

2    process, right?

3    A.  Yes.

4           THE COURT:  And is that procedural due process,

5    violation of liberty or property without due process.

6           MR. SIMON:  The case law -- I'm going to answer that.

7    The case law that I cited, which is *Shaw* and *Bishop*, mainly in

8    the Fifth Circuit, your Honor, because the Fifth Circuit dealt

9    with this particular issue while the Second Circuit has not yet

10   done that.

11          THE COURT:  Okay.

12          MR. SIMON:  It is, and then *Bishop* was specifically

13   within a disciplinary prosecutorial conduct is that one should

14   be free of bad-faith prosecution, period.  They don't really

15   specify procedural or substantive or what it is, and both *Shaw*

16   and *Bishop*, and I believe there was the other case that I cited

17   also out of the Fifth Circuit, say subjecting one to bad-faith

18   prosecution is a violation of due process.  They don't specify

19   exactly which one it is.

20          THE COURT:  Okay.  Thank you.

21          Defendant.

22          MR. HERSHLER:  Thank you, your Honor.

23          I'm not going to address the antitrust side of this

24   case.

25          In order to get past *Younger* abstention and even get

H662camH

1    to the merits plaintiff has to show bad faith, basically has to

2    show that there is no legitimate basis for the state

3    prosecution.  I submit he has failed to do that.

4         There clearly is a legitimate basis for the state's

5    charges.  Nothing in the charges mentions the type of modality

6    that he uses or suggests that they are singling Dr. Cameron out

7    for his preference, for a particular type of modality.  He is

8    accused of failing to meet the basic standards of medical

9    practice.  You can certainly argue that they are wrong, that it

10   it's not true, that what he did meet the standards.  That is

11   for the disciplinary hearing.  But there certainly is enough

12   evidence in this case, in this file, to show that this

13   prosecution has a basis.

14        I don't think anyone will dispute that there are

15   controversies involving how to treat Lyme disease.  It is a

16   hotbed of controversy.  But, nonetheless, the state has to be

17   able to regulate the practice of medicine, to protect the

18   patients from negligent doctors, and that's what they have --

19   that's what their investigative report, that's what the report

20   of the interview indicates, that he has not been doing the

21   basic things that need to be done to take care of virtually any

22   patient.  He has not been doing adequate physicals.  He has not

23   been taking histories.  He has not been following up.  Instead

24   it appears that he has been putting his patients on long-term

25   antibiotics and he has been injuring them, and they may well

H662camH

1    have been suffering from other diseases besides Lyme disease,

2    such as multiple sclerosis.

3            I am not a doctor.  I can't possibly decide who is

4    right in this case.  That's up to the State Board after a

5    full-fledged hearing with expert testimony, all of the medical

6    records examined.  There is nothing unusual about this case in

7    that respect.  It needs to go forward after all these years.

8    There are many patients at stake here.  If the doctor's

9    treatments are up to the standard of care, which is not ILADS

10   or IDSA, standard of care depends on each individual case,

11   based upon, as Mr. Nemerson said, a whole constellation of

12   evidence available in that case, if he meets the standard of

13   care, that's terrific.  That means his patients are being

14   treated well.  But if he is not, then the possible harm to his

15   patients, considering how many there are, although he doesn't

16   seem to know how many there are, is quite extreme, and I

17   believe that, if nothing else, the balance of equities in this

18   case falls heavily on the side of the state being able to

19   proceed with its case.  And if something goes terribly wrong,

20   the hearing committee messes up, then the Administrative Review

21   Board somehow upholds misconduct charges, even though there is

22   a blatant violation of law, because all they were trying to do

23   was penalize him for using a methodology that's not universally

24   recommended, he has still judicial redress in the Appellate

25   Division, and he can go there and get an immediate stay before

H662camH

1    his license is touched in any way.  And the Appellate Division

2    is not populated by doctors.  It is populated by judges who

3    have no competitive interest in this matter at all.

4            I think the real problem here is that if this kind of

5    case, if this kind of injunction is sustained, it will throw a

6    real chilling effect into the state's ability to bring cases

7    where there are actual controversies over the method of

8    treatment, and that would be terrible.  That would be contrary

9    to the interests of the public entirely.

10           There really isn't much else besides that.  He hasn't

11   raised a constitutional claim.  This circuit doesn't recognize

12   malicious prosecution in an administrative proceeding when

13   there has been no interference with a property right and there

14   hasn't been here.  There is a summary suspension procedure

15   available.  The commissioner did not invoke it.  He is able to

16   practice until his disciplinary hearing is decided.  There have

17   been other cases where the summary suspension procedure was

18   invoked and the courts have ruled on that.  If you look at the

19   *DeBlasio* case, you can see what's discussed there.  This is not

20   such a case.  The constitutional due process right is you get a

21   hearing with notice prior to a deprivation of a right.  That's

22   what he is getting.  He is getting a full hearing.  How can you

23   take what is actually the remedy for the requirement to give

24   due process and somehow distort that into a deprivation of due

25   process?  He hasn't stated a constitutional claim and bad

H662camH

1    faith.  I think that there is enough here, more than enough, to

2    show that the state is proceeding in good faith.  They are just

3    trying to do their job, and I think the time has come for them

4    to be able to do it.

5            Thank you, your Honor.

6            THE COURT:  Okay.  I will take the matter under

7    submission.  I appreciate that the hearing is scheduled for

8    Monday.  I will have decided the case before Monday.

9            Thank you all.

10                                   – – –

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25